**No. 25-50906**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

***DC TRANSCO, L.L.C.,***

***Plaintiff—Appellee/Cross-Appellant***
**v.**

***RAINBOW ENERGY MARKETING CORPORATION,***

***Defendant—Appellant/Cross-Appellee.***

**Appeal from the United States District Court for the**
**Western District of Texas**
**Case No. 1:24-cv-1260-RP**
**The Honorable Judge Robert Pitman Presiding**

# BRIEF OF APPELLANT

Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, NW
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Fax: (202) 315-3852
magid.chip@dorsey.com

*Attorneys for Appellant Rainbow Energy Marketing Corporation*

DATE: March 10, 2026

**No. 25-50906**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

***RAINBOW ENERGY MARKETING CORPORATION,***

Defendant/Counter-Plaintiff/Appellant

**v.**

***DC TRANSCO, LLC***

Plaintiff/Counter-Defendant/Appellee

## CERTIFICATE OF INTERESTED PERSONS REQUIRED BY 5TH CIR. R. 28.2.1

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## LIST OF PARTIES AND COUNSEL:

No publicly held company owns 10% or more of the stock of appellant Rainbow Energy Marketing Corporation. Rainbow Energy Marketing Corporation is represented in this appeal by:

Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, NW
Suite 900
Washington, D.C. 20005

Appellee DC Transco, LLC is represented in this appeal by:

James E. Zucker
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

Grant B. Martinez
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

Respectfully submitted,

/s/ Creighton R. Magid
Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, N.W.
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Fax: (202) 315-3852
magid.chip@dorsey.com

*Attorneys for Appellant Rainbow Energy Marketing Corporation*

DATED: March 10, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Rainbow Energy Marketing Corporation ("Rainbow") respectfully requests oral argument. The issues in the appeal involve the construction of a complex energy marketing contract, the nature of trading activity involving a "tie line" between energy markets, the business relationship between the parties, the parties' course of performance, and the interrelationship between physical and financial transactions during periods of price volatility. Oral argument will significantly aid the Court in understanding these matters and, consequently, in adjudicating this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS REQUIRED BY 5TH CIR. R. 28.2.1 ..... i

STATEMENT REGARDING ORAL ARGUMENT ..... iii

TABLE OF AUTHORITIES ..... vi

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 2

STATEMENT OF ISSUES ..... 3

STATEMENT OF THE CASE ..... 4

THE ENERGY MANAGEMENT AGREEMENT ..... 5

RAINBOW'S TRADING ON BEHALF OF DCT ..... 8

WINTER STORM URI ..... 10

PROCEEDINGS BELOW ..... 12

SUMMARY OF THE ARGUMENT ..... 17

ARGUMENT ..... 20

I. The Standard of Review ..... 23

II. The District Court's Grant of Summary Judgment Is Contrary to the Plain Language of the Contract. ..... 23

A. The District Court's Construction of Section 3.1(d) Is Contrary to the Plain Language of the Contract. ..... 24

1. Section 3.1(d) By Its Clear Terms Does Not Pertain to Third-Party Transactions ..... 25

2. Section 3.1(d) does not apply to "Back-to-Back Contracts." ..... 27

3. In any event, the transactions at issue are not "Back-to-Back Contracts." ....29

a. The "Back-to-Back Contract" Definition is a Vestige of a Former Contract And Has No Applicability Here ....29

b. Nothing in the EMA Says or Implies that Third-Party Contracts Are "Back-to-Back Contracts." ....30

B. The District Court Erred in Ignoring Clear Evidence that No Back-to-Back Transactions Occurred. ....32

C. The District Court Erred in Ignoring DCT's Obligations in 3.1(b). ....35

1. DCT Failed to Perform a Condition Precedent....37

2. The Duty DCT Seeks to Enforce is Not Sufficiently Particular. ....38

III. The District Court Erred in Ignoring the Parties' Course of Performance....40

A. The Record Establishes that DCT Approved Rainbow's Financial Trading. ....41

B. DCT's Actions Estop DCT From Asserting a Right to Exercise Prior Approval....42

C. Through Its Actions, DCT Waived Any Right to Prior Approval of Third-Party Trades. ....43

IV. The Court Awarded Damages Despite an Absence of Proof Under the Correct Measure. ....44

V. The District Court Erroneously Granted DCT Summary Judgment on Rainbow's Unjust Enrichment Counterclaim. ....47

CONCLUSION....49

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ....50

CERTIFICATE OF SERVICE....51

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aiello v. Burns Intl. Sec. Servs. Corp.*, 973 N.Y.S.2d 88 (N.Y. App. – 1st Dept. 2013) .......... 42, 44

*Aroneck v. Atkin*, 456 N.Y.S.2d 558 (N.Y. App. - 4th Dept. 1982) .......... 45

*Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210 (N.Y. 2007) .......... 35

*Blackman v. JPMorgan Chase, N.A.,* 2022 U.S. Dist. LEXIS 60243 (E.D.N.Y. Mar. 31, 2022) .......... 35

*Candid Prods. v. Int'l Skating Union*, 530 F. Supp. 1330 (S.D.N.Y. 1982) .......... 39

*Cedyco Corp. v. Petroquest Energy LLC*, 497 F.3d 485 (5th Cir. 2007) .......... 38

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190 (N.Y. 1987) .......... 48

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203 (N.Y. 1989) .......... 38

*Cramer v. Spada*, 610 N.Y.S.2d 662 (N.Y. App. – 3d Dept. 1994) .......... 44

*Crowe v. Miss. Div. of Medicaid*, 615 F. App'x 181 (5th Cir. 2015) .......... 21

*Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000 (N.Y. 2014) .......... 27

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 850 N.E.2d 653 (N.Y. 2006) .......... 43

*Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235 (5th Cir. 2011) .......... 23

*IIG Capital LLC v. Archipelago, L.L.C.*, 829 N.Y.S.2d 10 (N.Y. App. – 1st Dept. 2007) .......... 48

*Inmarsat Global Ltd. v. Speedcast Int'l Ltd.*, 76 F.4th 372 (5th Cir. 2023) .......... 23

*LNC Invs. v. First Fid. Bank, N.A.*, 173 F.3d 454 (2d Cir. 1999) .......... 44, 46

*Lucente v. IBM*, 310 F.3d 243 (2d Cir. 2002) .......... 45

*Luminant Energy Co. LLC v. PUC of Tex.*, 665 S.W.3d 166 (Tex. App. [3rd Dist. – Austin] 2023), *pet. granted.* ..........11

*Macklowe Inv. Props. LLC v. MIP 57th Dev. Acquisition LLC,* 243 N.Y.S.3d 43 (App. Div. 2025) ..........37

*Martin Delicatessen v. Schumacher*, 417 N.E.2d 541 (N.Y. 1981) ..........39

*Matter of Westmoreland Coal Co. v. Entech, Inc*., 794 N.E.2d 667 (N.Y. 2003) ..........35

*McGuire v. McGuire*, 153 N.Y.S.3d 280 (N.Y. App. – 4th Dept. 2021) ..........42

*Myers v. Gulf Oil Corp*., 731 F.2d 281 (5th Cir. 1984) ..........21

*Oppenheimer & Co. v. Oppenheim*, 660 N.E.2d 415 (N.Y. 1995) ..........37

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003) ..........45

*Proper v. State Farm Mut. Auto. Ins. Co*., 882 N.Y.S.2d 340 (App. Div. – 3rd Dept. 2009) ..........44

*Prospect Cap. Corp. v. Credito Real USA Fin., LLC*, 702 F. Supp. 3d 178 (S.D.N.Y. 2023) ..........42

*Reiss v Financial Performance Corp*., 764 N.E.2d 958 (N.Y. 2001) ..........25

*Rowe v. Great Atlantic & Pacific Tea Co*., 385 N.E.2d 566 (N.Y. 1978) ..........29

*Sarnelli v. Curzio*, 479 N.Y.S.2d 257 (N.Y. App. – 2d Dept. 1984) .......... 45, 46

*Schron v. Troutman Sanders LLP*, 986 N.E.2d 430 (N.Y. 2013) ..........34

*Segal v. Cooper*, 944 N.Y.S.2d 65 (N.Y. App. - 1st Dept. 2012) ..........48

*Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820 (2d Cir. 1990) .......... 45, 46

*Simon v. Electrospace Corp*., 269 N.E.2d 21 (N.Y. 1971) ..........45

*United States v. Slape*, 44 F.4th 356 (5th Cir. 2022) ..........21

*Vermont Teddy Bear Co. v. 538 Madison Realty Co*., 807 N.E.2d 876 (N.Y. 2004) ..........25

*W.W.W. Assoc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990) ............................ 25

*White v. Farrell*, 987 N.E.2d 244 (N.Y. 2013) .................................................. 45

**Statutes**

28 U.S.C. § 1291 .......................................................................................... 2

28 U.S.C. § 1332 .......................................................................................... 2

## INTRODUCTION

When the plain language of a contract and seven years of consistent practice are aligned, there should be little room for legal doubt. Yet DC Transco, LLC ("DCT") attempts to throw both to the wayside for its own financial gain. Over a period of seven years, Rainbow Energy Marketing Corporation ("Rainbow") made millions of dollars for its client, DCT, trading electric power and related financial products. Under the language of the contract, as well as the parties' longstanding practice, Rainbow was empowered to use its discretion in making trades. DCT repeatedly and enthusiastically endorsed Rainbow's trading strategy. Only when the dollars became especially large did DCT claim a new prerogative.

During a major winter storm in February 2021, prices spiked to unprecedented levels, causing both outsized trading gains and outsized trading losses. As a result, Rainbow earned a $16 million net profit for DCT in a single week. Not satisfied with this bounty, DCT turned seven years of history on its head with a sudden about-face, asserting that all trading losses were *Rainbow's* responsibility – but that DCT was entitled to keep all of the trading gains. To claim a contractual basis for its Monday morning quarterbacking, DCT had to invent the fiction that Rainbow's third-party trades were actually undocumented, "automatic" pass-through trades with DCT that required express approval – in

direct contradiction of the language of the contract and despite the fact that DCT's own executives acknowledged that no such pass-through trades existed.

The District Court rubberstamped this smoke-and-mirrors theory with only a cursory glance. It relied on old logic from a void opinion, failed to provide analysis of the actual briefs before the court and indeed, did not even address many of the arguments the briefs presented. This slapdash opinion – which grants DCT a $28 million windfall – flies in the face of both the contract and the facts. The decision below must be reversed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter is between citizens of different states (Rainbow is a North Dakota corporation with its principal place of business in Bismarck, North Dakota; DCT is a limited liability company whose members are not citizens of North Dakota and do not have partners or members who are citizens of North Dakota) and the amount in controversy exceeds $75,000. The District Court granted summary judgment in favor of DCT on September 29, 2025, and entered final judgment in favor of DCT on October 27, 2025. Rainbow timely filed a Notice of Appeal on October 29, 2025. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Did the District Court err as a matter of law by failing to address Rainbow's arguments on summary judgment, by failing to address undisputed facts presented on summary judgment contradicting its conclusions, and by relying entirely on prior orders that the District Court had previously declared void *ab initio*?

2. Did the District Court err as a matter of law in granting summary judgment in favor of DCT by construing a contractual provision applicable by its express terms only to transactions between Rainbow and DCT to apply to transactions between Rainbow and third parties and then failing to consider DCT's admissions that the assumptions underlying the District Court's construction of the contract were invalid?

3. Did the District Court err as a matter of law in granting summary judgment in favor of DCT where the contract granted Rainbow discretion to enter into physical and financial transactions with third parties on behalf of DCT; where DCT failed to limit Rainbow's discretion by establishing a Risk Management Strategy; and where Rainbow had no contractual duty to obtain DCT's prior approval for such transactions?

4. Did the District Court err as a matter of law by failing to consider the parties' course of performance, including DCT's repeated encouragement of and endorsement of Rainbow's combined physical-financial trading strategy?

5. Did the District Court err as a matter of law in granting summary judgment in favor of DCT despite DCT failing to present any evidence of damages under the correct legal measure?

6. Did the District Court err as a matter of law in concluding that Rainbow's unjust enrichment counterclaim was barred because the trades at issue were made pursuant to the contract, while granting summary judgment to DCT on its claim on the grounds that the trades at issue were *outside* the contract?

## STATEMENT OF THE CASE

As part of a larger transaction, LS Power Development, LLC ("LS Power") in 2014 acquired the rights to transmit 500 MW of electric power across a "tie line" connecting the electric grid operated by Southwest Power Pool, Inc. ("SPP") and the Texas energy grid operated by the Energy Reliability Council of Texas ("ERCOT").[1] (ROA1072 at 4-5, 21-24, 26-28) The value of the transmission rights lay in the ability to purchase energy in one market and to sell it for a higher price in the other market, profiting from the market price differential between SPP

---

1 DCT later relinquished its rights to all but 50 MWh of capacity on the tie line. (ROA)

and ERCOT. (ROA1073 at 2-3) Lacking both the expertise and the authority to engage in energy trading across the tie line itself, LS Power, through defendant DCT, a subsidiary created solely to own the transmission rights, engaged plaintiff Rainbow, an experienced power trader, to optimize the value of the transmission agreement. (*Id.*; ROA1072 at 7-9, 51) Rainbow was to use its experience and acumen in energy trading to capitalize on price differentials between the SPP and ERCOT markets, while using available financial instruments to mitigate risk. (ROA1073 at 3)

**The Energy Management Agreement**

Rather than drafting a new contract to memorialize the work that DCT engaged Rainbow to perform, LS Power insisted instead on marking up an existing, nearly 50 page (with exhibits and referenced documents that more than doubled its length) "energy management agreement" for the Columbia power generation facility owned by an affiliated LS Power entity to create the Energy Management Agreement ("EMA") at issue in this appeal. (ROA1072 at 33-39, 135-257) The superficial changes to the prior agreement – for example, changing the definition of the "Project" from "NatGen Southeast Power," the owner of the Columbia power plant, to "DC Transco, LLC" and changing the definition of "Facility" from "Columbia, the 606 nameplate MW natural gas fired and oil fired combined cycle plant including any additions thereto located in Gaston, South

Carolina" to "the Firm Point-to-Point Transmission Agreements entered into between the Project and the SPP" – resulted in an awkward and inapt document. (ROA1072 at 135-257)

The three artifacts of the marked-up power plant agreement most relevant to this appeal are the definitions of "Commodity Transactions," "Other Transaction," and "Back-to-Back Contract."

As in the Columbia power plant agreement, the EMA defines "Commodity Transactions" and "Other Transactions" as transactions "between Energy Manager [Rainbow] and Project [DCT]." (ROA1072 at 143-150; ROA179-186)

Also copied verbatim from the Columbia power plant agreement is the EMA's definition of "Back-to-Back Contract:" "a transaction or series of transactions between Energy Manager [Rainbow] and a Third Party that correspond(s) to, and mirrors the economic terms of, a Commodity Transaction or Other Transaction between Energy Manager and Project pursuant to the terms of [the EMA]." (ROA1072 at 142; ROA178)

All three defined terms make sense with respect to power generation facilities: the energy manager buys fuel on the market on behalf of the power plant, then sells that fuel to the power plant; similarly, the energy manager buys electric power produced by the power plant so that it has the necessary title to sell that output on the market on the plant's behalf. (ROA1075 at 1-3) Such terms

have no applicability to the management of a transmission agreement over a tie line, however, because the holder of the transmission agreement has nothing to sell to the energy manager and nothing to buy from the energy manager; all transactions are between the energy manager and third parties. (ROA1075 at 4)[2]

The EMA directed Rainbow to provide "Risk Management Services," which the EMA defined as meaning to "arrange for, administer and propose the entry into physical, financial and derivative product purchases and sales either in bilateral, over-the-counter or exchange-traded markets for the purpose of hedging or mitigating price or delivery risks associated with Power. . .." (ROA193; ROA237)

The EMA required DCT to establish a "Risk Management Strategy" setting forth "risk management strategies" and "set[ting] forth the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds specified thresholds." (ROA188) DCT never established any "Risk Management Strategy." (ROA1073 at 6; ROA1079 at 4)

The EMA provided that it would be governed by and interpreted in accordance with New York law. (ROA219)

---

[2] In the case of a physical sale, the identity of the third-party counterparty is known. In the case of a financial transaction, the identity of the third-party counterparty is unknown, because all settlements are made through a clearinghouse.

**Rainbow's Trading on Behalf of DCT**

Rainbow's trading activity on behalf of DCT involved coordinated purchases and sales of physical power and futures contracts to generate profits while mitigating price risk, utilizing DCT's rights to transport 50 megawatts of power per hour ("MWh") over the tie line. (ROA1073 at 1-4) Rainbow used that 50 MWh capacity for "physical trades" – contracting to deliver power across the tie line that same day or on the following day.[3] (*Id*. at 4, 6; ROA1074 at 8-53) To hedge against price risk, Rainbow also entered into "financial trades" – derivative contracts tied to the price of power at a future date.[4] (ROA1073 at 4, 6, 9-11; ROA1074 at 8-53) On the specified future date, if the market price of power was less than the contract price, Rainbow would profit from the difference between the prices; if the market price was higher than the contract price, Rainbow would owe the difference. (ROA1073 at 8) In periods of high price volatility, such as February 2021, prices can quickly fall. (ROA1073 at 4, 9) When prices in

---

[3] Physical power can only be sold on a "same day" or "day ahead" basis. (ROA1073 at 3-4)

[4] Financial trades, sometimes referred to as "futures contracts" or "hedge transactions," are contracts, entered into on an exchange, that are tied to the price of electricity at a particular location on a future date. (ROA1073 at 3) If the actual market price of power on the specified date is less than the contract price, the seller of the futures contract collects the difference between the contract price and the market price, multiplied by the volume of power subject to the contract. If the actual price of power on the specified date is higher than the contract price, the seller of the contract owes the difference between the contract price and the market price. (The reverse is true of the contract buyer.)

ERCOT fall below prices in SPP, physical trades lose money, since the cost of supply exceeds the sale price. (ROA1073 at 3-4) A financial trade (also known as a "futures contract") locks in a high sales price and protects against losses from price declines. (ROA1073 at 4; ROA1079 at 3)

By balancing physical trading and financial trading – the same strategy Rainbow employs in trading on its own account – Rainbow was able to generate profits while avoiding outsized risk. (ROA1073 at 4, 11; ROA1079 at 1-2) If prices fell, physical trades would lose money – the sale price would be less than what Rainbow paid to purchase the energy – but the financial trades would be profitable. (ROA1073 at 4) If prices rose above historical highs, the financial trades would lose money, but the physical trades would become profitable. (ROA1073 at 4, 10-11) The physical trades and the financial trades are therefore inseparable components of a single strategy. (ROA1073 at 4; ROA1079 at 1-2) This balanced strategy has proven highly profitable. (*Id.*)

DCT knew about, endorsed, and expressly encouraged this strategy, which Rainbow followed for the seven years the EMA was in effect.[5] (ROA1073 at 4-7;

[5] As an example, in a 2019 email exchange with Rainbow trader Mark Mortensen in which Mortensen explained that he had entered into futures contracts for the week ahead in increments of 5MWh – a strategy known as "layering" – DCT executive Marc Kline responded, "That's great, am a fan of layering especially as the weeklies [week-ahead prices] continue to rise." (ROA1079 at 2-3; ROA1080 at 2)

ROA1074 at 6-146; ROA1079 at 2-4) Each month for seven years, Rainbow provided an accounting to DCT showing the daily profits and losses from both physical and financial trades. (ROA1073 at 6-7; ROA1074 at 8-146) Not once prior to February 2021 did DCT take issue with Rainbow's balanced strategy or with any financial transactions entered into by Rainbow on its behalf. (ROA1073 at 4-7; ROA1079 at 2-4) Nor did DCT ever express any need or desire to approve such transactions in advance. *Id*. Throughout the seven years the EMA was in effect, DCT accepted the profits from this balanced strategy. (ROA1079 at 3)

**Winter Storm Uri**

In February 2021, Rainbow's Mark Mortensen, on behalf of DCT, began entering into futures contracts for a portion of the 50 MWh of capacity on the tie line to which DCT had transmission rights. (ROA1073 at 9-11) Following the balanced portfolio strategy approved by DCT, as well as the "layering" strategy approved by DCT, Mortensen entered into futures contracts for delivery of power in "blocks" at prices ranging from $300/MWh to $700/MWh, while reserving 25MW of peak period power and 50 MW of off-peak power to trade in the physical market. (*Id*.) Because the highest Day Ahead price *ever* for power in ERCOT in February was $300/MWh, locking in those prices was a prudent way to lock in expected profits and to protect against a price drop in ERCOT. (ROA1073 at 10-11) If prices dropped, physical sales would either have minimal returns or

would lose money, depending upon the prices for purchasing power in SPP, while the futures contracts would be highly profitable. (ROA1073 at 9-11) Conversely, if prices continued to rise, sales of physical power would be highly profitable and would greatly offset losses on the futures contracts. *Id*.

DCT had access to detailed information regarding the futures transactions through Rainbow's Integrated Asset Management platform beginning the morning of February 11, 2021. (ROA1079 at 5) Rainbow further informed DCT of the futures contracts by email the morning of February 12, 2021, and followed up early that afternoon with a spreadsheet containing detailed information on the futures contracts. (ROA258-59)

On February 15, 2021, ERCOT, responding to a directive of the Texas Utility Commission, adjusted its price algorithm to force the price of electricity in ERCOT to $9,000/MWh. (ROA1073 at 11)[6] This action resulted in large losses for the futures contracts, but even larger gains for the physical power transactions. (*Id*.) Ultimately, the physical power transactions that Rainbow entered into on behalf of DCT for the period February 13 through February 19, 2021, earned $37 million. (*Id*.) The futures contracts that Rainbow entered into on behalf of DCT for the same period lost $20.6 million due to ERCOT's artificial inflation of prices.

[6] The timing and mechanics of ERCOT's artificial inflation of prices are explained in *Luminant Energy Co. LLC v. PUC of Tex*., 665 S.W.3d 166, 176 (Tex. App. [3rd Dist. – Austin] 2023), *pet. granted*. The artificial $9,000/MWh price remained in effect until February 19, 2021. (ROA1073 at 11)

(*Id.*) The $37 million in profits Rainbow earned on behalf of DCT during the period on physical trades and the $20.8 million in losses from the futures contracts Rainbow entered into on behalf of DCT resulted in net profit of approximately $16 million for DCT. (*Id.*)

**Proceedings Below**

Following failed negotiations aimed at resolving DCT's claim that it was not responsible for losses arising from the futures contracts, Rainbow filed suit in the U.S. District Court for the Western District of Texas seeking a judicial declaration that Rainbow was not in breach of the EMA and that it owed DCT nothing beyond the net profit earned in February 2021, less Rainbow's fee. (ROA932) DCT counterclaimed for breach of contract. (*Id.*)

Both parties moved for summary judgment. The District Court denied Rainbow's motion for partial summary judgment and granted DCT's motion, in part. (ROA930-39) The court held that EMA Section 3.1(d) required Rainbow to obtain DCT's prior approval before entering into financial contracts with third parties, even though, by the express terms of the EMA, Section 3.1(d) applies only to "Commodity Transactions" or "Other Transactions," both of which the EMA defines as transactions exclusively *between DCT and Rainbow*. (ROA934-37; ROA179-85) To reach that conclusion, the District Court first held that futures contracts were "Other Transactions." (ROA936)

Then, the District Court contrived a mechanism to make Section 3.1(d) – a provision addressing transactions between DCT and Ranbow – applicable to transactions between Rainbow and third parties. The District Court held that "transactions between Rainbow and a third party made in pursuance of the EMA must translate into either a 'Commodity Transaction' or 'Other Transaction' via a 'Back-to-Back Contract,'"[7] (ROA936-37), notwithstanding the unrebutted evidence that Rainbow and DCT had never entered into "Back-to-Back Contracts." (ROA1073 at 7-9; ROA1075 at 2-4, 6-11) The District Court then proceeded to find that Rainbow had breached Section 3.1(d) because "it did not seek prior approval for the disputed transactions," (ROA937), ignoring the evidence that DCT had provided *advance approval* for Rainbow's hedging strategy, obviating any need for approval of *individual* transactions. (ROA1073 at 4-7; ROA1079 at 2-4) The court did hold, however, that DCT had a duty to mitigate its damages, and therefore denied summary judgment "on the extent of [Rainbow's] liability." (ROA938)

At trial, DCT's Ayan Nandi and Marc Klein, senior executives at DCT's parent, LS Power, acknowledged that Rainbow assumed the credit risk on financial hedge transactions under the EMA and that DCT avoided assuming such credit risk

---

[7] In other words, the District Court posited that all of Rainbow's third-party trades were actually pass-through transactions from third-party through Rainbow to DCT.

by specifically *avoiding* Back-to-Back Contracts. (ROA1072 at 265-67, 279-80, 282-83) Indeed, Klein told Nandi in a Slack message[8] that DCT was not exposed to credit risk from Rainbow's futures contracts with third parties because "we don't back-to-back the posting to them." (ROA1072 at 262, 272-75) Klein further testified that DCT studiously avoided having transactions between Rainbow and third parties on DCT's balance sheet by not recording trades or signing trade confirmations – further proof that there never were any Back-to-Back Contracts between Rainbow and DCT. (ROA1072 at 266, 282-83) Because the undisputed trial testimony validated Rainbow's summary judgment argument that no "Back-to-Back Contracts" existed and therefore undermined the District Court's rationale for finding Section 3.1(d) applicable, Rainbow renewed its motion for reconsideration of the summary judgment ruling. The District Court summarily denied the motion on June 26, 2023.

On September 27, 2023, the District Court issued Findings of Fact and Conclusions of Law. The court concluded that DCT did not breach its duty to mitigate and awarded DCT $20,773,930 in damages, which it calculated as of the dates when the various transactions settled, not on the dates when the alleged breaches occurred. (ROA940-52)

---

[8] Slack is a direct messaging application.

Rainbow timely appealed to this Court. Concluding that the record contained insufficient facts to determine the citizenship of DCT, the Court ordered a limited remand to the District Court to determine whether diversity jurisdiction existed. (Case 23-50720, Dkt. 75-1).

On remand, the parties were unable to establish DCT's citizenship, owing to DCT's ownership by multiple layers of limited liability companies and partnerships. (ADD001[9]) Accordingly, the District Court issued an order on November 26, 2024, dismissed the action in its entirety without prejudice, vacated all orders and judgments in the action, and declared all orders and judgments in the action null and void *ab initio*. (*Id.*)

Anticipating this result, DCT, having simplified its ownership structure, filed suit in the Western District of Texas on October 18, 2024, asserting what had been its counterclaim in the earlier action as an affirmative breach of contract claim. (ROA8-52) Rainbow answered and counterclaimed on January 3, 2025. (ROA83-102) On that same date, Rainbow brought a motion to dismiss DCT's claim for attorneys' fees on the grounds that neither the EMA nor New York law provided a basis for seeking attorneys' fees.[10] (ROA75-82)

---

[9] A copy of the November 26, 2024, order is attached as an Addendum.

[10] Due to the District Court's compressed schedule for answering the complaint and filing dispositive motions, Rainbow filed the motion to dismiss the

The parties, which had agreed that evidence from the first action could be used in lieu of conducting discovery in the second action, filed cross-motions for summary judgment on February 14, 2025. DCT repeated its argument that Rainbow had breached the EMA by netting the $20.6 million in trading losses during Winter Storm Uri against the $37 million in trading profits. (ROA146-69) Rainbow raised the following arguments:

- The EMA authorized Rainbow to use its own discretion to enter into physical and financial transactions with third parties on DCT's behalf.
- Rainbow did not breach any duty in EMA Section 3.1.
- DCT's "Back-to-Back" construct for tying Section 3.1 to third party transactions is inconsistent with the EMA.
- DCT's "Back-to-Back" construct for tying Section 3.1 to third party transactions is inconsistent with the facts and with DCT's admissions (which were not part of the record at the time of the summary judgment briefing in the first action).
- DCT failed to prove damages under the correct measure.
- If the EMA required prior approval for third-party trades, Rainbow is entitled to retain the $37 million in profits in addition to absorbing the $20.6 million in losses.

(ROA1070)

On September 15, 2025, the District Court granted Rainbow's motion to dismiss DCT's attorneys' fees claim. (ROA916-22) Two weeks later, the District Court issued an order granting DCT's motion for summary judgment and denying

---

attorneys' fees claim and its answer as to the remainder of the Complaint simultaneously.

Rainbow's motion for summary judgment. (ROA923-29) The order did not address any of Rainbow's arguments, but instead merely referred to its orders in the earlier case, despite having declared those orders void *ab initio*:

> Over the course of two years and more than 250 docket entries in *Rainbow I*, the Court addressed the breach of contract claim and the arguments made on both sides when it issued its order on the cross-motions for summary judgment filed in that case, and the findings of fact and conclusions of law issued after the Court held a three-day bench trial. Rather than repeating the same analysis on the same facts, the Court incorporates its two *Rainbow I* orders, which are appended to this order, and for those same reasons, finds that DC Transco is entitled to summary judgment on its breach of contract claim in this case.

(ROA927 (internal record citations omitted))

The District Court entered judgment in favor of DCT on October 27, 2025, awarding DCT $19,735,233.50 in compensatory damages, $8,170,383.38 in pre-judgment interest, and post-judgment interest at the rate of 3.65 percent, compounded annually. (ROA988-89) Rainbow timely filed a Notice of Appeal on October 29, 2025. (ROA990-91)

## **SUMMARY OF THE ARGUMENT**

The District Court erred by granting summary judgment in favor of DCT on both DCT's breach of contract claim and Rainbow's unjust enrichment counterclaim. The District Court did not address the arguments and facts Rainbow presented on summary judgment. Instead, the District Court merely referenced its orders in *Rainbow I*, even though the District Court had previously declared those

orders void *ab initio* and even though Rainbow's briefing in this matter included arguments not raised and facts not present in *Rainbow I*. The District Court adopted its *Rainbow I* conclusion that Rainbow had breached Section 3.1(d) of the EMA by failing to obtain DCT's prior approval before entering into financial hedging transactions during Winter Storm Uri, awarding DCT more than $27.9 million on top of the $16 million in net profits it had previously received from Rainbow's third-party trading. The District Court erred as matter of law in granting summary judgment in favor of DCT, for several reasons.

First, the District Court erroneously held that Rainbow breached Section 3.1(d) of the EMA by entering into financial transactions with third parties without DCT's prior approval even though the unequivocal language of Section 3.1(d) makes it plain that the section applies only to transactions *between* Rainbow and DCT and not to third-party transactions. The District Court improperly read the limitations of Section 3.1(d) out of the EMA by assuming that all third-party transactions are "Back-to-Back Contracts" that somehow require transactions between Rainbow and DCT. The EMA is explicit, however, that third-party transactions do *not* have to be Back-to-Back Contracts. There is no evidence in the record of any transactions between Rainbow and DCT. There is, by contrast, extensive evidence in the record refuting the existence of any Back-to-Back Contracts, including the absence of documentation and DCT's refusal to accept

transfers of risk. DCT even *admitted*, under oath and in internal documents, that it did not engage in any Back-to-Back Contracts with Rainbow.

Second, the District Court failed to address DCT's failure to establish the Risk Management Strategy as required by Section 3.1(b) – a failure that renders Section 3.1(d) inapplicable. In the absence of such a Risk Management Strategy, the EMA gave Rainbow discretion to enter into physical and financial trades with third parties with no obligation to seek DCT's prior approval. Without the condition precedent of a Risk Management Strategy, the EMA lacks any requirement that Rainbow seek prior trading approval and is not sufficiently definite to impose such a duty on Rainbow.

Third, the District Court ignored the unrebutted evidence that DCT consistently endorsed and approved of Rainbow's physical-financial trading strategy, including explicit approval of Rainbow's strategy of "layering" financial hedge transactions. The evidence establishes that, even if the EMA could be read to require DCT's advance approval, DCT provided such approval in spades. That it did not approve the specific, individual trades at issue is irrelevant.

Fourth, the District Court erred as a matter of law in granting DCT summary judgment on its breach of contract claim when DCT failed to present any evidence that it suffered any damages as of the dates of the trades at issue, which is the proper standard under New York law. Because there is no evidence in the record

of any damages under the proper standard, DCT failed to establish a necessary element of its claim.

Finally, the District Court erred as a matter of law in granting summary judgment in favor of DCT on Rainbow's counterclaim. Rainbow argued that if, as the District Court held, its third-party trading during Winter Storm Uri was not authorized by the EMA and therefore undertaken solely on Rainbow's own account, then DCT would have no responsibility for the $20.8 million in losses—but also would have no entitlement to the $37 million in profits. The District Court erred in holding that Rainbow's unjust enrichment claim was barred because the trades at issue were made pursuant to the EMA, while at the same time granting summary judgment to DCT on its claim by holding that the same trades were made *outside* the EMA.

## **ARGUMENT**

The District Court's opinion must be reversed as a matter of law. Despite being presented with two sets of fully briefed motions for summary judgment that included several arguments not included in the summary judgment briefing in *Rainbow I*, the District Court did not address – and apparently did not even consider – the briefing in this matter. Instead, the court declared, erroneously, that "the arguments raised in the cross-motions for summary judgment are the same as those in *Rainbow I*" and simply stated that "[r]ather than repeating the same

analysis on the same facts, the Court incorporates its two *Rainbow I* orders, which are appended to this order, and for those same reasons, finds that DCT is entitled to summary judgment on its breach of contract claim in this case." (ROA927) The court separately analyzed Rainbow's cross-claim for unjust enrichment, but otherwise provided no further analysis.

By declining to engage with the actual summary judgment briefing before it, the District Court failed to address the arguments presented by Rainbow, many of which were not discussed in *Rainbow I*. That failure was improper, as this Court has made clear that a district court must explain its reasons for granting or denying a summary judgment motion. *See Myers v. Gulf Oil Corp*., 731 F.2d 281, 284 (5th Cir. 1984); *Crowe v. Miss. Div. of Medicaid*, 615 F. App'x 181, 182 (5th Cir. 2015) (vacating denial of summary judgment where court failed to explain its decision).

Further, the District Court had previously declared the two *Rainbow I* orders void *ab initio*, meaning that they are to be treated as "null from the beginning, and therefore without legal effect." *United States v. Slape*, 44 F.4th 356, 361 (5th Cir. 2022) (internal citations and quotations omitted). Despite having declared its orders in *Rainbow I* void and without legal effect, the District Court declined to address the summary judgment briefing in *this* matter and simply referenced its prior orders as though they were binding.

The District Court's refusal to revisit the demonstrably erroneous logic behind its *Rainbow I* summary judgment order and its failure even to address the issues raised in *this* matter that were not before the court in *Rainbow I* underscore the necessity of reversing the District Court judgment.

Rainbow first addresses the District Court's assumption that Rainbow and DCT entered into "Back-to-Back Contracts" – which DCT's own witnesses acknowledge were never employed during the seven year term of the DCT – as a *deus ex machina* for transforming EMA Section 3.1(d) from a provision having nothing to do with third-party trading to a provision requiring approval of third-party trading. Rainbow then turns to why Section 3.1(d) is a red herring in any event: the EMA, in Section 3.1(b), makes clear that it was *DCT's obligation* to set forth any requirements that Rainbow obtain pre-trade approvals in a "Risk Management Strategy." DCT failed to fulfill that obligation. In the absence of such a "Risk Management Strategy," the EMA did not require Rainbow to obtain DCT's approval prior to entering into trades with third parties. This is borne out by the seven-year term of the EMA, during which DCT never required prior approval of Rainbow's third-party trading and, in fact, affirmatively endorsed Rainbow's combined financial-physical trading strategy.

## I. The Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 238 (5th Cir. 2011). This Court also reviews a district court's legal conclusions and interpretations of a contract de novo. *See, e.g., Inmarsat Global Ltd. v. Speedcast Int'l Ltd.*, 76 F.4th 372, 376 (5th Cir. 2023).

## II. The District Court's Grant of Summary Judgment Is Contrary to the Plain Language of the Contract.

The District Court's grant of summary judgment is contrary to the plain terms of the EMA. The District Court based its summary judgment grant on EMA Section 3.1(d), which by its express terms applies only to contracts *between* Rainbow and DCT and *not* to contracts, such as those at issue, between Rainbow and third parties. To transmute Section 3.1(d) into a provision applicable to Rainbow's third-party trading, the District Court *assumed* – without evidence – that all third-party trades were "back-to-backed" to contracts between Rainbow and DCT. The District Court engaged in this alchemy despite the *clear evidence that Rainbow and DCT never back-to-backed third-party transactions* and despite

*DCT's admissions under oath that it studiously avoided back-to-backing Rainbow's third-party contracts* so that it did not have to assume any credit risk.[11]

Moreover, the District Court ignored the plain language of EMA Section 3.1(b), which required DCT to set forth in a "Risk Management Strategy" any required prior approvals – an obligation that DCT failed to perform. Without any direction from DCT as to what approvals were required and under what circumstances, Rainbow cannot, as a matter of law, have breached a duty to obtain such approvals.

### A. The District Court's Construction of Section 3.1(d) Is Contrary to the Plain Language of the Contract.

The District Court adopted its *Rainbow I* summary judgment order, in which the District Court concluded that EMA Section 3.1(d) required Rainbow to obtain DCT's approval prior to entering into any third-party transaction, even though, by its express terms, Section 3.1(d) does not apply to transactions with third parties. [Order at 8] This ruling was in error, as it ignores the plain language of the EMA.

New York law is clear that a written agreement "should as a rule be enforced according to its terms." *W.W.W. Assoc. v. Giancontieri*, 566 N.E.2d 639, 642

---

[11] Had Rainbow's contracts with third-parties been "back-to-backed," making Rainbow merely a pass-through entity, DCT would have assumed all credit risk arising from the transactions. (ROA1072 at 279-80; ROA1073 at 8) DCT, however, emphatically refused to accept *any* credit risk from Rainbow's trading. (ROA1073 at 8, ROA1074 at 148-49; ROA1072 at 262, 266, 272-76, 282-3)

(N.Y. 1990). Accordingly, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear Co. v. 538 Madison Realty Co*., 807 N.E.2d 876, 879 (N.Y. 2004) (quoting *Reiss v Financial Performance Corp*., 764 N.E.2d 958, 961 (N.Y. 2001)). Yet the District Court did exactly that, construing a provision that explicitly pertains only to transactions between the parties as applying to transactions between Rainbow and third parties. The District Court's holding is manifestly erroneous as a matter of law.

Further, the District Court erred as a matter of law by disregarding the factual record, which made it clear both (a) that the assumption underlying the District Court's rationale for expanding Section 3.1(d) apply to third party transactions is unsupported and unwarranted, and (b) that even if Section 3.1(d) were applicable, DCT approved Rainbow's financial and physical trading strategy in advance, making the absence of prior approval for the *specific* trades at issue irrelevant. The refusal to consider the relevant facts is a further error of law.

#### *1. Section 3.1(d) By Its Clear Terms Does Not Pertain to Third-Party Transactions*

EMA Section 3.1(d) says nothing at all about third-party transactions. Rather, Section 3.1(d) by its express terms applies *only* to transactions between DCT and Rainbow. Section 3.1(d) provides:

> 3.1 Project Rights and Responsibilities. Project shall have the sole right and responsibility to:
>
> * * *
>
> (d) approve all Commodity Transactions and Other Transactions with respect to the Facility prior to such transactions being entered into, except to the extent that authority to enter into a Short-Term Commodity Transaction or Day-Ahead or Intraday Commodity Transaction has been delegated to Energy Manager under Section 7.8;
>
> (ROA188)

The EMA defines a "Commodity Transaction" as a "transaction between Energy Manager [Rainbow] and Project [DCT] under the Implementation Agreement for the purchase or sale of Power." (ROA179) The EMA similarly defines an "Other Transaction" as a "transaction or arrangement between Energy Manager [Rainbow] and Project [DCT] executed pursuant to this Agreement, other than a Commodity Transaction, which may include agreements and transactions related to Risk Management Services and emissions credits."[12] (ROA183) Thus, as clearly defined in the EMA, "Commodity Transactions" and "Other Transactions" do not involve third parties; they are two types of transactions *between Rainbow and DCT*. Accordingly, since Section 3.1(d) only pertains to "Commodity Transactions" and "Other Transactions," the scope of the provision

---

[12] The reference to "emissions credits" is another artifact from the power plant management agreement that DCT marked up to create the EMA. It has no relevance to the relationship between DCT and Rainbow.

extends only to transactions *between Rainbow and DCT*. Section 3.1(d) says nothing about, and does not apply to, the types of transactions at issue here, all of which were between Rainbow and third parties.

#### *2. Section 3.1(d) does not apply to "Back-to-Back Contracts."*

The clear language of Section 3.1(d) should have been the end of the analysis, since the provision, by its terms, does not address third-party transactions. *See, e.g., Ellington v. EMI Music, Inc*., 21 N.E.3d 1000, 1003 (N.Y. 2014) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). The District Court, however, overlooked the plain language of Section 3.1(d) and accepted DCT's contention that transactions between Rainbow and third parties were "Back-to-Back Contracts" that "mirror[ed] the economic terms of" Commodity Transactions and Other Transaction – thus bringing third-party transactions within the ambit of Section 3.1(d). (ROA936-37) This logic is flawed.

To start, the District Court's conclusion that the transactions being "Back-to-Back" contracts would bring them within the ambit of Section 3.1(d) is untethered from the text of the contract. The District Court recognized that the EMA defines "Back-to-Back Contracts" as "transaction[s] or series of transactions between [Rainbow] and a Third Party that correspond(s) to, and mirrors the economic terms of, a Commodity Transaction or Other Transaction between [Rainbow] and [DCT]

pursuant to the terms of this Agreement." (ROA936) But just because a transaction *mirrors* the economic terms of a Commodity Transaction or Other Transaction does not mean that it is therefore itself a Commodity Transaction or Other Transaction. As explained above, those definitions are expressly limited to transactions between the parties, not third-party transactions. And a "Back-to-Back Contract" is by definition a contract between Rainbow and a third-party. At the end of the day, Section 3.1(d) applies only to "Commodity Transactions" and "Other Transactions" and a "Back-to-Back Contract" falls expressly outside of either type of transaction.

The District Court ignored these clear definitions and made up its own instead. Eschewing the text, the court determined that "'Other Transactions' encompasses 'any' transaction 'other than a Commodity Transaction,'" and therefore concluded that "the disputed transactions must be "Other Transactions." (ROA937) But that is not what the EMA says. Rather, it defines "Other Transactions" as "any transaction or arrangement ***between Energy Manager and Project*** executed pursuant to this Agreement, other than a Commodity Transaction." (ROA183) The transactions at issue plainly do not meet that definition. The District Court's decision to conjure up a totally different definition for "Other Transactions," despite it being contractually defined, is a clear error. *See, e.g., Rowe v. Great Atlantic & Pacific Tea Co.*, 385 N.E.2d 566, 572 (N.Y.

1978) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.").

### *3. In any event, the transactions at issue are not "Back-to-Back Contracts."*

Even if one were to accept the District Court's muddled premise that Section 3.1(d) covers "Back-to-Back Contracts," the District Court's conclusion is still flawed, because the transactions at issue were not "Back-to-Back Contracts." Neither the language of the EMA nor the facts support the District Court's rationale.

#### a. The "Back-to-Back Contract" Definition is a Vestige of a Former Contract And Has No Applicability Here

As an initial matter, the "Back-to-Back Contract" is a red herring that has no bearing on the actual transactions engaged in by the parties. The EMA defines a "Back-to-Back Contract" as "a transaction or series of transactions between Energy Manager and a Third Party that correspond(s) to, and mirrors the economic terms of, a Commodity Transaction or Other Transaction between Energy Manager and Project pursuant to the terms of this Agreement." (ROA178) It is an artifact from the power plant management agreement that DCT marked up to create the EMA. (ROA1072 at 33-48, 135-257) A "Back-to-Back Contract" makes sense in a power plant management agreement: an energy manager engaged to sell a power plant's output lacks title to the power and therefore must contract with the power

plant to purchase the power that it has agreed to sell to a third party. (ROA1075 at 2; ROA1072 at 47-49) By contrast, there is no need for a "Back-to-Back Contract" in the EMA: DCT had no assets to sell and no assets to buy; it merely held the rights to transmit power over the DC Tie. (ROA1075 at 4; ROA1072 at 40-49) Rainbow entered into physical and financial trades on behalf of DCT without title ever passing to DCT. The artifact remains in the EMA as a definition, but has no purpose in the EMA. (ROA1075 at 4; ROA1072 at 40-49)

#### b. Nothing in the EMA Says or Implies that Third-Party Contracts Are "Back-to-Back Contracts."

The District Court's conclusion that the transactions at issue are "Back-to-Back" rests on the faulty premise that the EMA considers any and all third-party transactions to be "Back-to-Back Contracts." The District Court asserted that "the EMA only refers to financial transactions between Rainbow and third parties twice, both in the context of 'Back-to-Back Contracts'" and that Rainbow's trades with third parties were therefore *necessarily* "Back-to-Back Contracts." (ROA936) This is nonsensical. The two references to "financial transactions between Rainbow and third parties" identified by the District Court are (1) the definition of "Back-to-Back Contracts" in Section 1.2 and (2) the reference to "Back-to-Back Contracts" in Section 3.1(b). Neither suggests that "Back-to-Back Contracts" are the sole type of third-party transaction contemplated by the EMA.

To start, the definition of "Back-to-Back Contract" is just that: a definition. As discussed, the EMA defines "Back-to-Back Contracts" as a transaction that corresponds to or mirrors the economic terms of a "Commodity Transaction or Other Transaction." But nowhere does the EMA specify when or how Rainbow or DCT would need to utilize a "Back-to-Back Contract."

The EMA's only reference to "Back-to-Back Contracts" apart from the definition, moreover, is an explicit statement that Rainbow *does not have to* utilize "Back-to-Back Contracts." Section 3.1(b) says that "to the extent any transactions require Energy Manager to enter into one or more transactions with a Third Party under a Back-to-Back Contract *or other agreement*," the risk parameters in the Risk Management Strategy that DCT was to establish had to comport with Rainbow's own internal credit risk policies and procedures. (ROA 188) (emphasis added) This statement clearly recognizes that an "other agreement" might be used to engage with a third-party; "Back-to-Back" is plainly not the only option. Indeed, it is telling that the District Court, in quoting Section 3.1(b), elided "or other agreement." (ROA936) If all third-party transactions were necessarily "Back-to-Back Contracts" as the District Court concluded, the EMA would have no need to differentiate between a "Back-to-Back Contract" and an "other agreement" – or to include "under a Back-to-Back Contract or other agreement" at all.

### B. The District Court Erred in Ignoring Clear Evidence that No Back-to-Back Transactions Occurred.

Because the EMA neither states nor implies that all third-party contracts are necessarily "Back-to-Back Contracts," it is necessary to look at the record evidence to determine whether the trades at issue involved "Back-to-Back Contracts." The unrebutted evidence before the District Court on summary judgment made clear that Rainbow's trading with third parties never involved "Back-to-Back Contracts." (ROA1073 at 7-9; ROA1075 at 2-4, 6-11)

First, as DCT has admitted, had Rainbow's third-party transactions been back-to-backed to Commodity Transactions or Other Transactions with DCT, all of the credit risk for such transactions would have transferred to DCT. (ROA1073 at 8; ROA1072 at 279-280) Yet DCT repeatedly and steadfastly refused to accept any credit risk from Rainbow's trading. (ROA1073 at 8; 1074 at 148-49) Indeed, in a Slack message between DCT executives during Winter Storm Uri, the executives marveled at the amount of credit risk Rainbow was undertaking due to the spike in prices, noted that "credit becomes a concern at those levels," but expressed relief that DCT was immune from such credit risk because ***"we don't back-to-back the posting to them."*** (ROA1072 at 262, 272-76) In another internal email, DCT executives noted that they faced no credit risk from the trading activities of Rainbow's Mark "Morty" Mortensen: ***"to avoid posting [credit] we don't sign confirms or blotter them."*** (ROA1072 at 266, 279-80, 282-83) There

cannot be clearer admissions that DCT did not enter into "Back-to-Back Contracts" with Rainbow.

Second, as DCT itself argued in its motion for summary judgment, if Rainbow's trades with third parties had been back-to-backed to Commodity Transactions or Other Transactions with DCT, both the profits and the losses from the trades would have transferred to DCT; Rainbow would be a mere pass-through entity and would not retain any proceeds from the third-party trades. Section 6.2(c) of the EMA undermines the back-to-back theory by specifying that Rainbow is to wire transfer to DCT's bank account the monthly Energy Management Payment, less Rainbow's fee. (ROA194) If, as the District Court concluded, all third-party transactions had been back-to-backed, the payor and payee specified in Section 6.2(c) would have to be reversed: DCT, having received all third-party payments, would have to pay Rainbow. Throughout the seven years the EMA was in effect, Rainbow calculated the monthly Energy Management Payment and paid DCT the month's net trading profits, less Rainbow's fee (ROA1073 at 6-7; ROA1074 at 54-146), establishing that the parties did not back-to-back the Rainbow's trades with third parties.

Third, had there been "Back-to-Back Contracts," such contracts would have had to have been recorded in the financial records of both DCT and Rainbow. (DCT would have had to account for the profits and losses accruing to it from each

trade, and Rainbow would have had to net out any trading profits or losses with a corresponding trade to DCT.) But neither DCT nor Rainbow has any records of "Back-to-Back Contracts."[13] (ROA1073 at 7-9)

The District Court in *Rainbow I* brushed aside DCT's clear admissions and other clear evidence that DCT did not enter into "Back-to-Back Contracts" with Rainbow on the grounds that the EMA was "unambiguous on its face" and that "extrinsic evidence" could therefore not be considered. (ROA937) But the principle and case authority cited by the District Court – that "extrinsic evidence is inadmissible to alter or add a provision to a written agreement," *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) – is inapplicable. The EMA is unambiguous that Rainbow may transact with third parties "under a Back-to-Back Contract *or other agreement*." (ROA188) (emphasis added) The factual record is not offered to "alter or add a provision" to the EMA, but rather to answer the question that the EMA does not answer: were the particular trades at issue back-to-backed or not? The clear answer from the evidence is that the trades were not back-to-backed, rendering Section 3.1(d) inapplicable to this case, even under the District Court's misconstruction of that provision. The District Court erred as a matter of law in reading "or other agreement" out of the EMA, in ignoring DCT's

---

[13] It would have been an administrative nightmare for both parties to have confirmed and recorded "Back-to-Back Contracts" for each of the thousands of individual trades made by Rainbow on DCT's behalf.

admissions that there were no "Back-to-Back Contracts," and, consequently, in concluding that Rainbow's third-party trades were subject to Section 3.1(d).

### C. The District Court Erred in Ignoring DCT's Obligations in 3.1(b).

The District Court also erred in ignoring the clear obligation the EMA placed on DCT to establish a Risk Management Strategy setting forth "the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds specified thresholds." (ROA188) Although the District Court looked only to subsection 3.1(d), Section 3.1 of the EMA, which sets forth DCT's "Rights and Responsibilities,"[14] must be read as a whole. *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213-1214 (N.Y. 2007) ("a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" (quoting *Matter of Westmoreland Coal Co. v. Entech, Inc*., 794 N.E.2d 667, 670 (N.Y. 2003)).

[14] Indeed, that the District Court premised its judgment on a supposed breach by Rainbow of Section 3.1 reveals a more general logical fallacy. Section 3.1, by its terms, speaks only of *DCT's* obligations; it does not impose any duties at all on Rainbow. (ROA188) Because Rainbow had no duties under Section 3.1, it cannot be held to have breached a duty under that section. *See, e.g., Blackman v. JPMorgan Chase, N.A.,* 2022 U.S. Dist. LEXIS 60243, at *24 (E.D.N.Y. Mar. 31, 2022) (under New York law, "a claim for breach of contract . . . requires the existence of a contractual obligation that the defendant failed to perform.").

Section 3.1(b) mandates that DCT establish "a transaction execution policy and program for the Facility ('Risk Management Strategy')" that, among other things, "shall set forth the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds specified thresholds, or the effect of which would have certain consequences under the Risk Management Strategy," (ROA188), and specifies that "All Commodity Transactions and Other Transactions under this Agreement shall be consistent with such criteria[.]" *Id.* DCT's obligation to establish a Risk Management Strategy is not optional; Section 3.1 is explicit that DCT "*shall have* the right and responsibility" to "determine and establish" a Risk Management Strategy that "*shall* set forth the internal and external approvals that must be obtained. . .." (ROA188) (emphasis added).

DCT failed to comply with this obligation: the evidence is undisputed that DCT did not create a Risk Management Strategy as required by Section 3.1(b). In the absence of this required direction as to what types of trades required prior approval, Rainbow can hardly be said to have breached a duty to obtain DCT's prior approval for the trades at issue – particularly considering DCT's repeated plaudits for Rainbow's combined financial-physical trading strategy. Two different legal principles support this straightforward conclusion. First, DCT failed to comply with a condition precedent. Second, the duty on which DCT attempts to

base its claim is too indefinite to be enforced. Rainbow raised both arguments below, but the District Court addressed neither.

### *1. DCT Failed to Perform a Condition Precedent.*

Under New York law, a condition precedent exists when a contract provides that an act by one party must occur before a duty to perform arises on the part of the counterparty. *Oppenheimer & Co. v. Oppenheim*, 660 N.E.2d 415, 418 (N.Y. 1995). If the condition precedent has not occurred, there can be no breach of the counterparty's corresponding duty to perform. *Id.*; *see also Macklowe Inv. Props. LLC v. MIP 57th Dev. Acquisition LLC,* 243 N.Y.S.3d 43 (App. Div. 2025) (a party cannot be in breach of a contractual provision that imposes no duty upon it).

DCT's failure to implement a Risk Management Strategy means that Rainbow had no obligation to obtain DCT's prior approval for third-party trades undertaken on DCT's behalf pursuant to the EMA. EMA Sections 5.2 and 5.3 and Exhibit I directed Rainbow to enter into both physical power transactions and financial hedging transactions as DCT's "sole and exclusive market participant." (ROA193) The EMA further directed Rainbow to act "based upon prevailing market conditions." (ROA191, §4.1(a)) The EMA is clear that any limitations on Rainbow's discretion to enter into financial hedging transactions were to be set forth in the Risk Management Strategy. (ROA188, § 3.1(b); ROA191, §4.1(a)) Section 4.1(a) underscores this construction, as it places only two limitations on

Rainbow's objective of maximizing returns for DCT: compliance with "(i) Applicable Laws; and (ii) the Energy Management Plans, Risk Management Strategies and Execution Strategies of Project. . .." (ROA191)

Accordingly, even if the transactions at issue here were "Other Transactions" – and they are not – there was no requirement in the EMA that Rainbow obtain prior approval for the transactions. Not only did the District Court err in ignoring this argument, but the absence of a Risk Management Strategy compels vacating and reversing the judgment and entering judgment in Rainbow's favor. S*ee, e.g., Cedyco Corp. v. Petroquest Energy LLC*, 497 F.3d 485, 490 (5th Cir. 2007) (reversing grant of summary judgment and entering judgment for the opposing party because a condition precedent was not satisfied).

### *2. The Duty DCT Seeks to Enforce is Not Sufficiently Particular.*

Even if the EMA could be read to impose some general duty on Rainbow to obtain DCT's prior approval for third-party transactions, the absence of a Risk Management Strategy renders such a duty too indefinite to serve as a basis for a breach of contract claim.

It is a bedrock principle of New York law that all material terms in a contract must be certain and specific in order to be enforceable. *See, e.g., Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989) ("Few principles are better settled in the law of contracts than the

requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."); *Martin Delicatessen v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) ("[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."). Accordingly, material terms in a contract that are left for future negotiations cannot be enforceable until the parties reach agreement. *See, e.g., Martin Delicatessen*, 417 N.E.2d at 544 (lease provision allowing renewal at "annual rentals to be agreed upon" was too indefinite to be enforceable); *Candid Prods. v. Int'l Skating Union*, 530 F. Supp. 1330, 1336 (S.D.N.Y. 1982) ("[A]s as is the case with 'agreements to agree' where a material term is left open, the promise is unenforceable for it fails to show that the parties assented to the same obligation.").

EMA Section 3.1(b)'s requirement that DCT "determine and establish" a Risk Management Strategy is a textbook example of a "material term [] left open." Indeed, it states that DCT shall "determine and establish" the Risk Management Strategy "in consultation with" Rainbow. (ROA188) Because DCT never consulted with Rainbow regarding a Risk Management Strategy and never established a Risk Management Strategy setting forth the circumstances in which DCT's prior approval was required for financial hedge transactions, any purported obligation in the EMA to obtain DCT's prior approval for third-party trades is too

indefinite to be enforceable. A party can't breach terms that haven't been established. The District Court's conclusion that Rainbow breached a duty to obtain DCT's prior approval for the trades at issue is therefore erroneous as a matter of law.

## III. The District Court Erred in Ignoring the Parties' Course of Performance.

The unrebutted evidence before the District Court showed that, for many years, DCT consistently approved of and affirmatively endorsed Rainbow's combined physical-financial trading strategy and not once (until Winter Storm Uri) over the course of hundreds of financial transactions suggested that Rainbow needed advance approval for *specific* financial trades.[15] DCT was fully aware of Rainbow's use of financial trades throughout the seven years, but DCT never took issue with the financial trades until the current dispute arose. (ROA1079 at 2-3; ROA1073 at 4-7; ROA1074 at 6) Moreover, DCT *affirmatively approved* Rainbow's use of financial trades. For example, in a 2019 email discussion concerning financial contracts Rainbow was entering into for the week ahead in increments of 5MWh – a strategy known as "layering" – DCT executive Marc Kline fully endorsed the strategy: "That's great, am a fan of layering especially as the weeklies [week-ahead prices] continue to rise." (ROA1079 at 2-3; ROA1080

[15] The sole exception involved season-long or year-long contracts, which are not at issue here.

at 2) DCT executive Peter Anderson likewise told Rainbow that he "didn't want to get in the way" of Rainbow's physical-financial trading. (ROA1073 at 5-6; ROA1074 at 6). Each and every month for seven years, DCT received detailed invoices from Rainbow listing more than one thousand financial trades made on DCT's behalf without comment or complaint. (ROA1073 at 6-7; ROA1074 at 7-146)

### A. The Record Establishes that DCT Approved Rainbow's Financial Trading.

The District Court, after concluding in *Rainbow I* that Section 3.1(d) applied to Rainbow's third-party trades, held that Rainbow failed to obtain DCT's advance approval for the *specific* trades Rainbow made in the second week of February 2021. The District Court simply adopted this conclusion in *Rainbow II*. In focusing only on an absence of approval for the *specific* February trades, the District Court failed to address the extensive record evidence establishing that DCT had given *advance*, *blanket approval* for Rainbow's combined physical-financial strategy. Even if the EMA could be read to require DCT's prior approval of third-party trades (it does not), nothing in the EMA requires approval of individual trades as opposed to general advance approval of a trading strategy – particularly in the absence of a Risk Management Strategy. DCT's seven years of acquiescence in and approval of Rainbow's physical-financial trading strategy

establishes that DCT *did approve* the financial trades at issue in advance. To the extent that the EMA could be read to require approval of individual trades, or approvals in writing, the parties' course of performance modifies such requirements. *See, e.g., Aiello v. Burns Intl. Sec. Servs. Corp.*, 973 N.Y.S.2d 88, 96 (N.Y. App. – 1st Dept. 2013) ("the law is abundantly clear in New York that, even where a contract specifically contains a nonwaiver clause and a provision stating that it cannot be modified except by a writing, it can, nevertheless, be effectively modified by actual performance and the parties' course of conduct."); *Prospect Cap. Corp. v. Credito Real USA Fin., LLC*, 702 F. Supp. 3d 178, 189 (S.D.N.Y. 2023) ("Even where a contract specifically contains a nonwaiver clause or a provision that it cannot be modified without a writing, a waiver may be established by the parties' course of conduct or actual performance.") (quoting *McGuire v. McGuire*, 153 N.Y.S.3d 280, 286 (N.Y. App. – 4th Dept. 2021)).

### B. DCT's Actions Estop DCT From Asserting a Right to Exercise Prior Approval.

The same course of performance establishes that the doctrine of estoppel bars DCT's claim. Estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief

that such enforcement would not be sought." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 850 N.E.2d 653, 659 (N.Y. 2006). It would work an injustice to allow DCT suddenly to assert a supposed "right" to reject Rainbow's financial trades *ex post facto* after endorsing, approving, and benefitting from seven years of similar financial trading on DCT's behalf. DCT's seven years of reaping the benefits of Rainbow's financial trading, affirmative approval of Rainbow's financial trading, and failure to impose any conditions on Rainbow's financial trading estop DCT from rejecting such trades after the fact for lack of prior approval.

### C. Through Its Actions, DCT Waived Any Right to Prior Approval of Third-Party Trades.

For the same reasons, DCT has waived the right to enforce any alleged right it has to approve of transactions. "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors,* 850 N.E.2d at 658. Here, DCT's conduct in proceeding in this manner for over seven years waived any claimed contractual right to reject trades that it did not expressly approve in advance. The EMA § 17.7's "no waiver" provision does not change the result, as "the law is abundantly clear in New York that, even where a contract specifically contains a nonwaiver clause and a provision stating that it cannot be modified except by a writing, it can, nevertheless, be effectively

modified by actual performance and the parties' course of conduct." *Aiello*, 973 N.Y.S.2d at 96. That is precisely what happened here. After seven years of proceeding under the contract without any approval process for third-party trades, and frequently affirmatively approving of those trades after the fact, it is clear that DCT "knowingly, voluntarily and intentionally abandoned" any such alleged right to approve. *Fundamental Portfolio Advisors,* 850 N.E.2d at 658.

Critically, the District Court never explained why Rainbow's defenses of estoppel or waiver do not apply, or why Rainbow's evidence did not at the very least present a factual issue for trial. This is itself a reversible error. Properly considered, the doctrines of estoppel and wavier mandate that judgment be entered in favor of Rainbow.

## IV. The Court Awarded Damages Despite an Absence of Proof Under the Correct Measure.

The District Court also erred in awarding damages despite DCT failing to introduce any evidence of damage under the proper measure.

New York law is clear that a "failure to prove damages is . . . fatal to [a] plaintiff's breach of contract cause of action." *LNC Invs. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. 1999) (quoting *Cramer v. Spada*, 610 N.Y.S.2d 662, 664 (N.Y. App. – 3d Dept. 1994); *see also Proper v. State Farm Mut. Auto. Ins. Co*., 882 N.Y.S.2d 340, 341 (App. Div. – 3rd Dept. 2009). A plaintiff's claim for

damages must be based on the correct measure. *See, e.g., Sarnelli v. Curzio*, 479 N.Y.S.2d 257, 258 (N.Y. App. – 2d Dept. 1984). The correct measure is a question of law. *Lucente v. IBM*, 310 F.3d 243, 261 (2d Cir. 2002).

The only evidence of damages that DCT proffered was the total loss on financial trades as of the trades' *settlement dates*. The District Court—without comment or analysis—awarded that figure to DCT as damages. Under New York law, however, "breach of contract damages are measured *from the date of the breach*." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) (emphasis added); *see also Lucente*, 310 F.3d at 262; *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971). "New York courts have thus explicitly upheld damage awards based on 'what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach' and have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) (quoting *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559 (N.Y. App. - 4th Dept. 1982); *see also White v. Farrell*, 987 N.E.2d 244, 252 (N.Y. 2013) ("The time-of-the-breach rule is longstanding in New York . . . and is consistent with the general contract principles that damages 'are properly ascertained as of the date of the breach. . ..'") (citation omitted). Accordingly, the proper measure of damages "is the difference between the contract price and the fair market value of the asset

at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach." *Sharma*, 916 F.2d at 825.

The trades at issue were made – and therefore, under DCT's theory, the alleged "breaches" of the EMA occurred – between 10:26 a.m. on February 10, 2021, and 8:31 am on February 12, 2021. (ROA91; ROA156) DCT, however, made no effort to establish "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach," *Sharma*, 916 F.2d at 826, and the record is devoid of evidence of *any* damages as of the time of the alleged breaches. Instead, DCT relied upon, and the District Court accepted, losses based on prices days later, at the time of settlement. This is precisely the sort of damages "in light of hindsight" that New York law forbids. *Id.* Neither DCT nor any other plaintiff can wait to see whether a transaction involving future prices pays off and then, with perfect hindsight, claim damages based on the ultimate outcome.

DCT failed to offer any evidence of alleged damages from the trades at issue. This failure is "fatal to [its] breach of contract cause of action." *LNC Invs.*, 173 F.3d at 465; *see also Sarnelli*, 479 N.Y.S.2d at 258 (a plaintiff's claim for damages must be based on the correct measure). For this reason, too, the judgment in favor of DCT should be reversed and judgment entered in favor of Rainbow.

## V. The District Court Erroneously Granted DCT Summary Judgment on Rainbow's Unjust Enrichment Counterclaim.

Rainbow counterclaimed for unjust enrichment, arguing that if the District Court concluded (as it ultimately did) that Rainbow's combined physical-financial trading strategy during Winter Storm Uri was not on behalf of DCT but rather on Rainbow's account, then DCT could not relieve itself of responsibility for the trading losses during that period while retaining the trading *profits* earned during the week at issue. DCT cannot have it both ways: either the trades were executed on behalf of DCT, in which case DCT is entitled to the $16 million in net profits, or the trades were not executed on behalf of DCT, in which case DCT has no responsibility for the losses but no entitlement to the profits.

The District Court granted summary judgment in favor of DCT on Rainbow's counterclaim, on the grounds that "[b]ecause the EMA applies, Rainbow's unjust enrichment claim is precluded under New York law because of the existence of a valid and enforceable written contract that governs the subject matter of the claims." (ROA928) The District Court both fundamentally misconstrued the counterclaim and misapplied New York law.

The issue is not whether the "EMA applies," but rather whether the trades during Winter Storm Uri were or were not entered into on DCT's behalf. The District Court, applying the EMA, held that the disputed trades were *not* undertaken on DCT's behalf and were instead undertaken by Rainbow on behalf of

Rainbow. It was on this basis that the District Court held that DCT had no responsibility for the $20.8 million in trading losses. If Rainbow was not trading on DCT's behalf, as the District Court concluded, there is no basis for DCT to retain the $37 million in trading profits from the week at issue. Under the District Court's logic, those profits belong to Rainbow. Yet the judgment below awards DCT the entirety of the $37 million in profits (less Rainbow's fee) while assessing Rainbow all of the $20.8 million in losses.

The District Court also misapplied New York law. Although New York law does not permit unjust enrichment claims that are *duplicative* of contract claims, the existence of a contract governing a particular subject matter only precludes recovery in quasi contract "for events arising out of the *same* subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (emphasis added). Courts frequently permit unjust enrichment claims when the specific claim at issue is not covered by the parties' contract. *See, e.g., IIG Capital LLC v. Archipelago, L.L.C.*, 829 N.Y.S.2d 10, 14 (N.Y. App. – 1st Dept. 2007) ("where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit"); *Segal v. Cooper*, 944 N.Y.S.2d 65, 67 (N.Y. App. - 1st Dept. 2012) (declining to dismiss unjust enrichment claim because "LREA's Operating Agreement covers a different subject matter than Segal's unjust enrichment claim.").

The District Court granted summary judgment in favor of DCT based on its conclusion that the trades at issue were *not* executed pursuant to the EMA and were instead extracontractual. There is no basis under New York law for granting summary judgment in favor of DCT's unjust enrichment counterclaim on the theory that the claim arises out of the EMA while simultaneously granting judgment to DCT on the theory that the transactions at issue were *outside* the EMA. The District Court's grant of summary judgment should be reversed and judgment entered in favor of Rainbow.

## CONCLUSION

For the reasons set forth above, the Court should reverse and vacate the District Court's grant of summary judgment and entry of judgment in favor of DCT and should render judgment in favor of Rainbow.

Respectfully submitted,

Date: March 10, 2026

/s/ Creighton R. Magid
Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Attorneys for Appellant Rainbow Energy Marketing Corporation*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 11,329 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 and further this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type and style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

Date: March 10, 2026

/s/ Creighton R. Magid
Creighton R. Magid

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of March, 2026, I electronically filed the foregoing with the Clerk of Court using CM/ECF System, which will send notice of such filing.

/s/ Creighton R. Magid
Creighton R. Magid