**No. 25-50906**

# In the United States Court of Appeals for the Fifth Circuit

DC TRANSCO, L.L.C.,

Plaintiff-Appellee/Cross-Appellant

*v.*

RAINBOW ENERGY MARKETING CORPORATION,

Defendant-Appellant/Cross-Appellee

On Appeal from the United States district court, Western District of Texas, Austin Division, No. 1:24-CV-01260, Hon. Robert L. Pitman, Judge Presiding

## BRIEF OF APPELLEE/CROSS-APPELLANT DC TRANSCO, LLC

**YETTER COLEMAN LLP**
Grant B. Martinez
James E. Zucker
Shannon N. Smith
811 Main Street, Suite 4100
Houston, Texas 77002
713-632-8000

**Counsel for Appellee/Cross-Appellant DC Transco, LLC**

# Certificate of Interested Persons

No. 25-50906

DC Transco, L.L.C.,

Plaintiff-Appellee/Cross-Appellant

*v.*

Rainbow Energy Marketing Corporation,

Defendant-Appellant/Cross-Appellee

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate their possible recusal or disqualification:

1. Defendant-Appellant/Cross-Appellee Rainbow Energy Marketing Corporation is represented in the Fifth Circuit and the district court by:

Creighton Magid
Dorsey & Whitney LLP
1401 New York Avenue, NW Suite 900
Washington, DC 20005
(202) 442-3555
magid.chip@dorsey.com

In the district court proceedings, the following additional counsel represented Defendant-Appellant/Cross-Appellee Rainbow Energy Marketing Corporation:

Laura E. De Santos
Gordon Rees Scully Mansukhani
1900 West Loop South - Suite 1000
Houston, Texas 77027
(713) 490-4821

2. Plaintiff-Appellee/Cross-Appellant DC Transco, LLC, is represented in the Fifth Circuit by:

Grant B. Martinez
James E. Zucker
Shannon N. Smith
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
gmartinez@yettercoleman.com
jzucker@yettercoleman.com
ssmith@yettercoleman.com

In the district-court proceedings, the following counsel represented Plaintiff-Appellee/Cross-Appellant DC Transco, LLC:

James E. Zucker
Reagan W. Simpson
Elizabeth Wyman
Shannon N. Smith
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

3. The following entities are financially interested in the outcome of the litigation: Natgen DCT Holdings, Inc.; LS Power Development, LLC.

/s/ *Grant B. Martinez*
Grant B. Martinez
*Attorney of record for Appellee/Cross-Appellant DC Transco, LLC*

## Statement Regarding Oral Argument

The only reasonable interpretation of the contract's text and New York law supports the judgment, and Rainbow's contrary arguments lack merit. For those reasons, DC Transco does not believe oral argument will substantially aid the Court's decisional process in this straightforward appeal. If the Court grants oral argument, DC Transco welcomes the opportunity to discuss the case with the panel.

## Table of Contents


Certificate of Interested Persons ..... ii

Statement Regarding Oral Argument ..... v

Table of Authorities ..... x

Note on Definitions and Citations to the Record ..... xiv

Statement of Jurisdiction ..... xv

Statement of Issues for Review ..... xvi

Introduction ..... 1

Statement of the Case ..... 3

I. The Parties ..... 3

II. The Electricity Market ..... 4

III. The Energy Management Agreement ..... 8

- A. General Framework ..... 9
- B. Transactions Between DC Transco and Rainbow: Commodity Transactions and Other Transactions ..... 11
- C. Transactions Between Rainbow and Third Parties: Back-To-Back Contracts ..... 13
- D. DC Transco's Rights to Control and Approve ..... 14
  1. For all transactions, DC Transco had the right of prior approval. ..... 15
  2. DC Transco had the right to control not just individual transactions, but overall risk strategy. ..... 17
  3. DC Transco was not liable for any transactions by Rainbow that were not permitted under the Agreement. ..... 18

IV. The Dispute ........ 20

A. The Disputed Transactions ........ 20

B. The February Commodity Transactions ........ 21

Procedural History ........ 22

A. *Rainbow I*: The First Lawsuit ........ 22

B. *Rainbow II*: This Lawsuit ........ 24

1. Summary Judgment ........ 24

2. Final Judgment and Damages ........ 25

3. Attorney's Fees ........ 25

Standard of Review ........ 27

Summary of the Argument ........ 28

Argument on Rainbow's Appeal ........ 30

I. The district court properly granted summary judgment for DC Transco because Rainbow breached the Agreement. ........ 30

A. The Agreement is unambiguous and governs Rainbow and DC Transco's relationship. ........ 30

B. Rainbow breached the Agreement by assigning its losses on the Disputed Transactions to DC Transco and paying DC Transco less than was owed. ........ 33

1. The Disputed Transactions are Other Transactions under the Agreement. ........ 33

2. Rainbow breached the Agreement by charging DC Transco with its losses on the unapproved Disputed Transactions. ........ 34

3. DC Transco is entitled to recovery of its full damages. ........ 35

II. DC Transco's interpretation of the Agreement is the only commercially reasonable reading. .......... 37

III. The district court correctly concluded that Rainbow's contrary arguments lacked merit. .......... 39

A. The district court correctly classified the Disputed Transactions. .......... 39

B. The district court's order was well reasoned and sufficient. .......... 41

C. The plain language of the Agreement supports the district court's grant of summary judgment. .......... 43

1. The district court properly construed Section 3.1(d) of the Agreement to require DC Transco's approval of the Disputed Transactions. .......... 43

2. The district court did not err by concluding that Rainbow's third-party trades were Back-to-Back Contracts. .......... 45

3. The district court correctly interpreted and applied Section 3.1(b). .......... 49

a. DC Transco did not fail to satisfy a condition precedent. .......... 51

b. DC Transco's approval right is sufficiently definite; and even if it were not, Rainbow still breached the Agreement. .......... 54

D. The district court did not err in refusing to consider the parties' course of performance—the Agreement is unambiguous. .......... 55

1. Parol evidence is inadmissible to modify the Agreement's terms. .......... 56

2. DC Transco is not estopped from enforcing the Agreement's requirements. .......... 57

3. DC Transco did not waive its approval rights under the Agreement. .......... 59

E. The district court correctly awarded DC Transco damages under the appropriate measure. .......... 60

IV. The district court correctly held that Rainbow's unjust enrichment claim fails as a matter of New York law. .......... 62

Argument on DC Transco's Cross-Appeal .......... 65

I. The district court erred by dismissing DC Transco's attorney's fees claim. .......... 65

A. The Agreement's plain language is unmistakably clear: DC Transco is entitled to "any and all" reasonable attorney's fees .......... 65

B. The plain language of Section 4.4(b) is reinforced by contrasting it with the different indemnification provision in Article XI. .......... 67

C. Section 4.4(b)'s indemnification requirement applies. .......... 70

D. New York law did not require the district court to ignore Section 4.4(b)'s plain meaning. .......... 70

Conclusion .......... 73

Certificate of Service .......... 75

Certificate of Compliance .......... 76

# Table of Authorities

Page(s)

## Cases

*Aiello v. Burns Int'l Sec. Servs. Corp.*,
973 N.Y.S.2d 88 (App. Div. 2013) .......... 59

*Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*,
430 N.Y.S.2d 179 (App. Div. 1980) .......... 58

*Ashkenazi v. Kent S. Assocs., LLC*,
857 N.Y.S.2d 693 (App. Div. 2008) .......... 52

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
11 N.E.3d 676 (N.Y. 2014) .......... 62

*Brushton-Moira Cent. Sch. Dist. v. Fred. H. Thomas Assoc., P.C.*,
692 N.E.2d 551 (N.Y. 1998) .......... 36

*Chevron U.S.A., Inc. v. Traillour Oil Co.*,
987 F.2d 1138 (5th Cir. 1993) .......... 27

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
548 N.E.2d 203 (N.Y. 1989) .......... 54

*Colgate Inn, LLC v. Eberhardt*,
171 N.Y.S.3d 183 (App. Div. 2022) .......... 63

*E*TRADE Fin. Corp. v. Deutsche Bank AG*,
631 F. Supp. 2d 313 (S.D.N.Y. 2009) .......... 67

*Feld Motor Sports, Inc. v. Traxxas, L.P.*,
861 F.3d 591 (5th Cir. 2017) .......... 30, 31

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) .......... 4, 7

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
850 N.E.2d 653 (N.Y. 2006) .......... 59

*Goldman v. Metro. Life Ins. Co.*,
841 N.E.2d 742 (N.Y. 2005) .......... 63

*Gonzalez v. Denning*,
394 F.3d 388 (5th Cir. 2004) .......... 30

*Greenfield v. Philles Records, Inc.*,
780 N.E.2d 166 (N.Y. 2002) .......... 31, 56

*Hooper Assocs., Ltd. v. AGS Computs., Inc.*,
548 N.E.2d 903 (N.Y. 1989) .......... 65, 70, 71, 72

*Kass v. Kass*,
696 N.E.2d 174 (N.Y. 1998) .......... 31

*Louisville Gas & Elec. Co. v. FERC*,
988 F.3d 841 (6th Cir. 2021) .......... 8

*McClelland v. Katy Indep. Sch. Dist.*,
63 F.4th 996 (5th Cir. 2023) .......... 27

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
418 F.3d 168 (2d Cir. 2005) .......... 68

*MLB Constr. Servs., LLC v. Dormitory Auth. of N.Y.*,
149 N.Y.S.3d 271 (App. Div. 2021) .......... 48

*Modern Art Servs., LLC v. Fin. Guar. Ins. Co.*,
79 N.Y.S.3d 4 (App. Div. 2018) .......... 58

*New York v. FERC*,
535 U.S. 1 (2002) .......... 5

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*,
92 N.E.3d 743 (N.Y. 2017) .......... 67, 68

*Oppenheimer & Co. v. Oppenheim*,
660 N.E.2d 415 (N.Y. 1995) .......... 52

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003) .......... 60

*Matter of Part 60 Put-Back Litig.*,
165 N.E.3d 180 (N.Y. 2020)........................................ 65

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
869 N.Y.S.2d 511 (App. Div. 2008) ........................................31

*S.E.C. v. Res. Dev. Int'l, LLC*,
487 F.3d 295 (5th Cir. 2007) ........................................ 27

*Schron v. Troutman Sanders LLP*,
986 N.E.2d 430 (N.Y. 2013) ........................................ 31, 46, 56

*Shah v. 20 E. 64th St., LLC*,
154 N.Y.S.3d 6 (App. Div. 2021) ........................................ 67

*Sharma v. Skaarup Ship Mgmt. Corp.*,
916 F.2d 820 (2d Cir. 1990) ........................................ 62

*Sullivan v. Feldman*,
132 F.4th 315 (5th Cir. 2025) ........................................ 62

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ........................................ 6

*Wildbur v. Arco Chem. Co.*,
974 F.2d 631 (5th Cir. 1992)........................................ 42

## STATUTES & RULES

28 U.S.C. § 1291 ........................................ xv

28 U.S.C. § 1332(a)(1) ........................................ xv

Fed. R. Civ. P. 56(a)........................................ 41

Fed. R. Civ. P. 56 Advisory Committee's Notes to 2010 Amendments................ 42

## OTHER AUTHORITIES

FERC, *Reliability Primer* (Apr. 2020), available at
https://permacc/TK38-EHSH ........................................ 4, 5

FERC, Staff Report, *Energy Primer* (Jan. 2024), available at: https://perma.cc/7QTY-PKAT ........................................................ 4, 6, 7, 8

FERC, Staff Report, *Report on Curtailments During the Southwest Cold Weather Event of February 1-5, 2011*, available at: https://perma.cc/7A7D-VZYA ........................................................ 7

U.S. ENERGY INFO. ADMIN., *Introduction to the U.S. electric system*, available at: https://perma.cc/M9BG-7C3L ........................................................ 6

## NOTE ON DEFINITIONS AND CITATIONS TO THE RECORD

Plaintiff-Appellee/Cross-Appellant DC Transco, LLC is referred to as "DC Transco." Defendant-Appellant/Cross-Appellee Rainbow Energy Marketing Corporation is referred to as "Rainbow."

DC Transco and Rainbow's contract—the Energy Management Agreement—is referred to as the "Agreement." The Agreement itself referred to DC Transco as "Project" and Rainbow as "Energy Manager."

This appeal concerns certain transactions carried out in February 2021, around the time of Winter Storm Uri. The disputed financial transactions executed by Rainbow in the lead up to Winter Storm Uri are referred to as the "Disputed Transactions." The approved physical power transactions that Rainbow executed on DC Transco's behalf are referred to as the "February Commodity Transactions."

The brief uses the following citation conventions:

| | |
|---|---|
| Record on Appeal | ROA.____ |
| Sealed Record | ROA.____ at ##[1] |
| Appellant's Brief | Br. at ____ |

---

[1] This citation format was provided by the Clerk following an inquiry by Plaintiff-Appellee/Cross-Appellant DC Transco.

## Statement of Jurisdiction

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1). The record contains undisputed evidence of each party's citizenship, which establishes diversity. ROA.10; ROA.84; ROA.361; ROA.365; ROA.923-24.

On September 29, 2025, the district court issued an opinion resolving the parties' motions for summary judgment. ROA.923-52. The district court entered final judgment on October 27, 2025. ROA.988-89. Rainbow noticed its appeal on October 29, 2025, ROA.990-91, and DC Transco timely cross-appealed on November 21, 2025. ROA.1019.

This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of Issues for Review

1. **<u>Rainbow's breach of contract.</u>** Rainbow engaged in transactions, allegedly on DC Transco's behalf, that were not permitted under the parties' Agreement. The Agreement provided that DC Transco shall not be liable for such transactions and that Rainbow will indemnify and hold harmless DC Transco for such transactions. Did Rainbow breach the contract by withholding payment of amounts owed to DC Transco because Rainbow was charging DC Transco for liabilities on transactions that were not permitted under the Agreement?

2. **<u>Rainbow's unjust enrichment claim.</u>** Rainbow argues that DC Transco was unjustly enriched because it profited on transactions that were approved under the parties' Agreement. Does Rainbow have a viable claim for unjust enrichment under New York law where the subject matter in dispute is expressly covered by the parties' valid, enforceable Agreement?

3. **<u>DC Transco's attorney's fees.</u>** The parties' Agreement entitled DC Transco to recover "any and all" attorney's fees from Rainbow when Rainbow engaged in any transactions not permitted under the Agreement. Does the Agreement's unmistakably clear language entitle DC Transco to its attorney's fees?

## Introduction

This is a straightforward breach of contract case. Rainbow made a series of bad bets in the futures market in the days before Winter Storm Uri that lost nearly $20 million. These bets were made without DC Transco's knowledge or approval, and Rainbow actively concealed them from DC Transco. Rainbow then tried to pass those losses to DC Transco. The parties' contract—the Energy Management Agreement, or the Agreement—does not allow Rainbow to do so.

The Agreement governed the entirety of DC Transco's and Rainbow's business relationship. DC Transco owned rights to move electricity from the Southwest Power Pool in Arkansas into ERCOT. DC Transco hired Rainbow to trade in the market on DC Transco's behalf and subject to DC Transco's prior approval. In turn, DC Transco paid Rainbow a fee tied to the performance of those transactions.

Rainbow's ability to trade on DC Transco's behalf was subject to strict limits. Under the Agreement, DC Transco had the "sole right" to approve "all" transactions between the parties before they were entered. That right was absolute. It required no predicate act, admitted no exception, and was subject to no condition. If a transaction was not approved in advance by DC Transco, then the Agreement mandated that DC Transco was not financially responsible for that transaction.

Likewise, DC Transco was not financially responsible for any transactions that were not permitted by or that existed outside of the Agreement.

During Winter Storm Uri, Rainbow executed certain pre-approved transactions with DC Transco that were lucrative for both parties: DC Transco made around $37 million in profits, and Rainbow earned a handsome fee. At the same time, and without DC Transco's knowledge, Rainbow placed bets in the futures market that lost over $20 million. Rainbow neither sought nor obtained DC Transco's approval for those transactions, and under the Agreement's plain text, DC Transco is not liable for them. But Rainbow charged DC Transco with these losses anyway, in breach of the Agreement, paying only about $16 million after wrongfully subtracting what Rainbow lost on its unapproved, losing bets.

To avoid the Agreement's clear pre-approval requirements, Rainbow argues that the transactions at issue fall outside the Agreement entirely—that they are "third-party trades" for which no approval was required. But Rainbow loses either way:

- If the Disputed Transactions are governed by the Agreement, DC Transco's prior approval was required, Rainbow never got it, and DC Transco is not liable for them;
- If the Disputed Transactions fall outside the Agreement, the Agreement's indemnification provision expressly confirms that DC Transco is not liable for them.

There is no third option. Rainbow wrongfully withheld $20 million under any theory.

In a well-reasoned opinion, the district court correctly granted summary judgment for DC Transco on the merits of its breach of contract claim. This Court should affirm the judgment on those merits. On one issue, however, this Court should reverse: the district court erroneously rejected DC Transco's request for attorney's fees. The Agreement's indemnification provision explicitly and unmistakably entitles DC Transco to those fees.

## Statement of the Case

### I. The Parties

DC Transco owned one key asset: the right to move electricity between two regional power grids in Texas and the surrounding area—specifically, from the Southwest Power Pool (SPP) into the Texas grid (ERCOT) through a connection called the East DC Tie. *See* ROA.10. However, DC Transco could not actually buy, sell, or transport electricity on its own, so it needed to join forces with a service provider to capitalize on its transmission rights. *See* ROA.10.

That's where Rainbow came in. Rainbow is a power marketer authorized by the Federal Energy Regulatory Commission and various other entities to buy and sell wholesale electricity at market-based rates and move electricity across transmission systems. *See* ROA.10. Rainbow buys and sells physical and financial energy products

both on its own account and for customers that have contracted for its services. *See* ROA.10.

## II. The Electricity Market

The parties contracted and interacted against the background of the electric power market. DC Transco offers this summary of that market to aid the Court's review.

"Electricity is a physical product - the flow of electrical power." FERC, Staff Report, *Energy Primer* 33 (Jan. 2024).[2] "Providing reliable electricity is an enormously complex technical challenge: it involves real-time assessment, control and coordination of electricity production at thousands of generators, moving electricity across vast interconnected networks of transmission lines, and ultimately delivering the electricity to millions of customers by means of extensive distribution networks." FERC, *Reliability Primer* 9 (Apr. 2020).[3]

Early on, "utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). After deregulation, "electricity [is] a competitive interstate business," *id.*, and now

---

[2] Available at: https://perma.cc/7QTY-PKAT.

[3] Available at: https://perma.cc/TK38-EHSH.

electricity is "delivered over three major networks, or 'grids,' in the continental United States"—the Eastern, Western, and Texas grids. *New York v. FERC*, 535 U.S. 1, 7 (2002).




These grids largely "are electrically independent from each other." *Reliability Primer* 11. Power systems within a grid transmit electricity using an alternating current (AC) and operate in sync with each other but are not easily able to sync with the AC on other grids. Overcoming this asynchronicity requires "special transmission ties" that convert the AC "of one interconnection into direct current (DC) and then convert[] the direct current into the alternating current of the second

interconnection." U.S. ENERGY INFO. ADMIN., *Introduction to the U.S. electric system*.[4]

Only a few of these "DC Ties" connect the grids, and most have limited transfer capacity. *Id.*



"While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies." *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016). ERCOT's independence and relatively small size makes it vulnerable to price spikes. *See id.* at 431. When prices spike, a limited amount of

[4] Available at: https://perma.cc/M9BG-7C3L.

power may flow into ERCOT from the Eastern grid through two DC Ties—the North DC Tie and East DC Tie:




FERC, Staff Report, *Report on Curtailments During the Southwest Cold Weather Event of February 1-5, 2011*, 24-25.[5]

Supply and demand drives prices. To ease the matching of electricity supply with demand, the federal government "encouraged the creation of nonprofit entities to manage wholesale markets on a regional basis." *Elec. Power Supply*, 577 U.S. at 267. Regional transmission operators like ERCOT and SPP administer "wholesale auctions . . . to balance supply and demand on a continuous basis." *Id.* at 268; *Energy Primer* 37. Only certain approved entities may participate in these auctions and move electricity across interconnections. *See id.* at 68.

---

[5] Available at: https://perma.cc/7A7D-VZYA.

Transmission across interconnections has its own pricing structure. *See Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 843-44 (6th Cir. 2021). And those looking to move electricity "can choose between paying for transmission as needed or securing a long-term reservation of transmission rights (like a membership). The former is cheaper (but may not always be available); the latter guarantees that the transmission lines will have capacity when the purchaser needs them." *Id.* at 844. The latter is called "firm" transmission rights. When geographic price differentials exist, transmission rights have value. *Energy Primer* 56.

Finally, electric power markets include purely financial elements. "The financial markets include the buying and selling of financial instruments that derive value from the price of the physical commodity." *Id.* at vi, 120. Financial and physical markets are distinct: "financial markets have their own set of market structures and institutions, market participants, and traded products which have their own drivers of supply and demand." *Id.* at vi. Financial products can be used to manage risk, lock in prices, or take positions in the market in the hope of profiting from market fluctuations. *Energy Primer* 120.

## III. The Energy Management Agreement

DC Transco's contract with Rainbow was called the Energy Management Agreement (or here, the "Agreement"). ROA.171.

DC Transco owned firm transmission rights to move electricity across the East DC Tie. ROA.10. DC Transco executed the Agreement with Rainbow in 2014 to capitalize on these rights. ROA.177. Rainbow, as an electric power marketer, is in the business of buying and selling physical power (electricity) and financial products related to power for its own account and for the accounts of its clients. ROA.10; ROA.177. The Agreement comprehensively delineated the terms of DC Transco's and Rainbow's agreement for Rainbow to execute physical and financial transactions on DC Transco's behalf. ROA.171-244. The Agreement governed the entirety of DC Transco's and Rainbow's business relationship. ROA.171-244; ROA.215 (Agreement § 17.2).

### A. General Framework

The Agreement laid out in detail how DC Transco's and Rainbow's relationship was intended to work and what authority Rainbow had to act on DC Transco's behalf. DC Transco was not Rainbow's only client and Rainbow maintained the right to trade for itself and others. As a result, it was important that the Agreement delineated (1) how and when Rainbow could transact on DC Transco's behalf and (2) for which of Rainbow's transactions DC Transco would be financially responsible. ROA.83, 151-52, 164.

Accordingly, the Agreement provided as follows:

> "[N]o Party is authorized to assume or create any obligation, liability, or responsibility . . . on behalf of or in the name of the other Party or to bind the other Party to any Third Party in any manner whatsoever" except as expressly authorized by the Agreement."

ROA.187 (Agreement § 2.3). DC Transco wanted to ensure that it was only financially responsible for authorized transactions between the parties within the Agreement's detailed framework. ROA.83.

This framework allowed DC Transco to maintain complete control over the transactions for which it was financially responsible. The Agreement contained no blanket authorization for Rainbow to transact on DC Transco's behalf, nor to bind DC Transco to any third party. *See generally* ROA.171-244. Quite the opposite: the Agreement outlined specifically what types of transactions are authorized and when. *See* ROA.188 (Agreement § 3.1); ROA.195-98 (Agreement Art. VII). Critically, if a transaction was not authorized by the Agreement, then DC Transco would bear no financial responsibility for it:

> "Project shall not have any liability with respect to any transactions executed by Energy Manager in breach of subparagraph (a) above, [including 'any transaction on behalf of Project not permitted under this Agreement'], and Energy Manager shall indemnify and hold harmless Project Indemnified Parties from any Claims or Losses arising in connection with such transactions."

*See* ROA.192 (Agreement § 4.4). The Agreement defined "Project Indemnified Parties" as DC Transco and its affiliates. ROA.184.

### B. Transactions Between DC Transco and Rainbow: Commodity Transactions and Other Transactions

The Agreement recognized only two types of transactions between DC Transco and Rainbow: **Commodity Transactions and Other Transactions**. *See* ROA.179 ("Commodity Transactions"); ROA.183 ("Other Transaction"); *see generally* ROA.171-244 (identifying only Commodity Transactions and Other Transactions for transactions between DC Transco and Rainbow).

**Commodity Transactions** were "any transaction between Energy Manager and Project . . . for the purchase or sale of Power." ROA.179. The Agreement recognized several subspecies of Commodity Transactions based on the duration of the transaction: Intraday Commodity Transactions (same day), Short-Term Commodity Transactions (more than one day but less than 62 days), and Long-Term Commodity Transactions (anything longer). ROA.179; ROA.182; ROA.185.

**"Other Transaction"** was a catch-all term meaning "everything else" between Rainbow and DC Transco. It was defined as: "*any transaction or arrangement* between Energy Manager and Project executed pursuant to this Agreement, *other than a Commodity Transaction*, which may include agreements and

transactions related to Risk Management Services and emissions credits." ROA.183.[6]

The Agreement contemplated no other transactions between DC Transco and Rainbow. A transaction was either a "Commodity Transaction" for physical power or within the catch-all bucket for "Other Transactions." *See* ROA.171-244. Commodity and Other Transactions were the Agreement's exclusive vehicle for transferring Rainbow's exposure on its transactions with third parties to DC Transco. *See, e.g.*, ROA.195.

Indeed, the Agreement was structured entirely around Commodity and Other Transactions. The Agreement contained detailed Transaction Procedures for Commodity and Other Transactions, including pricing, expense allocation, and transactional approval. *See* ROA.195-98 (Agreement Art. VII); ROA.188 (Agreement § 3.1). For example, the Agreement provided that Rainbow "shall present to Project for review any potential Other Transaction identified by Energy Manager. Project shall, in its sole discretion, determine whether to approve and enter into any proposed Other Transaction." ROA.197 (Agreement § 7.5).

---

[6] All emphasis herein is added unless otherwise noted.

Rainbow's fee—how Rainbow made money under the Agreement—was calculated based on how much revenue was earned from *only* its Commodity and Other Transactions with DC Transco. ROA.629-30. Throughout the parties' business relationship, Rainbow collected millions of dollars in such fees based solely on the performance of the parties' Commodity Transactions and Other Transactions. *See* ROA.1074 at 54-146.

### C. Transactions Between Rainbow and Third Parties: Back-To-Back Contracts

Rainbow is a middleman. It does not itself create power or associated financial products; it must buy them from third parties that do. *See* ROA.10; ROA.84.

The Agreement recognized and accounted for Rainbow's need to transact with third parties to fulfill its obligations to DC Transco. ROA.194-98 (Agreement Art. VII). The Agreement referred to Rainbow's third-party transactions as "Back-to-Back Contracts." ROA.178. A "Back-to-Back Contract" was defined as "a transaction or series of transactions between Energy Manager and a Third Party that correspond(s) to, and mirrors the economic terms of, a Commodity Transaction or Other Transaction between Energy Manager and Project pursuant to the terms of this Agreement." ROA.178.

DC Transco had no financial responsibility under the Agreement for Back-to-Back Contracts or any other third-party trading activity undertaken by Rainbow

absent a mirroring Commodity Transaction or Other Transaction with DC Transco. *See generally* ROA.171-244. In practice, it worked like this:




Back-to-Back Contracts were the only defined type of transaction between Rainbow and third parties contemplated by the Agreement. ROA.171-244.

### D. DC Transco's Rights to Control and Approve

The Agreement's plain text repeatedly provided for DC Transco's right to control transactions that affected its bottom line. DC Transco paid Rainbow to perform services under DC Transco's "oversight and direction." *See* ROA.177 (Agreement Preliminary Statement). And "all control over and with respect to . . . the undertaking of any particular arrangement or Transaction, the ultimate decision-making authority hereunder, and the execution of any transaction intended to produce Power Revenues or otherwise, shall reside exclusively with" DC Transco. *See* ROA.219 (Agreement § 17.15).

#### 1. For all transactions, DC Transco had the right of prior approval.

Consistent with DC Transco's right to control Rainbow's trading on DC Transco's behalf, the parties agreed DC Transco would have the right of prior approval on all transactions. The Agreement provided:

> DC Transco "shall have the sole right and responsibility to . . . *approve* all Commodity Transactions and Other Transactions with respect to the Facility *prior to such transactions being entered into*."

ROA.188 (Agreement § 3.1(d)). For both Commodity and Other Transactions, the Agreement provided specifically that DC Transco "shall, in its sole discretion, determine whether to approve any . . . Transaction." ROA.196-97 (Agreement §§ 7.2-7.5); *see also* ROA.237 (Agreement Ex. I § V(a)) (providing that Rainbow will propose hedging transactions "At Project's election").

The Agreement gave DC Transco the ability to forego its transaction-by-transaction approval rights and, for ease of administration, categorically approve certain types of Commodity Transactions in advance. *See* ROA.198. The Agreement provided that DC Transco may "from time-to-time in writing delegate its authority to Energy Manager to execute Day-Ahead or Intraday Commodity Transactions and Short-Term Commodity Transactions without prior approval by Project." ROA.198. Under the Agreement, any transactions executed in accordance with such a Delegation "shall be automatically entered into between" DC Transco and

Rainbow. *See* ROA.198 (Agreement § 7.8). Notably, the Agreement contained no equivalent procedure for Other Transactions. *See generally* ROA.171-244.

Immediately after the parties signed the Agreement in 2014, their correspondence reflected their shared understanding that Rainbow required DC Transco's prior approval for transactions. Because of that shared understanding, Rainbow requested that DC Transco provide a delegation of authority for Rainbow to execute certain types of Commodity Transactions under the Agreement:

> **From:** b.moye@rainbowenergy.com [mailto:b.moye@rainbowenergy.com]
> **Sent:** Wednesday, June 25, 2014 11:18 AM
> **To:** Marc Kline
> **Cc:** Morty Mortensen; KJ Coghlan
> **Subject:** DC Transco Management for July 1

> AM. If you plan to delegate intraday, next day, and some short-term trading to us (e.g., out through a week to ensure we can appropriately handle weekends and holidays), we'll need to get that in writing prior to Monday morning.

*See* ROA.372.

DC Transco agreed and executed a "Short-Term Authority Delegation" (the "Delegation"):

**Short-Term Authority Delegation - DC Transco**

**From:** Marc Kline <mkline@lspower.com>
**To:** "Bob Moye (b.moye@rainbowenergy.com)" <b.moye@rainbowenergy.com>, Morty Mortensen <m.mortensen@rainbowenergy.com>
**Cc:** Peter Anderson <panderson@lspower.com>
**Date:** Tue, 01 Jul 2014 17:36:14 +0000

Bob / Morty,

Pursuant to section 7.8 of the EMA, we delegate authority to execute Day-Ahead and Intraday Commodity Transactions and Short-Term Commodity Transactions with a term of less than 4 days (to cover long weekend packages). For any Short-Term Commodity Transactions greater than 4 days or Long Term Commodity Transactions, we'll have to approve.

Thanks,

Marc

ROA.374. Upon delegating such authority, DC Transco made clear it was limited, confirming in writing that for transactions not covered by the Delegation, "we'll have to approve." *See* ROA.374. Tellingly, Rainbow does not mention the Delegation at all in its brief.

### 2. DC Transco had the right to control not just individual transactions, but overall risk strategy.

DC Transco's control extended not just to individual transactions, but to Rainbow's overall risk management strategy. Under Section 3.1 of the Agreement, DC Transco had the "sole right and responsibility" to establish Energy Management Plans, a Risk Management Strategy, and "methodologies and procedures for assessing risk on existing and proposed transactions," in each case as

DC Transco deemed appropriate in its sole discretion. ROA.188 (Agreement § 3.1). Rainbow was required to implement and operate within that strategy. ROA.188. In other words, DC Transco's approval authority under the Agreement was not limited to green-lighting individual trades—it governed the strategic framework within which Rainbow was permitted to trade at all. ROA.188. DC Transco exercised these risk management rights in practice. For example, DC Transco executed the Delegation to pre-approve certain categories of Commodity Transactions for ease of administration. *See* ROA.374.

For all other Commodity and Other Transactions, DC Transco and Rainbow corresponded regularly about Rainbow's trading plans. *See* ROA.860. For example, Rainbow provided DC Transco with daily "DC Tie Strategy" spreadsheets outlining Rainbow's existing positions and proposed strategies, which DC Transco reviewed as part of its methodology for assessing risk on existing and proposed transactions. *See, e.g.*, ROA.469-73.

#### 3. DC Transco was not liable for any transactions by Rainbow that were not permitted under the Agreement.

Consistent with DC Transco's bargained-for control, DC Transco was not responsible for any losses Rainbow incurred ostensibly on DC Transco's behalf unless Rainbow was acting with DC Transco's transaction-level approval or categorical-level delegation. As noted above, the Agreement expressly stated that

Rainbow could not "create any obligation, liability, or responsibility" for DC Transco or bind DC Transco "to any Third Party in any manner whatsoever" except as permitted by the Agreement. ROA.187 (Agreement § 2.3). The Agreement further prohibited Rainbow from engaging in "any transaction" on behalf of DC Transco that was not affirmatively "permitted under this Agreement":

> "Except as may be expressly authorized (1) by this Agreement, (2) or in writing by Project or (3) on a recorded telephone line by Project from time-to-time, Energy Manager shall have no authority to: . . . engage in any transaction on behalf of Project not permitted under this Agreement."

ROA.192 (Agreement § 4.4(a)(vi)).

And DC Transco "shall not have any liability with respect to any transactions executed by Energy Manager in breach of" the foregoing "and Energy Manager shall indemnify and hold harmless" DC Transco "from any Claims or Losses arising in connection with such transactions." ROA.192 (Agreement § 4.4(b)).[7]

---

[7] The Agreement defined "Claims" broadly as "all suits, actions, liabilities, legal proceedings, claims, demands, loss, costs and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses." ROA.207. It defined "Losses" broadly to include "any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, costs, charges, taxes, obligations, demands, fees, interest, losses and expenses (including court costs and reasonable fees of attorneys, accountants and other experts)." ROA.183.

## IV. The Dispute

Rainbow breached the Agreement when it withheld about $20 million owed to DC Transco. Rainbow wrongfully charged DC Transco with Rainbow's losses on financial transactions it executed without DC Transco's prior approval.

### A. The Disputed Transactions

In the run-up to Winter Storm Uri on February 10 to February 12, 2021, a Rainbow trader made a series of bad bets. Using Rainbow's account, Rainbow's trader made several bets between Rainbow and third parties that prices in ERCOT during the upcoming storm would not rise above certain levels, the highest being $700/MWh. ROA.767-68. These are the "Disputed Transactions." Prices hit $9,000/MWh during the storm and the Disputed Transactions lost more than $20 million. ROA.767, ROA.772.

Attempting to pass the bag for these bad bets to DC Transco, Rainbow claimed that its trader made these financial bets on DC Transco's "behalf" as a "hedge." *See* ROA.84.

It is undisputed that the Disputed Transactions were not approved by DC Transco at the time they were entered. *See* ROA.255 ("Q. And you admit that DC Transco did not approve the hedges before they were entered, right? A. Correct."). Nor did DC Transco have any knowledge of them. *See* ROA.462.

At first, Rainbow concealed these trades from DC Transco. *See* ROA.258; ROA.272-73. The Agreement required Rainbow to make reports as requested by DC Transco. *See* ROA.199 (Agreement § 8.1). At DC Transco's request, these reports were in the form of a "DC Tie Strategy" spreadsheet provided by Rainbow to DC Transco daily reflecting the economic terms of Rainbow's existing positions with third parties and proposed strategies going forward. *See, e.g.*, ROA.469-73.

But Rainbow inexplicably hid the Disputed Transactions: the DC Tie Strategy spreadsheet Rainbow sent to DC Transco before and just after Rainbow executed the Disputed Transactions on February 10 and 11 did not include the Disputed Transactions. *See* ROA.258; ROA.272-73; *see also* ROA.93. On the afternoon of Friday, February 12, Rainbow sent DC Transco an "updated" spreadsheet referencing the Disputed Transactions for the first time. ROA.469-73; ROA.258.

When DC Transco learned of the Disputed Transactions upon receiving the "updated" DC Tie Strategy spreadsheet, it immediately objected to them. *See* ROA.462. Rainbow nevertheless assigned its over $20 million in losses on the Disputed Transactions to DC Transco in violation of the Agreement. *See* ROA.280.

**B. The February Commodity Transactions**

During Winter Storm Uri, in addition to the Disputed Transactions, Rainbow executed legitimate, approved physical power transactions on DC Transco's behalf.

These transactions were highly lucrative for both DC Transco and Rainbow. Grasping at straws, Rainbow has brought these physical-power transactions into this dispute through its unjust enrichment claim (the "February Commodity Transactions"). ROA.280.

The February Commodity Transactions were executed pursuant to DC Transco's limited delegation of authority to Rainbow in the Delegation. *See* ROA.374. As a result, these transactions were expressly permitted under the Agreement and were automatically entered into between the parties, entitling DC Transco to the profits of these trades and entitling Rainbow to its fee. *See* ROA.198.

## PROCEDURAL HISTORY

### A. *Rainbow I*: The First Lawsuit

This case is the second time these issues and facts have been presented to the district court and this Court by these parties.

In the first case, styled *Rainbow Energy Marketing Corporation v. DC Transco, LLC*, No. 1:21cv313 (Pitman, J.) ("*Rainbow I*"), the district court entered judgment for DC Transco on its breach of contract claim against Rainbow and awarded DC Transco its full damages.

The district court granted summary judgment for DC Transco as to liability on its breach of contract counterclaim, concluding that: (1) the Agreement was unambiguous; (2) the Disputed Transactions were Other Transactions under the

Agreement; (3) the Agreement unambiguously required DC Transco's prior approval for the Disputed Transactions, which it is undisputed Rainbow did not have; and (4) that Rainbow breached the Agreement as a result. ROA.585-94. It then conducted a bench trial limited to damages issues, namely Rainbow's mitigation defense. The district court entered judgment for DC Transco, awarding DC Transco its full damages. ROA.596-608.

Rainbow appealed the final judgment in *Rainbow I*. ROA.613. The parties fully briefed the merits, but this Court never reached them. This Court *sua sponte* raised the issue that Rainbow and DC Transco "failed to distinctly and affirmatively allege the citizenship" of DC Transco and asked the parties to brief the issue. ROA.619 (Remand Order). The parties agreed that the record from the original proceeding lacked proof of DC Transco's citizenship, so this Court issued a limited remand to the district court to determine whether diversity jurisdiction existed. ROA.619 (Remand Order).

On remand, the district court concluded that based on the evidence in the record, diversity jurisdiction could not be established as of the day Rainbow filed *Rainbow I*. ROA.621. As a result, the district court dismissed the case without prejudice and vacated its orders and prior judgment. ROA.621.

### B. *Rainbow II*: This Lawsuit

DC Transco filed its complaint in this matter (*Rainbow II*), pleading the same breach of contract claim it pleaded in *Rainbow I*. ROA.8. Rainbow filed a new counterclaim for unjust enrichment. ROA.83.

In this case, DC Transco cured the jurisdictional defect identified by this Court in *Rainbow I* by affirmatively alleging the citizenship of both DC Transco and Rainbow in its pleadings and submitting evidence thereof in its motion for summary judgment. ROA.10; ROA.84; ROA.361; ROA.365; ROA.923-24.

#### 1. Summary Judgment

Given the district court's familiarity with the issues in dispute, the Court ordered—and the parties agreed—to proceed directly to filing dispositive motions. ROA.57-61. DC Transco and Rainbow filed cross-motions for summary judgment on February 14, 2025. ROA.146 (DC Transco MSJ); ROA.1070 at 1-25 (Rainbow MSJ).

The district court, for a second time, ruled in DC Transco's favor on the merits. ROA.923-29. In granting summary judgment for DC Transco, the district court incorporated its orders in *Rainbow I* by reference, appending them to its opinion in *Rainbow II*. *See* ROA.930-52. The district court also concluded that Rainbow's unjust enrichment claim failed as a matter of law because the Agreement governed the February Commodity Transactions and those transactions fell within

the subject matter of the Agreement, precluding an unjust enrichment claim under New York law.

#### 2. Final Judgment and Damages

In the district court's summary judgment order, it awarded DC Transco $20,799,930 in damages. *See* ROA.952. After DC Transco submitted its proposed final judgment reflecting a damages award of $20,799,930, Rainbow filed a response arguing that $20,799,930 was the wrong amount of damages because it did not account for Rainbow's contractual fee. ROA.959. Rainbow also argued that DC Transco's prejudgment interest calculation was incorrect, because "Rainbow could not have been in breach of the agreement until March 23, 2021"—the day after payment was due. ROA.960.

DC Transco agreed with Rainbow and made Rainbow's requested adjustments in an amended proposed final judgment. ROA.983. The Court entered DC Transco's amended proposed final judgment, which awarded DC Transco $19,735,233.50 in damages, and calculated pre-judgment interest from March 23, 2021, the business day after the date Rainbow breached the Agreement by withholding amounts owed to DC Transco. ROA.988.

#### 3. Attorney's Fees

In its complaint, DC Transco pleaded a request for its attorney's fees under the Agreement. ROA.26. Rainbow moved to dismiss DC Transco's request for

attorney's fees under Rule 12(b)(6), arguing that the Agreement's indemnification provision (in Section 4.4(b)) was not "unmistakably clear" that it was intended to apply to claims for attorney's fees between the parties, as New York law requires. ROA.76. In response, DC Transco argued that the Agreement was unmistakably clear in its intended application to claims and losses between DC Transco and Rainbow, which expressly included "reasonable fees of attorneys." ROA.122-28.

The district court agreed with Rainbow and dismissed DC Transco's request for attorney's fees. *See* ROA.916. The district court held that Section 4.4(b)'s indemnification provision did not allow DC Transco to recover its attorney's fees. *See* ROA.921-22. That determination was incorporated into the district court's final judgment. ROA.989.

Rainbow timely appealed from the final judgment, and DC Transco timely cross-appealed on the issue of attorney fees. ROA.990-91, 1019.

## Standard of Review

DC Transco agrees with Rainbow's description of the standard of review and adds the following. This Court "will not reverse a judgment if the district court can be affirmed on any ground, regardless of whether the district court articulated the ground." *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (quotation marks omitted); *see also Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1146 (5th Cir. 1993) ("Where, as here, the movants for summary judgment advanced several independent arguments in district court in support of their motions for summary judgment, we will affirm if any of those grounds support the district court's decision.").

This Court reviews orders granting motions to dismiss *de novo*, "accepting all well-pleaded facts as true and drawing all inferences in favor of the plaintiff." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1004 (5th Cir. 2023).

## Summary of the Argument

The district court correctly granted summary judgment for DC Transco. The Agreement unambiguously required DC Transco's approval before Rainbow could execute the Disputed Transactions on its behalf. Section 3.1(d) granted DC Transco the "sole right" to approve such transactions; Section 4.4(b) confirmed that DC Transco had no liability for transactions Rainbow executed without that approval. It is undisputed that Rainbow never obtained DC Transco's approval for the Disputed Transactions. Under the Agreement's plain text, DC Transco is not liable for them. Rainbow breached the Agreement by charging DC Transco with Rainbow's losses on the Disputed Transactions and withholding $20 million owed to DC Transco.

Rainbow's arguments to avoid the Agreement's requirements are meritless. It argues that the Disputed Transactions are third-party trades falling outside the Agreement's framework, but this argument gets Rainbow nowhere. If the Disputed Transactions are not affirmatively permitted by the Agreement, then Section 4.4(b) expressly precluded any DC Transco liability for such transactions.

Rainbow cannot escape Section 3.1(d)'s approval requirement without running into Section 4.4(b)'s indemnification provision. Either way, DC Transco is not responsible for Rainbow's losses. Rainbow's remaining arguments—that the parties' course of performance somehow modified the Agreement's clear terms, that

DC Transco waived its approval rights, or that DC Transco is estopped from enforcing those rights here—fail as a matter of law because the Agreement is unambiguous.

The district court correctly granted summary judgment for DC Transco on Rainbow's meritless unjust enrichment counterclaim. New York law bars unjust enrichment claims where, as here, a valid contract governs the subject of the parties' dispute. And on the facts, Rainbow's claim makes no sense: the profitable February Commodity Transactions were pre-approved Commodity Transactions under the Agreement covered by the Delegation. On such transactions, DC Transco is entitled to the profits and Rainbow is entitled to its fee. That is not unjust.

Finally, the district court erred in dismissing DC Transco's request for attorney's fees. Section 4.4(b) is unmistakably clear: it requires Rainbow to indemnify DC Transco for "any Claims or Losses" arising from unauthorized transactions, which explicitly includes "any and all . . . reasonable fees of attorneys."

This Court should affirm the judgment for DC Transco on the merits of its breach of contract claim and reverse in part and remand for further proceedings on attorney's fees.

## Argument on Rainbow's Appeal

### I. The district court properly granted summary judgment for DC Transco because Rainbow breached the Agreement.

Under the plain text of the Agreement, DC Transco is not liable for the Disputed Transactions. No matter how Rainbow characterizes the Disputed Transactions, it loses. Either they were Other Transactions that expressly required pre-approval, or they were extra-contractual transactions between Rainbow and third parties for which DC Transco expressly is not liable. Either way, DC Transco is not financially responsible for the Disputed Transactions.

Rainbow breached the Agreement when it wrongfully withheld $20 million from a $37 million payment it owed to DC Transco. DC Transco is entitled to full recovery of the amount wrongfully withheld. The district court agreed and correctly granted DC Transco's motion for summary judgment.

#### A. The Agreement is unambiguous and governs Rainbow and DC Transco's relationship.

The district court correctly held that the Agreement is an unambiguous contract. Because this is a diversity case, the Court applies state law to interpret the contract. *See Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

Under New York law, which governs the Agreement, the "question of whether a written contract is ambiguous [is] a question of law for the court." *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 597 (5th Cir. 2017) (applying New

York law); *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998). A determination of ambiguity must be made "by looking within the four corners of the document, not to outside sources." *Kass*, 696 N.E.2d at 180; *see also Traxxas*, 861 F.3d at 598. A contract is unambiguous if its language has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002) (cleaned up). It is well-established that "clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S.2d 511, 517 (App. Div. 2008).

The Agreement stated repeatedly in clear, definite, and precise language that Rainbow must not enter into any transaction on DC Transco's behalf without authorization under the Agreement and DC Transco's prior approval. The parties' relationship began and ended with the Agreement: it contained the parties' entire agreement and exclusively controlled the parties' rights and obligations. ROA.215 (Agreement § 17.2). The Court need not—and should not—look beyond the plain text of the unambiguous Agreement to resolve the parties' dispute. *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013) ("[E]xtrinsic evidence is inadmissible to alter or add a provision to a written agreement."). The Court can dispose of Rainbow's appeal based on the following key provisions of the Agreement.

## Key Provisions of the Agreement

"Other Transaction" means any transaction or arrangement between Energy Manager and Project executed pursuant to this Agreement, other than a Commodity Transaction, which may include agreements and transactions related to Risk Management Services and emissions credits.

2.3 Relationship of Parties.

(a) Except as provided in this Section 2.3, Section 6.3 or Section 7.8, no Party shall be an agent, partner, joint venturer, or legal representative of any other Party for any purpose whatsoever, and no Party is authorized to assume or create any obligation, liability, or responsibility, expressed or implied, on behalf of or in the name of the other Party or to bind the other Party to any Third Party in any manner whatsoever; provided, however, that Energy

3.1 Project Rights and Responsibilities. Project shall have the sole right and responsibility to:

. . .

(d) approve all Commodity Transactions and Other Transactions with respect to the Facility prior to such transactions being entered into, except to the extent that authority to enter into a Short-Term Commodity Transaction or Day-Ahead or Intraday Commodity Transaction has been delegated to Energy Manager under Section 7.8;

4.4 Limitation on Authority of Energy Manager.

(a) Except as may be expressly authorized (1) by this Agreement, (2) or in writing by Project or (3) on a recorded telephone line by Project from time-to-time, Energy Manager shall have no authority to:

. . .

(vi) engage in any transaction on behalf of Project not permitted under this Agreement.

(b) Project shall not have any liability with respect to any transactions executed by Energy Manager in breach of subparagraph (a) above, and Energy Manager shall indemnify and hold harmless Project Indemnified Parties from any Claims or Losses arising in connection with such transactions.

### B. Rainbow breached the Agreement by assigning its losses on the Disputed Transactions to DC Transco and paying DC Transco less than was owed.

Rainbow breached the Agreement by passing along its losses on the Disputed Transactions to DC Transco. What Rainbow and DC Transco intended under the Agreement is clear from the text: DC Transco had the right to pre-approve transactions between the parties executed pursuant to the Agreement. *See* ROA.188 (Agreement § 3.1(d)); ROA.250. Without DC Transco's approval, a transaction is not permitted by the Agreement, and the Agreement expressly provided that DC Transco is not financially responsible for it. ROA.192 (Agreement § 4.4).

It is undisputed that Rainbow did not have DC Transco's prior approval for the Disputed Transactions. ROA.255. It is also undisputed that Rainbow passed along its losses from the Disputed Transactions to DC Transco by paying DC Transco $20 million less than it was owed, causing DC Transco to bear the financial consequences of those unapproved transactions. ROA.280. In doing so, Rainbow breached the Agreement.

#### 1. The Disputed Transactions are Other Transactions under the Agreement.

The Agreement recognized and authorized only two types of transactions between DC Transco and Rainbow: Commodity Transactions and Other Transactions. *See generally* ROA.171-244 (identifying only Commodity Transactions

and Other Transactions for transactions between DC Transco and Rainbow). "Commodity Transactions" are transactions between Rainbow and DC Transco for physical power. ROA.179. "Other Transactions" is a catch-all term that covered *every other transaction or arrangement* between Rainbow and DC Transco: it is "any transaction or arrangement" between the parties made "pursuant to this Agreement, *other than a Commodity Transaction*." ROA.183. As a result, any transaction between DC Transco and Rainbow authorized by the Agreement must fall in one bucket or the other.

It is undisputed that the Disputed Transactions are not Commodity Transactions because they were not for physical power; the Disputed Transactions were financial hedges. ROA.84. As a result, if under the Agreement, the Disputed Transactions must be Other Transactions—they can't be anything else.

#### 2. Rainbow breached the Agreement by charging DC Transco with its losses on the unapproved Disputed Transactions.

The Agreement gave DC Transco the absolute "sole right" to "*approve all . . . Other Transactions* with respect to the Facility *prior to such transactions being entered into*." ROA.188 (Agreement § 3.1(d)). Transactions not pre-approved by DC Transco are "not permitted under" the Agreement, and DC Transco "shall not have *any liability* with respect to any [such] transactions." ROA.192 (Agreement § 4.4). Section 2.3 reinforced this framework by providing that Rainbow could not

"create any obligation, liability, or responsibility, express or implied, on behalf of or in the name of" DC Transco, or to "bind [DC Transco] to any Third Party in any manner whatsoever" except as expressly provided by the Agreement. ROA.187 (Agreement § 2.3(a)).

Sections 2.3, 3.1(d), and 4.4 worked in tandem:

- Section 2.3 confirmed that Rainbow cannot bind DC Transco to any third party except as expressly provided by the Agreement;
- Section 3.1(d) required DC Transco's advance approval for each transaction to be permitted under the Agreement; and
- Section 4.4 ensured that if Rainbow executed an unapproved transaction, DC Transco would bear no financial responsibility.

Because the Disputed Transactions are Other Transactions, DC Transco's prior approval was required—approval Rainbow admittedly never sought or obtained. ROA.255. Rainbow's breaches are thus readily apparent: it failed to seek DC Transco's prior approval for the Disputed Transactions, breaching Section 3.1(d), and then passed Rainbow's losses on those transactions to DC Transco, breaching Section 4.4(b).

### 3. DC Transco is entitled to recovery of its full damages.

Rainbow is responsible for DC Transco's damages based on Rainbow's breaches of the Agreement. Under New York law, "the theory underlying damages

is to make good or replace the loss caused by the breach of contract." *Brushton-Moira Cent. Sch. Dist. v. Fred. H. Thomas Assoc., P.C.*, 692 N.E.2d 551, 553 (N.Y. 1998).

The loss caused by Rainbow's breach is simple: it is the amount that Rainbow wrongfully withheld from DC Transco. The total losses on the Disputed Transactions that Rainbow charged DC Transco are undisputed: $20,733,929.98. *See* ROA.959-60 (Rainbow's judgment-formation filing). Once Rainbow's fee is deducted, the total damages due to DC Transco is $19,735,233.50. *See* ROA.960. Calculation of this figure is, likewise, undisputed. *See* ROA.960. Rainbow wrongfully deducted these losses from amounts owed to DC Transco. ROA.960, 975, 1074 at 137.

Section 4.4 of the Agreement provided that if Rainbow "engage[s] in any transaction on behalf of Project not permitted under this Agreement," i.e., without DC Transco's pre-authorization, then DC Transco "shall have no liability" with respect to those transactions, and Rainbow "shall indemnify and hold harmless Project Indemnified Parties from any Claims or Losses arising in connection with such transactions." ROA.192. "Project Indemnified Parties" includes DC Transco, and "Losses" includes "any and all . . . losses, . . . damages, . . . and expenses (including court costs and reasonable fees of attorneys, accountants and other experts)." ROA.184 ("Project Indemnified Parties"); ROA.183 ("Losses").

Pursuant to the Agreement's plain terms, DC Transco is not liable for the Disputed Transactions. Rainbow breached the Agreement by withholding its losses on the Disputed Transactions from amounts owed and paid to DC Transco. ROA.960, 975, 1074 at 137. Accordingly, DC Transco is entitled to recover $19,735,233.50 in damages to be made whole for Rainbow's breach.

## II. DC Transco's interpretation of the Agreement is the only commercially reasonable reading.

The Agreement was designed to ensure that DC Transco—which has extensive industry knowledge and owned valuable transmission rights, but lacked the ability to execute trades on its own—could participate in the energy market and capitalize on its transmission rights while maintaining strict control over its financial exposure.

To achieve this, the Agreement created a framework in which Rainbow would execute two types of trades on DC Transco's behalf—Commodity Transactions and Other Transactions—but only with DC Transco's prior approval. Section 3.1(d)'s approval requirement protected DC Transco from being blindsided by transactions it never authorized. Section 4.4(b)'s indemnification provision ensured that if Rainbow executed unauthorized transactions anyway, DC Transco was held harmless. Together, these provisions created a coherent risk-allocation framework

that ensured the parties both had real-time visibility into, and control over, their exposure.

The Agreement explained in great detail how these Commodity Transactions and Other Transactions were to be proposed, approved, priced, and settled. It specified how Rainbow's fee was calculated based on revenue from these transactions. No commercially sophisticated party would negotiate and execute such a comprehensive framework—complete with bargained-for approval requirements—only to then operate entirely outside that framework.

Indeed, at the outset of the relationship, Rainbow expressly recognized that the Agreement required DC Transco's prior approval before Rainbow could transact:

> **From:** b.moye@rainbowenergy.com [mailto:b.moye@rainbowenergy.com]
> **Sent:** Wednesday, June 25, 2014 11:18 AM
> **To:** Marc Kline
> **Cc:** Morty Mortensen; KJ Coghlan
> **Subject:** DC Transco Management for July 1

> AM. If you plan to delegate intraday, next day, and some short-term trading to us (e.g., out through a week to ensure we can appropriately handle weekends and holidays), we'll need to get that in writing prior to Monday morning.

*See* ROA.372. DC Transco reaffirmed this principle when it made the limited Delegation but expressly said for transactions not covered "we'll have to approve." ROA.374.

Rainbow's contrary interpretation makes no sense: it requires that the parties' actual trading relationship existed in some undefined space beyond the Agreement's terms, rendering its detailed transaction procedures irrelevant. Under Rainbow's view, it could execute any transaction it wished—regardless of whether DC Transco approved and regardless of how risky it was—and still hold DC Transco financially responsible for the outcome. No sophisticated commercial actor would agree to such an arrangement. DC Transco did not.

DC Transco's interpretation, on the other hand, gives effect to the Agreement as written and yields the outcome the parties intended: DC Transco is not liable for transactions that it did not have the opportunity to evaluate and pre-approve.

## III. The district court correctly concluded that Rainbow's contrary arguments lacked merit.

The district court correctly rejected Rainbow's arguments and granted summary judgment for DC Transco.

### A. The district court correctly classified the Disputed Transactions.

Rainbow has no path to victory. No matter how it characterizes the Disputed Transactions, DC Transco is not liable for them. If the Disputed Transactions are Other Transactions governed by the Agreement, DC Transco's approval was required under Section 3.1(d); and it is undisputed that Rainbow never sought or obtained it. If instead the Disputed Transactions fall outside the Agreement,

Sections 2.3 and 4.4(b) preclude DC Transco's liability for them. The district court correctly saw through Rainbow's maneuvering.

DC Transco and Rainbow have fundamentally different views as to how to classify the Disputed Transactions under the Agreement. DC Transco argues—and the district court agreed—that the Disputed Transactions were Other Transactions under the Agreement, which required DC Transco's pre-approval under Section 3.1(d). To escape that pre-approval requirement, Rainbow argues that the Disputed Transactions are third-party trades that exist outside the Agreement's framework. But in fleeing the Scylla of Section 3.1(d), Rainbow sails directly into the Charybdis of Section 4.4(b).

Rainbow cannot identify any provision of the Agreement permitting the Disputed Transactions, defining them, or even contemplating them. This is fatal. Section 4.4(b) expressly provides that DC Transco "shall not have any liability with respect to any transactions executed by Energy Manager" that are "not permitted under this Agreement." ROA.192 (Agreement § 4.4(b)). This requires affirmative permission set forth in the Agreement itself, and Rainbow does not, and cannot, identify any provision affirmatively granting such permission.

Setting aside Section 4.4(b), Rainbow's argument that the Disputed Transactions are third-party trades is, by itself, damning: in no event under the

Agreement is DC Transco financially responsible for any trades between Rainbow and third parties, except by way of Commodity and Other Transactions between Rainbow and DC Transco that mirrored Rainbow's third-party transactions (Back-to-Back Contracts). *See* ROA.187 (Agreement § 2.3); ROA.195 (Agreement § 7.1). In any event, DC Transco is undisputedly a stranger to Rainbow's trades with third parties. And Rainbow does not—and cannot—identify any Agreement provision that would make DC Transco financially responsible for such trades apart from Commodity or Other Transactions (that DC Transco must approve) that mirror Rainbow's third-party Back-to-Back Contracts.

So, whether the third-party Disputed Transactions are "Back-to-Back Contracts," "other agreements," or something else, DC Transco is not responsible and Rainbow loses.

### B. The district court's order was well reasoned and sufficient.

Rainbow argues, without citing any law, that the district court's failure to explicitly address every new fact and legal argument that it attempted to inject into the case in *Rainbow II* was reversible error. Br. at 21-22. Rainbow is wrong.

The district court's analysis easily satisfies Rule 56's directive that a district court "should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). In 2010, when Rule 56 was amended to add that requirement,

the advisory committee explained that "[t]he form and detail of the statement of reasons are left to the court's discretion. The statement on denying summary judgment need not address every available reason." *See* Fed. R. Civ. P. 56, advisory committee's notes to 2010 amendments.

Here, the district court appropriately exercised its discretion on the form and detail of the statement of reasons for granting DC Transco's motion and denying Rainbow's motion. This case was the second time the district court addressed these same facts and issues. In ruling on the parties' motions for summary judgment below, the district court, upon review of the parties' briefing and arguments, determined that because the material facts and law were unchanged from *Rainbow I*, the same result should obtain here. ROA.927. The district court incorporated its well-reasoned orders in *Rainbow I* by reference into its opinion in *Rainbow II* granting DC Transco's motion for summary judgment and denying Rainbow's motion for summary judgment. ROA.927. Nothing in the applicable Rules or this Circuit's jurisprudence prohibited the district court from doing so.

This Court has made clear that district courts need not "expressly list or refer to each factual and legal argument raised" by the parties in their opinions and orders. *See Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 644 (5th Cir. 1992). This "does not mean that the court did not consider these facts and arguments." *Id.*

Rainbow's attacks throughout regarding the sufficiency of the district court's opinion lack merit and should be rejected.

### C. The plain language of the Agreement supports the district court's grant of summary judgment.

The district court granted summary judgment for DC Transco after correctly holding that the Disputed Transactions were Other Transactions under the Agreement, and that Section 3.1(d) required that DC Transco have the right to approve these transactions prior to their entry. Rainbow's arguments to the contrary are not supported by the plain text of the Agreement.

#### 1. The district court properly construed Section 3.1(d) of the Agreement to require DC Transco's approval of the Disputed Transactions.

Rainbow's arguments that DC Transco's prior approval of the Disputed Transactions was not required all rest on the same flawed premise: that the Disputed Transactions are not Other Transactions, but rather trades between Rainbow and third parties. *See, e.g.*, Br. at 23-24. That premise fails for two independent reasons.

First, as explained above, if the Disputed Transactions are third-party trades falling outside the Agreement, Sections 2.3 and 4.4(b) absolved DC Transco of any liability. Second, if the Disputed Transactions are third-party trades that exist within the Agreement's structure, then Rainbow's theory doesn't work with the text.

The Agreement defined and provided detailed procedures for only one type of transaction between Rainbow and third parties: Back-to-Back Contracts. These are Rainbow's contracts with third parties that mirror its Commodity or Other Transactions with DC Transco. ROA.178. This structure reflects Rainbow's business model: Rainbow is a middleman that does not itself generate electricity or make markets for financial transactions. It must engage in physical and financial trades with third parties (via Back-to-Back Contracts) to trade with DC Transco (via Commodity or Other Transactions). ROA.195. Critically, under this framework, DC Transco is not financially responsible for Rainbow's Back-to-Back Contracts absent an approved mirroring Commodity or Other Transaction. *See, e.g.*, ROA.195-96 (Agreement § 7.1(a), (b)).

Recognizing that Back-to-Back Contracts don't give it an escape hatch, Rainbow protests that its transactions with third parties are not necessarily Back-to-Back Contracts, citing Section 3.1(b)'s reference to Rainbow's "Back-to-Back Contract[s] or *other agreement[s]*" with third parties. Br. at 27-29; *See* ROA.188. But Rainbow never explains what "other agreements" are or what transactions would qualify. Nor does Rainbow argue that its third-party transactions are actually "other agreements"—only that they could be. Br. at 31. This is no answer. More

fundamentally, under Sections 2.3 and 4.4, any such "other transaction" would need to be affirmatively permitted by the Agreement. It was not.

Ultimately, whether Rainbow's third-party trades were Back-to-Back Contracts, "other agreements," or transactions outside the Agreement entirely is a distinction without a difference. The district court correctly concluded that the Disputed Transactions were Other Transactions between Rainbow and DC Transco that required approval—not Back-to-Back Contracts or any other form of third-party trade. Because the Disputed Transactions were financial hedges rather than transactions for physical power, they cannot be Commodity Transactions and therefore must fall within the Agreement's catch-all category of Other Transactions for DC Transco to be financially responsible for them. And even if it had concluded otherwise, as discussed above, there is no contractual basis in the Agreement for DC Transco to bear financial responsibility for the Disputed Transactions, whatever their label.

**2. The district court did not err by concluding that Rainbow's third-party trades were Back-to-Back Contracts.**

The Agreement commanded that Rainbow use Back-to-Back Contracts when it went out and transacted with third parties to fulfill its obligations to DC Transco. Section 7.1(a) of the Agreement directed that Rainbow "shall utilize documentation forms similar to the Implementation Agreements for Back-to-Back Contracts to meet

[Rainbow's] obligations under Commodity Transaction and Other Transactions." ROA.195. Section 7.1(b) set pricing of Commodity or Other Transactions "equal to . . . the applicable contract price specified in the related Back-to-Back Contract." ROA.195-96. The Agreement's transaction procedures did not contemplate or provide for "other agreements"; they are structured around Back-to-Back Contracts and their corresponding Commodity and Other Transactions. *See, e.g.*, ROA.195-96.

Rainbow argues that it never engaged in Back-to-Back Contracts. Not so. DC Transco and Rainbow routinely engaged in Commodity or Other Transactions, and Rainbow routinely paid itself the exact incentive fee prescribed by the Agreement for revenue from Commodity and Other Transactions. *See* ROA.1074 at 54-146. Those Commodity and Other Transactions necessarily had mirroring Back-to-Back Contracts between Rainbow and third parties. The Agreement defines those corresponding third-party trades as Back-to-Back Contracts. ROA.195 (Agreement § 7.1).

Parol evidence is not admissible to contradict the Agreement, *Schron*, 986 N.E.2d at 436, and the parol evidence Rainbow relies on is substantively irrelevant to the issues here. Rainbow argues that a chat between DC Transco's Ayan Nandi and Marc Kline confirms that Rainbow never entered into Back-to-Back Contracts with third parties, but it does no such thing. In the back-and-forth between Nandi

and Kline, Nandi writes, "u would never manage sandy [referring to Sandy Creek, a power plant] this way[;] [t]hat's quite some *credit support required*." ROA.1083 at 2. Kline responded, "*Credit* becomes a concern at these levels . . . and we don't *back to back the posting* to them." ROA.1083 at 2. Contrary to Rainbow's assertion, Kline's comment merely states what the parties agreed to in the Agreement: that DC Transco would not be "responsible for any costs or expenses or other liabilities or obligations relating to any *credit sleeves*, *credit posting* expenses, or other related *credit charges* related to any Commodity Transaction or Other Transaction." ROA.196 (Agreement § 7.1(d)). Exhibit I to the Agreement reiterated this point: "[Rainbow] will execute transactions with ERCOT and SPP counter parties . . . with no additional . . . credit or sleeve costs charged to [DC Transco] and *no requirement by [DC Transco] to post collateral or credit to [Rainbow]* for such transactions." ROA.234 (Agreement Ex. I, III(b)). When Kline said "we don't back-to-back the posting to them," he isn't referring to Rainbow's Back-to-Back Contracts with third parties under the Agreement, but instead the posting of credit or collateral.

Rainbow's other arguments fare no better. Section 6.2(c) required Rainbow to wire the Energy Management Payment—the sum of Generation Margins, less Rainbow's Incentive Fee—to DCT's Revenue Account each month. ROA.194. This netting arrangement is entirely consistent with a back-to-back structure; it

consolidates cash flows rather than settling each Back-to-Back Contract separately. And Rainbow's reliance on the absence of documentation is unavailing. The Agreement required Rainbow to maintain a "Facility Book" tracking "all Commodity Transactions and Other Transactions, and Back-to-Back Contracts and Related Agreements associated therewith." ROA.181 (Agreement ("Facility Book")); ROA.198 (Agreement § 7.1(c)). If no Back-to-Back Contracts were documented, that reflects Rainbow's own noncompliance—not the absence of a contractual requirement.

Left with nothing else, Rainbow is forced to argue that the contract it signed does not make sense, and that the numerous references to Commodity Transactions, Other Transactions, and Back-to-Back Contracts throughout the Agreement are inapplicable vestiges of the form agreement that evolved into the Agreement. Aside from being wrong—Rainbow's request for the Delegation pre-authorizing certain types of Commodity Transactions shows that Rainbow understood these basic elements of the Agreement—this is no defense to the plain application of the Agreement's unambiguous terms. *MLB Constr. Servs., LLC v. Dormitory Auth. of N.Y.*, 149 N.Y.S.3d 271, 276 (App. Div. 2021) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced

according to its terms, especially in the context of a commercial contract negotiated at arm's length by a sophisticated business." (cleaned up)).

Again, it bears repeating: if the Disputed Transactions are transactions between Rainbow and third parties, be they Back-to-Back Contracts, "other agreements," or something else, there is nothing in the Agreement that would make DC Transco financially responsible for them. For this reason alone, Rainbow loses.

**3. The district court correctly interpreted and applied Section 3.1(b).**

Section 3.1(b) of the Agreement gave DC Transco the right to establish Energy Management Plans and a Risk Management Strategy that Rainbow must follow. ROA.188 (Agreement § 3.1(b)). DC Transco did exactly that. DC Transco executed the Delegation to pre-approve only certain Commodity Transactions, while expressly reserving its right to approve the rest:

**Short-Term Authority Delegation - DC Transco**

**From:** Marc Kline <mkline@lspower.com>
**To:** "Bob Moye (b.moye@rainbowenergy.com)" <b.moye@rainbowenergy.com>, Morty Mortensen <m.mortensen@rainbowenergy.com>
**Cc:** Peter Anderson <panderson@lspower.com>
**Date:** Tue, 01 Jul 2014 17:36:14 +0000

Bob / Morty,

Pursuant to section 7.8 of the EMA, we delegate authority to execute Day-Ahead and Intraday Commodity Transactions and Short-Term Commodity Transactions with a term of less than 4 days (to cover long weekend packages). For any Short-Term Commodity Transactions greater than 4 days or Long Term Commodity Transactions, we'll have to approve.

Thanks,

Marc

ROA.374. Indeed, the parties corresponded regularly to discuss Rainbow's trading plans, including through Rainbow's daily spreadsheets outlining its trading strategy.[8] *See, e.g.*, ROA.1074 at 2-4. Together with the framework established in the Delegation, DC Transco's review of the spreadsheets and the parties' discussions of the same was its "methodolog[y] and procedure[] for assessing risk on existing and proposed transactions." ROA.188 (Agreement §3.1(b)). Similarly, the parties'

[8] DC Transco took advantage of its right to approve transactions. For example, Mortensen contacted DC Transco in 2020 writing to "*ask[] permission* to hedge [a] position." ROA.791. DC Transco declined to approve the hedges Mortensen suggested, and as a result Mortensen acknowledged *he could not execute the trades*. ROA.792.

routine discussions and the Delegation itself were part of DC Transco's "energy management strategy for Power" transactions. ROA.188 (Agreement § 3.1(a)).

The Delegation coupled with the parties' routine correspondence was DC Transco's Risk Management Strategy. Notably, the Agreement contained no provision requiring DC Transco's Risk Management Strategy to be contained on a piece of paper titled "Risk Management Strategy" or otherwise prescribed a particular form. ROA.188.

Rainbow incorrectly argues that DC Transco failed to establish the Risk Management Strategy that Section 3.1(b) requires and that, as a result, Section 3.1(d)'s approval requirements are inapplicable. Br. at 35-40. Rainbow is wrong on every front. First, establishment of a Risk Management Strategy under Section 3.1(b) is not a condition precedent to DC Transco's transaction approval rights in Section 3.1(d). Second, even assuming DC Transco did not establish a Risk Management Strategy, that would not give Rainbow carte blanche to trade as it wished on DC Transco's behalf and stick DC Transco with the bill for Rainbow's losses.

#### a. DC Transco did not fail to satisfy a condition precedent.

Establishing Energy Management Plans and a Risk Management Strategy under Section 3.1(b) are not conditions precedent to DC Transco's right to pre-approve all Commodity or Other Transactions in Section 3.1(d).

A condition precedent is an "act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim*, 660 N.E.2d 415, 418 (N.Y. 1995) (cleaned up). "[I]t must clearly appear from the agreement itself that the parties intended a provision to operate as a condition precedent." *Ashkenazi v. Kent S. Assocs., LLC*, 857 N.Y.S.2d 693, 694 (App. Div. 2008). "A contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Id.*

Section 3.1 listed eight of DC Transco's "sole rights and responsibilities" in lettered subsections. ROA.188-89. Among those were DC Transco's rights to establish a Risk Management Strategy in Section 3.1(b) and to pre-approve all Commodity or Other Transactions in Section 3.1(d). ROA.188-89. These rights were entirely independent and were not made contingent on each other. They don't even reference each other. This is a far cry from "clear language showing that the parties intended to make it a condition." *Ashkenazi*, 857 N.Y.S.2d at 694.

Rainbow mistakenly argues that any limitations on Rainbow's discretion to enter financial hedging transactions needed to be set in the Risk Management Strategy. Not so. DC Transco had the unconditional right to approve such transactions in Section 3.1(d). Further, the Agreement stated repeatedly and in no

uncertain terms that the decision to approve any transaction between DC Transco and Rainbow was within DC Transco's "sole discretion." *See, e.g.*, ROA.196 § 7.2(b) ("[T]he ultimate authority as to the execution of any Long-Term Commodity Transactions shall remain within the *sole authority and discretion of Project.*"); ROA.196 § 7.4 ("Project shall, in its *sole discretion, determine whether to approve* any proposed Day-Ahead or Intraday Commodity Transaction."); ROA.197 § 7.5 ("Energy Manager shall present to Project for review any potential Other Transaction identified by Energy Manager, Project shall, *in its sole discretion, determine whether to approve and enter into any proposed Other Transaction.*").

Rainbow's argument that Section 4.1(a) somehow overrides these provisions is unavailing. Br. at 37-38. Indeed, Section 4.1(a) confirms that Rainbow should perform services on behalf of DC Transco with the goal of maximizing profit. ROA.191 (Agreement § 4.1(a)). But this does not override the multiple limits placed on Rainbow elsewhere in the Agreement. Section 4.2 was clear: Rainbow's services must be performed in accordance with "the terms of this Agreement." ROA.191 (Agreement § 4.2(a)).

DC Transco did not fail to satisfy a condition precedent because Section 3.1(d) had no conditions precedent.

#### b. DC Transco's approval right is sufficiently definite; and even if it were not, Rainbow still breached the Agreement.

Rainbow argues that absent a Risk Management Strategy, its duty to seek approval of transactions from DC Transco under the Agreement is too indefinite. Br. at 38-40. This is absurd.

DC Transco had a Risk Management Strategy. *See* Section III.C.3, *supra*. In any event, the Agreement makes abundantly clear throughout that DC Transco's approval was required for all Commodity or Other Transactions, and it is within DC Transco's sole discretion whether to approve and enter into such transactions. *See, e.g.*, ROA.188 (Agreement § 3.1(d)); ROA.196-97 (Agreement §§ 7.2-7.5).

Under New York law, ignoring a party's written promises because they are not sufficiently definite "is at best a last resort." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). It is hard to imagine a contract provision more definite than Section 3.1(d), which unambiguously required that DC Transco have the "sole right" to "approve all Commodity Transactions and Other Transactions . . . prior to such transactions being entered into." ROA.188 (Agreement § 3.1(d)). There was no material term left open as to DC Transco's approval rights. *See Cobble Hill*, 548 N.E.2d at 206. Rainbow understood this when it asked for DC Transco's approval to execute certain Commodity Transactions

right after the Agreement was signed. ROA.372. To the extent Rainbow failed to appreciate that this language required DC Transco's prior approval for Other Transactions—including the Disputed Transactions—that deficiency lies with Rainbow, not with the clarity of the Agreement. And in any event, the proper response to any such misunderstanding was not to forge ahead with unapproved transactions and hope that no consequences would follow.

DC Transco's right under the Agreement to approve all Commodity and Other Transactions was clear, definite, and unconditional. The district court correctly held that DC Transco had a right to approve the Disputed Transactions under Section 3.1(d).

**D. The district court did not err in refusing to consider the parties' course of performance—the Agreement is unambiguous.**

The Agreement unambiguously gave DC Transco the right to pre-approve all Commodity and Other Transactions. *See* ROA.188 (Agreement § 3.1(d)). It is undisputed that DC Transco did not approve the Disputed Transactions, which the district court correctly held were Other Transactions. As a result, DC Transco is not liable for Rainbow's losses on the Disputed Transactions under Section 4.4(b). *See* ROA.192 (Agreement § 4.4(b)).

To avoid Section 3.1(d)'s unambiguous approval requirement, Rainbow argues, using inadmissible parol evidence, that the parties' course of performance

shows that DC Transco "approved" of Rainbow's trading "strategy" in the past. Br. at 40-44. The district court correctly refused to consider such evidence.

### 1. Parol evidence is inadmissible to modify the Agreement's terms.

The district court correctly interpreted Section 3.1(d) to require DC Transco's prior approval of all Commodity Transactions and Other Transactions. ROA.937-38.

Rainbow argues that the district court erred by refusing to consider inadmissible parol evidence of the parties' course of performance. Br. at 40-42. Rainbow is wrong. Under New York law, "parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract. As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement." *Schron*, 986 N.E.2d at 436; *see also Greenfield*, 780 N.E.2d at 171 ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."). The district court correctly determined, and Rainbow does not dispute, that the Agreement is unambiguous.

In the district court, Rainbow sought to use parol evidence for the exact purpose prohibited by New York law: to alter Section 3.1(d)'s unambiguous transaction-by-transaction approval right. Rainbow argues that the parties' course of

performance "*modified*" the Agreement's requirements because DC Transco gave "advance, blanket approval" of Rainbow's trading "strategy," and did not historically approve individual trades. Br. at 42. The parties' course of performance shows no such thing, but even if it did, it would not matter—this evidence is inadmissible to vary the Agreement's unambiguous terms.

Further, the Agreement itself prohibited the "modification" Rainbow suggests. The Agreement confirmed that any modifications to its terms must be consented to by the parties in writing. ROA.215 (Agreement § 17.3). And there is no such writing.

The district court correctly held that parol evidence was inadmissible to modify the terms of the unambiguous Agreement.

**2. DC Transco is not estopped from enforcing the Agreement's requirements.**

The district court correctly rejected Rainbow's estoppel defense. Rainbow has never attempted to prove the elements of the affirmative defense of estoppel under New York law, nor can it.

The elements of equitable estoppel are: "with respect to the party estopped: (1) conduct which amounts to a *false representation or concealment of material facts*; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to himself: (1)

lack of knowledge of the true facts; (2) *reliance upon the conduct of the party estopped*; and (3) a prejudicial change in his position." *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (App. Div. 1980) (emphasis added). Rainbow presented no evidence to the district court of any "false representation" made to it by DC Transco. ROA.1052 at 16-17. DC Transco never told Rainbow that approval of transactions was not required. The evidence in the record shows it did the opposite: When DC Transco executed the Delegation for certain Commodity Transactions, DC Transco informed Rainbow that for any other transactions, DC Transco would "have to approve." ROA.374. And Rainbow knew it needed DC Transco's approval in writing; that is why Rainbow asked for the Delegation in the first place. ROA.372. Further, Rainbow presented no evidence of its reliance on any false representation. ROA.1052 at 16-17.

Rainbow's argument is essentially that it would be unfair to hold Rainbow to the bargain that it struck. Br. at 42-43. It is not unfair to hold sophisticated parties to the terms of their unambiguous written agreements. *See Modern Art Servs., LLC v. Fin. Guar. Ins. Co.*, 79 N.Y.S.3d 4, 6 (App. Div. 2018) ("The possibility of unfairness to [a party] does not warrant an interpretation [] that is not in accordance with [the contract's] unambiguous language." (cleaned up)). The district court correctly rejected Rainbow's estoppel defense.

### 3. DC Transco did not waive its approval rights under the Agreement.

The district court correctly rejected Rainbow's waiver defense. *Contra* Br. at 43-44. DC Transco did not waive its right to pre-approve the Disputed Transactions. To establish that DC Transco waived its approval rights through its course of performance, Rainbow would need to prove that DC Transco "knowingly, voluntarily, and intentionally abandoned" its rights. *Aiello v. Burns Int'l Sec. Servs. Corp.*, 973 N.Y.S.2d 88, 96 (App. Div. 2013). Waiver requires a "clear manifestation of intent" to relinquish a contractual protection. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006). Rainbow presented no evidence to the district court that DC Transco knowingly and intentionally abandoned any contract right under the Agreement because DC Transco did not and no such evidence exists. ROA.1052 at 16-17. On the contrary, the Agreement contains an unambiguous nonwaiver provision requiring a waiver to be made specifically and in writing:

> 17.7 Waiver. Failure by any Party to exercise any of its rights under this Agreement shall not constitute a waiver of such rights. No Party shall be deemed to have waived any right resulting from any failure to perform by another Party unless it has made such waiver specifically in writing.

ROA.218 (Agreement § 17.7).

Rainbow argues that DC Transco's course of performance evidenced its intent to waive its approval rights because there was historically no advance "approval process for third-party trades," and that the district court erred by not addressing this argument. Br. at 43-44. As discussed above, the district court correctly rejected Rainbow's invitation to consider inadmissible extrinsic evidence to vary the Agreement's unambiguous terms.

### E. The district court correctly awarded DC Transco damages under the appropriate measure.

The district court applied the correct damages measure. *Contra* Br. at 44-46. Rainbow is reversing positions from its successful arguments in the district court. Rainbow now contends that damages must be calculated from February 10 and 12, 2021—when the unapproved transactions were entered—rather than March 23, 2021, when Rainbow wrongfully withheld amounts owed to DC Transco from a payment to DC Transco. Rainbow argues that DC Transco's breach of contract claim fails because there is no evidence in the record of damages calculated from the appropriate date. Br. at 44-46. Rainbow is wrong.

The district court correctly measured damages on the date of Rainbow's breach of Section 4.4(b) via short-payment. Under New York law, "breach of contract damages are measured from the date of the breach." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). Here, Rainbow breached the

Agreement in multiple ways on multiple dates. Yes, it breached Section 4.4(a) when it engaged in transactions not permitted under the Agreement; but, it also breached Section 4.4(b) when it made DC Transco liable with respect to such transactions and did not indemnify DC Transco from any Claims or Losses arising in connection with such transactions. ROA.192. This later breach of Section 4.4(b) via Rainbow's short payment is the breach that caused DC Transco's damages. The short payment occurred on March 23, 2021: on that date, Rainbow charged DC Transco with liability on the Disputed Transactions, did not indemnify DC Transco on such transactions, and wrongfully withheld $20 million from its payment to DC Transco. Thus, with the correct breach identified, the district court correctly measured the damages on the correct date: the damages were simply the amount that Rainbow wrongfully withheld from payment, on the date that payment was due.[9]

Rainbow embraced this exact position below, during judgment formation. In response to DC Transco's proposed final judgment, Rainbow stated: "if DC Transco had been entitled to payment of the $19,735,233.50, that payment would not have been due until March 22, 2021. . . . *Rainbow could not have been in breach of the agreement until March 23, 2021.*" ROA.960. DC Transco agreed with Rainbow's

---

[9] Accounting for the weekend, payment was not past due until March 23, 2021. ROA.280, ROA.980; *see also* ROA.960.

point and revised the proposed final judgment, which the district court entered. Rainbow cannot turn around and fault DC Transco and the district court for *adopting Rainbow's position* on the date of the breach. *Sullivan v. Feldman*, 132 F.4th 315, 332 (5th Cir. 2025) ("[A] party cannot complain on appeal of errors which he himself induced the district court to commit." (internal quotation marks omitted)).

DC Transco's damages must be, and were, measured from March 23, 2021—the date of the breach that caused DC Transco's damages. That is exactly what the district court did—at Rainbow's invitation. ROA.988.[10]

## IV. The district court correctly held that Rainbow's unjust enrichment claim fails as a matter of New York law.

The district court correctly held that Rainbow's unjust enrichment claim fails as a matter of New York law. It also fails on the facts.

Rainbow argues that if DC Transco is not responsible for the Disputed Transactions under the Agreement, then it is not entitled to the profits from

---

[10] Rainbow's reliance on *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820 (2d Cir. 1990) is misplaced. Br. at 45-46. Rainbow quotes a portion of *Sharma* discussing the measure of damages for "a breach of an agreement to purchase securities." 916 F.2d at 825. The Agreement is not an agreement to purchase securities; *Sharma* does not apply. Rather, DC Transco merely seeks "money that the breaching party agreed to pay under the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (quotation marks omitted).

approved physical power transactions executed between the parties pursuant to the Agreement in February 2021. Br. at 47-49. Rainbow is wrong.

Rainbow cannot state a claim for unjust enrichment under New York law because a valid and enforceable written contract (the Agreement) governs the subject matter of Rainbow's claim. *Goldman v. Metropolitan Life Ins. Co.*, 841 N.E.2d 742, 746-47 (N.Y. 2005) ("Here, in each case, there was no unjust enrichment because the matter is controlled by contract."); *Colgate Inn, LLC v. Eberhardt*, 171 N.Y.S.3d 183, 188 (App. Div. 2022). Rainbow cannot dispute that its entire trading relationship with DC Transco was governed by the Agreement. The subject of Rainbow's unjust enrichment claim, the February Commodity Transactions, were executed pursuant to the Agreement. They were executed pursuant to DC Transco's delegation of authority to Rainbow in the Delegation. ROA.374. Tellingly, Rainbow paid itself the fee prescribed by the Agreement based on revenue from these transactions. ROA.980. The Agreement governs the subject matter and precludes Rainbow's unjust enrichment claim.

Even if this Court reached the facts, Rainbow's unjust enrichment claim fails. Rainbow contends that if DC Transco had to pre-approve the Disputed Transactions before being liable for those losses, then DC Transco should likewise have had to pre-approve the profitable February Commodity Transactions to receive those

profits. Br. at 48-49. But DC Transco *did* pre-approve these transactions through the Delegation pursuant to Section 7.8 of the Agreement.

**Short-Term Authority Delegation - DC Transco**

**From:** Marc Kline <mkline@lspower.com>
**To:** "Bob Moye (b.moye@rainbowenergy.com)" <b.moye@rainbowenergy.com>, Morty Mortensen <m.mortensen@rainbowenergy.com>
**Cc:** Peter Anderson <panderson@lspower.com>
**Date:** Tue, 01 Jul 2014 17:36:14 +0000

Bob / Morty,

Pursuant to section 7.8 of the EMA, we delegate authority to execute Day-Ahead and Intraday Commodity Transactions and Short-Term Commodity Transactions with a term of less than 4 days (to cover long weekend packages). For any Short-Term Commodity Transactions greater than 4 days or Long Term Commodity Transactions, we'll have to approve.

Thanks,

Marc

ROA.374. Rainbow's failure to even mention the Delegation in its brief is telling.

The district court correctly held that Rainbow's unjust enrichment claim fails as a matter of law.

* * *

The district court correctly held that Rainbow breached the EMA and that DC Transco was entitled to $19,735,233.50 in damages. The district court correctly rejected Rainbow's unmeritorious arguments to the contrary. This Court should affirm on the merits of DC Transco's breach of contract claim.

## ARGUMENT ON DC TRANSCO'S CROSS-APPEAL

### I. The district court erred by dismissing DC Transco's attorney's fees claim.

DC Transco is entitled to recover its attorney's fees under the plain text of the Agreement and New York law. The district court's conclusion to the contrary was erroneous.

#### A. The Agreement's plain language is unmistakably clear: DC Transco is entitled to "any and all" reasonable attorney's fees.

New York follows the "American Rule"—the general rule that "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule." *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989); *accord Matter of Part 60 Put-Back Litig.*, 165 N.E.3d 180, 193 (N.Y. 2020). "It is not uncommon, however, for parties to a contract to include a promise by one party to hold the other harmless for a particular loss or damage and counsel fees are but another form of damage which may be indemnified in this way." *Hooper*, 548 N.E.2d at 904. Given the American Rule, for "one party to a contract to indemnify the other for attorney's fees incurred in litigation between them," the intention to do so must be "unmistakably clear from the language" of the contract. *Id.* at 905.

Here, the Agreement's language is "unmistakably clear." The parties agreed:

> 4.4(a): "Energy Manager shall have no authority to: . . . engage in any transaction on behalf of Project not permitted under this Agreement."
>
> 4.4(b): "Energy Manager shall indemnify and hold harmless Project Indemnified Parties from ***any Claims or Losses*** arising in connection with such transactions."

> "Losses" means "***any and all*** . . . reasonable fees of attorneys"

> "Claims" are "***any and all*** . . . expenses of ***whatsoever kind or character***, including reasonable attorneys' fees and expenses"

ROA.183, 192, 207 (Agreement §§ 1.2, 4.4(a)(iv), (b), 11.1(a)).

Putting this all together, the parties agreed that, if Rainbow engaged in "any transaction" on behalf of DC Transco "not permitted under this Agreement," Rainbow would indemnify DC Transco for:

- "any Claims," which are "any and all . . . expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses"; and
- "any . . . Losses," which are "any and all . . . reasonable fees of attorneys."

This language is unmistakably clear. The terms "any", "any and all", and "of whatsoever kind or character" are universal and all-encompassing. The parties could not have been clearer that they meant to include *all* reasonable attorney's fees.

Thus, once the indemnification provision in Section 4.4(b) is triggered, the Agreement is unmistakably clear: DC Transco is indemnified for "any and all . . . expenses of whatsoever kind or character, including reasonable attorneys' fees." ROA.183, 192, 207 (Agreement §§ 1.2, 4.4(a)(iv), (b), 11.1(a)).

Indeed, New York courts have found language similar to Section 4.4(b) to be "highly inclusive language." *Shah v. 20 E. 64th St., LLC*, 154 N.Y.S.3d 6, 20-22 (App. Div. 2021). In *Shah*, the parties' indemnification extended to "any and all . . . reasonable attorneys' fees . . . arising from: . . . Owner's breach of any of its obligations under this Agreement." *Id.* at 20. As in *Shah*, reading Section 4.4(b) to apply to "any and all" attorney's fees—including for claims between Rainbow and DC Transco arising from Rainbow's breach of section 4.4(a)—gives effect to the clear, universal, "highly inclusive" language the parties used in their Agreement.

**B. The plain language of Section 4.4(b) is reinforced by contrasting it with the different indemnification provision in Article XI.**

DC Transco's interpretation of Section 4.4(b)'s plain text is reinforced by considering the Agreement's other indemnification provision in Article XI. Courts applying New York law "must construe the contract so as to afford fair meaning to all of the language employed by the parties in the contract and leave no provision without force and effect." *E*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 391 (S.D.N.Y. 2009) (cleaned up). New York courts "read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (quotation marks omitted). A "contract must be construed in

a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect." *Id.* (quotation marks omitted).

Specifically, if a contract contains more than one indemnity provision, courts must read the provisions together to determine whether the parties intended for any provision to apply to claims between the contractual parties. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178-79 (2d Cir. 2005). For example, in *Mid-Hudson*, the contract at issue contained two indemnity provisions: one with language expressly limiting indemnification to third-party disputes, and one that broadly required indemnification of the plaintiff by the defendant for all losses "connected with any activity" under the contract—without any express limitation to third-party claims. *Id.* at 178. The Second Circuit, applying New York law, concluded that when read together, the latter provision was "unmistakably" broad enough to apply to actions between the parties. *Id.* at 178-79. The court's reasoning turned on the contrast between the two provisions: if the parties had intended the broader provision to also be limited to third-party disputes, they would have simply copied the structure and wording of the third-party indemnification provision. *See id.*

So too here. Section 4.4(b) was not the only indemnification provision in the Agreement. Article XI of the Agreement, appropriately titled

"**INDEMNIFICATION**," expressly addressed the mechanics of *third-party* indemnification under the agreement. Article XI contains standard two-way indemnification clauses where the parties agree to "defend" and hold each other harmless against a swath of losses and claims by "Third Parties," including any Third Party claims based on either party's "failure . . . to perform its obligations under" the Agreement. ROA.207-08 (Agreement §§ 11.1 (Indemnification by Rainbow), 11.2 (Indemnification by DC Transco)).

Section 4.4(b) must be read together with Article XI. Article XI's indemnity provisions were expressly limited to Third Party claims—demonstrating the parties knew how to impose such a limitation when they wanted to. They chose not to do so in Section 4.4(b). The textual differences confirm Section 4.4(b) was intended to cover first-party claims: Article XI imposed a duty to "defend" against third-party claims; Section 4.4(b) contained no such duty. The absence of a defense obligation in Section 4.4(b) makes sense only if that provision was designed for claims between the parties, where no "defense" against outside litigation is needed. Contrasting Article XI and Section 4.4(b) and giving meaning to both yields the conclusion that Article XI addresses third-party claims, while Section 4.4(b) contains no such limitation and includes first-party claims between Rainbow and DC Transco.

### C. Section 4.4(b)'s indemnification requirement applies.

Here, the indemnification obligation in Section 4.4(b) was clearly triggered. Rainbow short-paid DC Transco by assigning losses from the Disputed Transactions to DC Transco while claiming it entered those transactions on DC Transco's behalf. *See* ROA.980; ROA.84. Rainbow then started this litigation by suing DC Transco. *See supra*, p. 22. At that point, not only had DC Transco suffered damages because of Rainbow's breach, it was then incurring substantial attorney's fees because of Rainbow's meritless contract arguments.

DC Transco proved that Rainbow "engaged in [] transaction[s] on behalf of [DC Transco] not permitted under" the Agreement—triggering Section 4.4(b)'s indemnification provision, which obligates Rainbow to indemnify DC Transco for any and all "Claims or Losses arising in connection with" those unauthorized transactions. ROA.192. DC Transco's litigation costs—including reasonable fees of attorneys, accountants, and other experts—"arise in connection with" Rainbow's breach. These provisions entitle DC Transco to recover "any and all . . . reasonable fees of [its] attorneys," including its attorney's fees here. ROA.183.

### D. New York law did not require the district court to ignore Section 4.4(b)'s plain meaning.

The district court relied on *Hooper* to conclude mistakenly that Section 4.4(b), even if broadly worded, did not unmistakably require Rainbow to indemnify

DC Transco for attorney's fees incurred in litigation between the parties because it did not specifically say so. ROA.921-22.

The district court concluded that Section 4.4(b) was not "unmistakably clear" in its intent to cover attorney's fees claims between the parties because it does not "explicitly say" that DC Transco can recover its attorney's fees from Rainbow. ROA.921-22. The district court's error: *Hooper* requires unmistakable *clarity*, not *specificity*. *See Hooper*, 548 N.E.2d at 905. The universal, all-encompassing language of the Agreement is exceptionally clear—once triggered, Section 4.4(b) provides indemnification to DC Transco for "any and all . . . expenses of whatsoever kind or character, including reasonable attorneys' fees." ROA.183, 192, 207 (Agreement §§ 1.2, 4.4(a)(iv), (b), 11.1(a)).

Further, the indemnification provision at issue in *Hooper* is distinguishable. In *Hooper*, the Court of Appeals applied standard interpretation tools to conclude that nothing in the indemnification clause at issue "support[ed] an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *See Hooper*, 548 N.E.2d at 905. That clause referred to actions associated with third parties, not breach claims. *Id.* And it required "plaintiff to 'promptly notify' defendant of 'any claim or litigation to which the indemnity . . . shall apply' and it further provide[d] that defendant 'may assume the defense of any such claim

or litigation with counsel satisfactory to [plaintiff].'" *Id.* The provision made no sense if intraparty disputes were included. *See id.*

Here, Section 4.4(b) is triggered by Rainbow's breach, and applying its broad coverage would not render any other Agreement term meaningless. To the contrary, reading Section 4.4(b) to cover first-party claims is the only interpretation that gives independent meaning to both Section 4.4(b) and Article XI, which covers third-party claims.

Still more, unlike the agreement in *Hooper*, the Agreement imposes a duty to "defend" only in Article XI's separate indemnification provisions expressly limited to third-party disputes. *See* ROA.207-09 (Agreement art. XI). The parties' choice to leave out the duty to defend in Agreement § 4.4(b) is further proof that they intended § 4.4(b) to cover intraparty litigation. Likewise, one cannot impliedly limit Agreement § 4.4(b)'s "shall indemnify . . . Project . . . from any Claims or Losses" to "third-party indemnification" obligations without making the Contract's express third-party limitations in Article XI superfluous. *Hooper*'s indicia point the opposite way here, showing Rainbow's obligation for DC Transco's fees and costs "is unmistakably clear from the language of the promise." 548 N.E.2d at 905.

Under the district court's interpretation, Rainbow could execute numerous unauthorized transactions on DC Transco's "behalf" and then flood DC Transco

with litigation, forcing DC Transco to incur substantial attorney's fees to defend Rainbow's claims arising from the very conduct that Section 4.4 prohibits. That's exactly what happened here: Rainbow executed unauthorized transactions and then sued DC Transco, causing it to incur millions in legal fees. The whole point of Section 4.4(b)'s indemnification obligation is to ensure that DC Transco is held *actually* harmless from the consequences of Rainbow's unpermitted transactions that breach the Agreement—and litigation costs incurred to enforce DC Transco's rights with respect to those transactions are among the most direct consequences of Rainbow's breach. ROA.192 (Agreement § 4.4(b) (applicable to transactions "in breach of" the Agreement)).

By construing section 4.4(b) to provide indemnification for only *some* kinds of fees, the district court failed to give effect to the Agreement's unmistakably clear text—which provides indemnification for "*any and all* . . . reasonable attorneys' fees." ROA.183, 192, 207 (Agreement §§ 1.2, 4.4(a)(iv), (b), 11.1(a)). DC Transco is entitled to recover its fees and costs incurred in this litigation, and the district court's order to the contrary should be reversed.

## Conclusion

The Court should affirm the district court's judgment for DC Transco on the merits of DC Transco's breach of contract claim. The Court should reverse the

judgment with respect to DC Transco's request for its attorney's fees and remand for further proceedings regarding the amount of fees due to DC Transco. DC Transco respectfully requests all other relief to which it may be entitled.

Dated: May 11, 2026

Respectfully submitted,

/s/ Grant B. Martinez
Grant B. Martinez
gmartinez@yettercoleman.com
James E. Zucker
jzucker@yettercoleman.com
Shannon N. Smith
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

***Attorneys for Appellee/Cross-Appellant DC Transco, LLC***

## Certificate of Service

I certify that this document was filed with the Court via the court's electronic filing system, on the 11th day of May, 2026, and an electronic copy of this document was served on all counsel of record, as listed below, via the court's electronic filing system on the same date:

Creighton Magid
Dorsey & Whitney LLP
1401 New York Avenue, NW Suite 900
Washington, DC 20005
magid.chip@dorsey.com

***Counsel for Appellant/Cross-Appellee Rainbow Energy Marketing Corp.***

/s/ Grant B. Martinez
Grant B. Martinez

## Certificate of Compliance

1. This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this document contains 14,039 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date: May 11, 2026

/s/ Grant B. Martinez
Grant B. Martinez