**No. 25-50906**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

***RAINBOW ENERGY MARKETING CORPORATION,***

Defendant/Counter-Plaintiff/Appellant

**v.**

***DC TRANSCO, LLC,***

Plaintiff/Counter-Defendant/Appellee

**Appeal from the United States District Court for the**
**Western District of Texas**
**Case No. 1:24-cv-1260-RP**
**The Honorable Judge Robert Pitman Presiding**

# APPELLANT'S REPLY BRIEF AND RESPONSE TO CROSS-APPEAL

Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, NW
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Fax: (202) 315-3852
magid.chip@dorsey.com

*Attorneys for Appellant Rainbow Energy Marketing Corporation*

DATE: June 10, 2026

# Table of Contents

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

ARGUMENT ................................................................................................7

I. DCT MISREADS THE PLAIN LANGUAGE OF THE EMA. ................7

A. Rainbow's Third-Party Transactions Are Not "Other Transactions." ........................................................................7

B. DCT's Claim is Not a "Commercially Reasonable Reading" of the EMA – And Is Inconsistent with the Plain Language of the EMA. ........................................................................................9

C. The "Back-to-Back Contract" Canard Does Not Save DCT's Argument. .......................................................................................12

II. DCT'S ARGUMENTS REGARDING SECTION 3.1(b) FAIL. ............16

A. DCT Failed to Establish a Risk Management Strategy. ................16

B. DCT Failed to Satisfy a Condition Precedent to Section 3.1(d). ....18

III. THE DISTRICT COURT ERRED IN IGNORING THE PARTIES' COURSE OF PERFORMANCE..........................................................20

A. The Facts Establish that DCT Approved Rainbow's Trading. ......21

B. The Parties' Course of Performance Modified the EMA. .............22

C. DCT's Actions Over Seven Years Estop It From Seeking to Disclaim the Transactions at Issue. ...............................................23

D. DCT Waived Any Right of Prior Approval. ..................................25

IV. The District Court Measured Damages Incorrectly. ...............................26

V. The District Court Erroneously Granted DCT Summary Judgment on Rainbow's Unjust Enrichment Counterclaim. .........................................27

VI. The District Court Properly Dismissed DCT's Attorneys' Fees Claim...29

CONCLUSION ............................................................................................33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................35

CERTIFICATE OF SERVICE .........................................................................36

# **Table of Authorities**

Page

**Cases**

*214 Wall St. Assoc., LLC v. Medical Arts – Huntington Realty*, 953 N.Y.S.2d 124 (App. Div. – 2d Dept. 2012)....29

*A. G. Ship Maint. Corp. v. Lezak*, 503 N.E.2d 681 (N.Y. 1986) ....29

*Aiello v. Burns Int'l Sec. Servs. Corp.*, 973 N.Y.S.2d 88 (N.Y. App. – 1st Dept. 2013) .... 22, 25

*Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179 (N.Y. App. – 4th Dept. 1980)....24

*Aroneck v. Atkin*, 456 N.Y.S.2d 558 (N.Y. App. 4th Dept. 1982) ....26

*CT Chems., Inc. v. Cinmar Impex, Inc.*, 613 N.E.2d 159 (N.Y. 1993)....22

*Expocorp v. Hyatt Mgmt. Corp. of N.Y.*, 520 N.Y.S.2d 579 (N.Y. App. – 2d Dept. 1987) ....22

*Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.*, 850 N.E.2d 653 (N.Y. 2006) .... 24, 25

*Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992)....10

*Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903 (N.Y. 1989).... 29, 31

*Lake Eugenie Land & Dev., Inc. v. Halliburton Energy Servs. (In re Deepwater Horizon*, 934 F.3d 434 (5th Cir. 2019)....4

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005) .... 32, 33

*Myers v. Gulf Oil Corp.*, 731 F.2d 281 (5th Cir. 1984)....18

*Oppenheimer & Co. v. Oppenheim*, 660 N.E.2d 415 (N.Y. 1995)....18

*Rainbow Energy Mktg. Corp. v. DC Transco, LLC*, No. 1:21-cv-00313-RP (W.D. Tex.) ("*Rainbow I*").... 4, 6, 16

*Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430 (N.Y. 2013) ............................10

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77 (N.Y. App. – 1st Dept. 2005).........................................................................28

*Shah v. 20 E. 64th St., LLC*, 154 N.Y.S.3d 6 (App. Div. 1st Dept. 2021)...............31

*Sharma v. Skaarup Ship Management Corp.,* 916 F.2d 820 (2d Cir. 1990) ...........26

*Wildbur v. Arco Chem. Co.,* 974 F.2d 631 (5th Cir. 1992) ....................................17

# INTRODUCTION

Ignoring the plain language of the parties' Energy Management Agreement ("EMA"), appellee DC Transco, LLC ("DCT") would have the Court believe that the EMA vested DCT with "total control" over Rainbow's energy trading and that DCT had "no financial responsibility" for Rainbow's trading activity with third-parties "absent a mirroring Commodity Transaction or Other Transaction with DC Transco." Neither is true.

The EMA expressly directed Rainbow to "be the provider of Services" – with "Services" defined by the EMA as including "Risk Management Services." ROA185-86 (EMA §§ 1.2, 2.1). The "Risk Management Services" that the EMA directed Rainbow to provide included "financial and derivative product purchases and sales either in bilateral, over-the-counter or exchange-traded markets for the purpose of hedging or mitigating price or delivery risks associated with Power" – the very types of transactions of which DCT now complains. ROA237 (EMA Exhibit I, § V(a)).[1] In contrast to DCT's unsupported assertion that the EMA gave

---

[1] DCT makes much of the fact that Appendix I to the EMA states that the Risk Management Services are to be provided "at Project's election." ROA237. In EMA Section 2.1, DCT explicitly elected to have Rainbow provide such Risk Management Services. ROA186. Moreover, DCT repeatedly endorsed Rainbow's strategy of balancing physical trades with financial hedges, evidencing its "election" of Rainbow's strategy, and accepted the benefits of such trades without objection or reservation. *See, e.g.*, ROA1073 at 4; ROA1079 at 1-3; ROA1080 at 2. Contrary to DCT's assertion, Appendix I does not suggest that *individual* hedging transactions are subject to DCT's "election": not only does Appendix I,

DCT "total control" over Rainbow's third-party transactions, the EMA explicitly provided that DCT "*shall look to Energy Manager [Rainbow] for results only and shall have no right at any time to direct or supervise* Energy Manager's servants or employees in the performance of such work or *as to the manner, means, and method in which the Services are performed*." ROA187 (EMA § 2.3(a)) (emphasis added).

The EMA provided only two limits on Rainbow's discretion. First, DCT could "determine and establish, in consultation with [Rainbow], a transaction execution policy and program for the Facility ('Risk Management Strategy')." ROA188 (EMA § 3.1(b)). Through such a Risk Management Strategy, DCT could set forth "appropriate, mutually agreed, risk parameters and methodologies." *Id*. Additionally, the Risk Management Strategy "shall set forth the internal or external approvals that must be obtained prior to entering into Commodity Transactions or Other Transactions whose nominal value or duration exceeds specified thresholds, or the effect of which would have certain consequences under the Risk Management Strategy." *Id*. It is undisputed that DCT never established such a Risk Management Strategy. ROA1073 at 6; ROA1079 at 4.[2]

---

Section V refer to "election" of the entire *program* of risk management, but DCT's construction would render section 3.1(b) superfluous. ROA237; ROA188.

[2] DCT's Opposition asserts that the occasional conversations between Rainbow and DCT over the seven years the EMA was in effect constituted a "Risk

Second, because DCT did not wish to assume any credit risk from Rainbow's third-party trades, the EMA made clear that Rainbow would need such prior approvals from DCT as set forth in a Risk Management Strategy would need prior approval from DCT before entering into a *transfer-of-risk transaction with DCT* – either a "Commodity Transaction" or an "Other Transaction." ROA188 (EMA § 3.1(d)); *see also* ROA192 (evidencing DCT's credit aversion by precluding Rainbow from "pledg[ing] the credit of [DCT] in any way in respect to any agreements entered into between [Rainbow] and any Third Party").[3]

Apart from transfer-of-risk transactions between Rainbow and DCT and any limitations set forth in a Risk Management Strategy (which DCT never promulgated), the EMA directed Rainbow to use its discretion in buying and selling physical power and in hedging risk through financial transactions.

---

Management Strategy." Oppn. at 18, 50. The language of Section 3.1(b) makes it clear, however, that the Risk Management Strategy was to "establish[] risk management strategies" and to "establish[] appropriate, mutually agreed, risk parameters and methodologies," not *ad hoc* discussions of individual trades. Moreover, after 2018, DCT rarely communicated with Rainbow. *See, e.g.*, ROA15159-60 in No. 23-50720. Indeed, there is no evidence in the record that DCT ever referred to the parties' periodic discussions as Risk Management Strategies.

[3] Demonstrating DCT's refusal to accept credit risk and conclusively establishing that DCT and Rainbow did not enter into Back-to-Back Contracts, Rainbow had to deposit more than $15 million in 2018 to cover margin calls on trades it had executed on DCT's behalf. DCT, despite being the beneficiary of the trades, refused to provide any financial assistance to Rainbow to cover the margin calls. ROA1049 at 8.

DCT similarly distorts the factual record. Far from making "bad bets" on financial trades, Rainbow employed the same balanced physical-and-financial trading strategy that it had employed throughout the EMA's seven-year term – a strategy compliant with the EMA's mandate that Rainbow provide "Risk Management Services," a strategy that DCT repeatedly endorsed, and a strategy that proved highly profitable to DCT, including $16 million in net profits from the single week of Winter Storm Uri. *See, e.g.*, ROA185-86 (EMA §§ 1.2, 2.1); ROA1073 at 4-7; ROA1079 at 1-4. The financial trades may well have been the profitable trades and the physical trades the unprofitable trades, but for ERCOT taking the unprecedented step of forcing the price of electricity to $9,000/MWh. DCT's claim that Rainbow "actively concealed" the financial transactions from DCT – an assertion notable for the absence of any citation – is false and a purposeful slander. Rainbow reported the trades almost immediately to DCT electronically. ROA759; *Rainbow Energy Mktg. Corp. v. DC Transco, LLC*, No. 1:21-cv-00313-RP (W.D. Tex.) ("*Rainbow I*"), Dkt. 238, Day 1 Trial Tr. at 57-60.[4]

[4] DCT has raised a number of factual disputes that were not litigated below in this matter and are thus not part of the record on appeal but were addressed during the damages mitigation trial that took place in the first litigation between the parties. Rainbow asks that the Court take judicial notice of these relevant portions of the trial transcript. *See Lake Eugenie Land & Dev., Inc. v. Halliburton Energy Servs. (In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019) ("We may take judicial notice of prior court proceedings as matters of public record.").

Rainbow's email report was delayed by half a day because Rainbow's trader was out of the office with his vacationing family and his assistant inadvertently forgot to send the report. *Id.*, Day 1 Trial Tr. at 80-82, 151-153, 232-234.

DCT's mischaracterization of the EMA and distortion of the factual record leads it to posit binary outcomes: either the transactions at issue are "governed by" the EMA and required DCT's prior approval, or they are outside the EMA, relieving DCT of any responsibility for them. This is a false dichotomy. The trades were within the scope of the EMA pursuant to the EMA's directive to perform Risk Management Services and pursuant to DCT's endorsement of the balanced physical-financial trading strategy. With respect to approvals, the plain language of the EMA sets forth far different requirements than DCT posits:

- For any third-party trade in which the credit risk is to be passed to DCT by means of a Back-to-Back Transaction between Rainbow and DCT, the EMA required Rainbow to obtain such approvals from DCT as are set forth in a Risk Management Strategy. DCT made clear that it would not accept any credit risk, so there were *no* Back-to-Back Transactions. Further, DCT never established a Risk Management Strategy.

- For any third-party trade in which the credit risk would *not* pass to DCT, Rainbow did *not* have to seek DCT's prior approval, but had to follow guidelines set forth in a Risk Management Strategy. This makes sense because trades are made based on minute-by-minute changes in prices offered on an electronic trading platform; there would be no practical way to obtain prior approval.[5] In none of

[5] The rapid changes in prices on the trading exchange during Winter Storm Uri demonstrated the split-second decision-making required for successful energy trading. Rainbow asks that the Court take judicial notice of Plaintiff's Trial

> Rainbow's third-party trades did credit risk pass to DCT, so no advance approval was required.

Had the trades at issue involved Back-to-Back Transactions, and had DCT established a Risk Management Strategy setting forth the types of approvals required, and had Rainbow failed to obtain the specified approvals, DCT might have a case. But the trades at issue were not Back-to-Back Transactions – there was no credit risk passed to DCT on *any* of Rainbow's third-party transactions during the EMA's seven-year term – and therefore did not require any prior approval. DCT's gambit to pocket all profits from Rainbow's balanced physical-financial trading strategy while shirking the setoffs inherent in such a trading strategy has no basis in the EMA and is the product of pure greed.

DCT's attempt in its cross appeal to read an entitlement to attorneys' fees into the EMA's indemnification provision is similarly groundless. New York law is clear that an indemnification provision cannot be construed to apply to first-party claims unless such an intent is "unmistakably clear" – either because the provision expressly provides for indemnification of first-party claims or because the provision could only apply to first-party claims. The EMA provision does not make applicability to first-party claims "unmistakably clear." Indeed, the opposite

---

Exhibit 170 in *Rainbow I*, a record of all financial trades made on the Intercontinental Exchange on February 12, 14, and 15, showing prices moving as much as $250/MWh in less than a minute.

is true: the provision provides only for third-party claims. The District Court was right to reject DCT's attorneys' fees claim.

## ARGUMENT

### I. DCT MISREADS THE PLAIN LANGUAGE OF THE EMA.

#### A. Rainbow's Third-Party Transactions Are Not "Other Transactions."

DCT's entire argument rests on a transmogrification of the term "Other Transaction." The EMA defines "Commodity Transaction" and "Other Transaction" as the two types of transactions *between Rainbow and DCT*. ROA179; ROA183. DCT begins by quoting the EMA's definition of the term correctly: an "Other Transaction" is a transaction *between Rainbow and DCT* pursuant to the EMA that is not a "Commodity Transaction." ROA183. But DCT then ignores the express limitation "*between Rainbow and DCT*" and concludes that because the transactions at issue were not "Commodity Transactions," they "must be Other Transactions – they can't be anything else." Oppn. at 34. This is fundamentally wrong. The transactions at issue were between Rainbow and third-parties; none of the transactions was between Rainbow and DCT. By definition, therefore, the transactions were *neither* "Commodity Transactions" nor "Other

Transactions."[6]

DCT's argument thus falls apart. Rainbow's third-party trades were not "Other Transactions" and therefore were not, by the EMA's express terms, subject to Section 3.1(d). DCT's breach of contract claim based on Section 3.1(d) consequently fails. Further, because the EMA expressly authorizes Rainbow to enter into such third-party transactions, the transactions at issue do not fall outside the EMA. *See, e.g.*, ROA237 (Section V, authorizing third-party hedging transactions); ROA188 (Section 3.1(b), authorizing Rainbow "to enter into one or more transactions with a Third Party"). Sections 2.3 and 4.4 are therefore inapposite. Because Rainbow's third-party trading activity – the very *raison d'être* of the EMA – was explicitly authorized by the EMA and did not require DCT's prior approval of trades lasting less than a full season, Rainbow did not breach the EMA by entering into either physical or financial trades during Winter Storm Uri.

---

[6] DCT repeatedly refers to "Other Transactions" as defined in the EMA as a "catch-all." This is only true with respect to transactions *between Rainbow and DCT*; if a transaction between the two parties is not a "Commodity Transaction," it is an "Other Transaction." But the EMA is clear that Rainbow may engage in transactions that are neither "Commodity Transactions" or "Other Transactions." Section 3.1(b), for example, makes clear that Rainbow may engage in transactions with third parties – whether a "Back-to-Back Contract" or any other type of agreement – that are neither "Commodity Transactions" or "Other Transactions." Similarly, section V of Appendix I, which defines "Risk Management Services," expressly contemplates financial transactions on "exchange-traded markets" – transactions with anonymous third parties.

### B. DCT's Claim is Not a "Commercially Reasonable Reading" of the EMA – And Is Inconsistent with the Plain Language of the EMA.

DCT attempts to gloss over the disconnect between the actual language of the EMA and its "interpretation" of the EMA by claiming that its "interpretation" is the "only commercially reasonable reading" of the EMA. The reverse is true.

As noted above, DCT premises its "interpretation" on the notion that "the Agreement created a framework in which Rainbow would execute two types of trades on DC Transco's behalf – Commodity Transactions and Other Transactions." Oppn. at 37. There is a reason why DCT does not include a citation supporting this proposition: it is incorrect. Nothing in the EMA supports its contention. To the contrary, the EMA expressly authorizes Rainbow to make trades other than Commodity Transactions and Other Transactions.

First, the EMA specifically defines "Commodity Transactions" and "Other Transactions" as transactions *between DCT and Rainbow*. ROA179; ROA183. But the EMA also specifically addresses trades between Rainbow and third parties – which, as DCT acknowledges, was the whole reason for the EMA. Oppn. at 37; ROA237 (Section V, authorizing third-party hedging transactions); ROA188 (Section 3.1(b), authorizing Rainbow "to enter into one or more transactions with a

Third Party").[7]

Second, if the parties had intended the EMA to require DCT's prior approval for *all* trades, the EMA would have said so. It does not. Instead, Section 3.1(d) specifically refers only to "Commodity Transactions" and "Other Transactions."

Third, if Section 3.1(d) were read to require DCT's *ad hoc* approval of every third-party trade entered into by Rainbow, as DCT contends, Section 3.1(b) would be superfluous: there would be no need to establish "appropriate, mutually agreed, risk parameters and methodologies." Interpretations that render other contractual terms superfluous are impermissible under New York law. *See, e.g., Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

Fourth, interpreting the EMA to require DCT's *ad hoc* approval of every third-party trade is inconsistent with Section 2.3(a)'s directive that DCT "shall look to [Rainbow] for results only" and shall have "no right at any time to direct or supervise . . . the manner, means, and method" utilized by Rainbow in performance of Services under the EMA.

---

[7] DCT attempts to support its characterization of the EMA by citing an email from a former Rainbow employee. But, as DCT itself argues vociferously, in matters of contract construction, "[p]arol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013). DCT cannot have it both ways.

Not only is DCT's "interpretation" inconsistent with the actual language of the EMA, but it is far from "the only commercially reasonable reading" of the EMA. To read Sections 3.1(d) and 4.4(b) as a "coherent risk-allocation framework" is to ignore Section 3.1(b)'s requirement for the establishment of a Risk Management Strategy. More practically, it would be impossible to engage in the type of trading for which DCT engaged Rainbow – trading that requires instantaneous decision-making to respond to short-term changes in prices[8] – if Rainbow had to seek out a DCT representative prior to making each trade. DCT has no explanation for how its "interpretation" could work in practice.

Further, it is impossible to reconcile DCT's "interpretation" with the parties' actual practice. As explained in Rainbow's opening brief, Rainbow entered into thousands of trades with third parties over the seven-year term of the EMA without DCT once suggesting that prior approval was required. DCT routinely endorsed Rainbow's strategy and accepted the trades without protest or reservation. It was only after ERCOT artificially forced prices to $9000/KWh, resulting in outsized profits and losses, that DCT had its interpretive epiphany.

---

[8] An example is the "layering" strategy endorsed by DCT's Marc Klein, in which Rainbow entered into contracts in 5 MW increments in response to changes in prices, rather than entering into a single contract. ROA1079 at 2-3; ROA1080 at 2.

### C. The "Back-to-Back Contract" Canard Does Not Save DCT's Argument.

The District Court recognized that the transactions at issue were not "Other Transactions," but nonetheless sought to bring them within the ambit of "Other Transactions" by *assuming*, despite the absence of any supporting evidence, that Rainbow's third-party trades were paired with corresponding Back-to-Back Contracts between Rainbow and DCT. Tellingly, in its Opposition, DCT distances itself from this rationale and instead insists that Rainbow's third-party financial trades were themselves "Other Transactions." Oppn. at 45.[9]

As explained above, the transactions at issue cannot, under the EMA's express terms, be "Other Transactions" as they were between Rainbow and third parties, not Rainbow and DCT. Nor were the transactions at issue "Back-to-Back Contracts" tied to "Other Transactions" as the District Court concluded.

DCT argues out of both sides of its mouth with respect to "Back-to-Back Contracts." DCT begins by asserting that the EMA provided for "only one type of transaction between Rainbow and third parties: Back-to-Back Contracts." Oppn. at 44. This, of course, is not true: Section 3.1(b) specifically refers to transactions

---

[9] In yet another sleight of hand, DCT asserts that the District Court concluded that the transactions at issue were "Other Transactions." This is not so. The District Court concluded, despite the unrebutted evidence to the contrary, that the transactions at issue were "Back-to-Back Contracts" and, as such, were linked to imputed "Other Transactions" between Rainbow and DCT. ROA936-37.

between Rainbow and third parties "under a Back-to-Back Contract *or other agreement*." ROA188 (emphasis added). The argument is also inconsistent with DCT's argument that the EMA only authorized Rainbow to "execute two types of trades on DC Transco's behalf – Commodity Transactions and Other Transactions," Oppn. at 37, as well as its argument that the transactions at issue were "*not* Back-to-Back Contracts." Oppn. at 45 (emphasis added). Apparently confused by its own inconsistent interpretations of the EMA, DCT claims that "whether Rainbow's third-party trades were Back-to-Back Contracts" or something else "is a distinction without a difference."

Under the plain language of the EMA, however, it is most definitely a distinction with a difference. Section 3.1(d) expressly does not apply to transactions between Rainbow and third parties; it applies only to transactions between Rainbow *and DCT*. The District Court sought to bootstrap Section 3.1(d) to the third-party transactions at issue by simply *assuming* that there were corresponding Back-to-Back Contracts. Rainbow's opening brief explained in detail why there is no basis for such an assumption and why the record contradicts such an assumption.

DCT's tepid attempt at defending the District Court's rationale is unavailing. First, DCT merely wishes away the EMA's reference to "other agreements" in Section 3.1(b), by asserting that the EMA's "transaction procedures did not

contemplate or provide for 'other agreements.'" Oppn. at 46. But the EMA clearly did contemplate and provide for "other agreements" by referencing them in Section 3.1(b). Moreover, the EMA clearly provided a mechanism for cabining Rainbow's discretion in entering into such agreements in Section 3.1(b). This provision is at least as extensive as any references to Back-to-Back Contracts in the EMA. DCT's assertion that Rainbow paid itself a fee based on "revenue from Commodity and Other Transactions" is wholly unsupported; as explained in Rainbow's opening brief, Rainbow based its fee calculation on net earnings from third-party transactions, not any transactions with DCT. Indeed, DCT has no answer to the fact that had there been any Back-to-Back Contracts, all revenues and losses would have flowed to DCT, such that DCT would have paid the fee to Rainbow rather than Rainbow remitting payments to DCT.

DCT's attempt to respond to its own executives' admission that DCT studiously avoided taking on credit risk and therefore refused to enter Back-to-Back Contracts is particularly infirm. DCT first tries to erase the factual record by arguing that parol evidence is not admissible to *contradict* an agreement. But Rainbow does not offer DCT's admissions to contradict any aspect of the EMA. Rather, because the EMA makes plain that transactions between Rainbow and third parties *may be* but *do not have to be* Back-to-Back Contracts, Rainbow offers the admissions as proof that the third-party transactions were not back-to-backed with

any agreements between Rainbow and DCT. The rule against parol evidence is therefore inapplicable.

DCT then attempts to explain away the admissions by arguing that Messrs. Kline and Nandi meant something other than what they said. DCT offers no support for these explanations and there is none in the record. Moreover, by suggesting that a fact issue exists as to whether any Back-to-Back Contracts existed between Rainbow and DCT, DCT implicitly acknowledges that the District Court's grant of summary judgment was in error.[10]

DCT fares no better in its attempt to explain away the absence of any documentation of "Other Transactions" – clear evidence that no such transactions between Rainbow and DCT occurred. DCT blames the absence of documentation on Rainbow, but Section 7.5 requires that *both* parties confirm in writing any "Other Transactions" in accordance with the 1992 ISDA Master Agreement. ROA195; ROA182; [ISDA]. There is no documentation because *there never were any Other Transactions or Back-to-Back Contracts*, a critical fact ignored by the District Court.

---

[10] DCT misconstrues the point regarding the provenance of the EMA. Back-to-Back Contracts made perfect sense in the power generation agreement that served as the template for the EMA. But the vestige had no utility in the EMA itself. None of this means that the EMA should not be applied according to its terms, only that some provisions were inapplicable to the relationship between Rainbow and DCT.

## II. DCT'S ARGUMENTS REGARDING SECTION 3.1(b) FAIL.

### A. DCT Failed to Establish a Risk Management Strategy.

The EMA placed a clear obligation on DCT to establish a Risk Management Strategy setting forth "the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds specified thresholds." ROA188. Implicitly conceding the importance of the obligation to establish a Risk Management Strategy, DCT now claims that it fulfilled that obligation on an *ad hoc* basis through "discussions." Oppn. at 50. DCT fails to identify any such discussions and, at the mitigation trial in the initial matter between the parties, DCT's liaison with Rainbow admitted that DCT did not regularly review the daily reports provided by Rainbow. *Rainbow I*, Dkt. 239, Day 2 Trial Tr. at 40. From January 2019 onward, there were almost no discussions between DCT and Rainbow. ROA764-66. The plain language of Section 3.1(b), moreover, makes it clear that a Risk Management Strategy involves "establishing risk management strategies" and "establishing appropriate, mutually agreed, risk parameters and methodologies" – not discussions of individual trades.[11]

[11] DCT's claim that it "took advantage of its right to approve transactions" is specious. From the outset, the parties agreed that Rainbow would seek approval for transactions covering an entire season or longer. (ROA1049 at 6.) The document DCT cites in footnote 8 of its Opposition expressly references a potential *summer-long* transaction. ROA791.

Additionally, DCT attempts to support its argument with extrinsic evidence – an email from DCT's Marc Klein and the (wholly unsupported and inaccurate) assertion that "the parties corresponded regularly to discuss Rainbow's trading plans." Oppn. at 50. The purported "evidence" does nothing to help DCT's argument, but DCT's own resort to extrinsic evidence does undermine DCT's claim that the Court should disregard its own executives' admissions that DCT never entered into Back-to-Back contracts. At a minimum, DCT's attempt to avoid the consequence of its failure to comply with Section 3.1(b) raises a dispute regarding issues of material fact – a dispute that itself establishes the impropriety of the District Court's grant of summary judgment.

Notably, the District Court did not even analyze this issue, choosing to rely on its voided order from the prior litigation, rather than analyzing the actual briefs submitted in the present case. While DCT makes a brief attempt to defend this haphazard approach, it is plain that the court's order is deficient. While it is true that a district court need not "expressly list or refer to each factual and legal argument raised" by the parties in their opinions and orders, *Wildbur v. Arco Chem. Co.,* 974 F.2d 631, 644 (5th Cir. 1992), DCT does not and cannot dispute the principle discussed in Rainbow's opening brief that when this Court has "no notion of the basis for a district court's decision, because its reasoning is vague or was simply left unsaid, there is little opportunity for effective review." *Myers v.*

*Gulf Oil Corp*., 731 F.2d 281, 284 (5th Cir. 1984). By simply relying on a void order from a prior case and leaving substantial arguments entirely unaddressed, the District Court committed this very error.

**B. DCT Failed to Satisfy a Condition Precedent to Section 3.1(d).**

The plain language of the EMA undermines the District Court's conclusion – and DCT's argument – that the transactions at issue in any way implicated Section 3.1(d): because the transactions were between Rainbow and third parties, rather than between Rainbow and DCT, the trades were not "Other Transactions" subject to Section 3.1(d).

Even if this Court were to lend credence to the District Court's bootstrapping of Rainbow's third-party transactions by means of imaginary Back-to-Back Contracts, however, DCT's failure to establish a Risk Management Strategy as required by Section 3.1(b) bars DCT's claim under Section 3.1(d). First, because DCT's establishment of a Risk Management Strategy was a condition precedent to any duty on the part of Rainbow to obtain DCT's approval pursuant to Section 3.1(d), and because DCT failed to establish that condition precedent, Rainbow cannot have breached Section 3.1(d). *See, e.g., Oppenheimer & Co. v. Oppenheim*, 660 N.E.2d 415, 418 (N.Y. 1995). Additionally, DCT's failure to establish a Risk Management Strategy rendered Section 3.1(d) too indefinite to give rise to a breach of contract claim.

DCT attempts to avoid these results by asserting (1) that Sections 3.1(b) and 3.1(d) are entirely unrelated and (2) that an email that is not only outside the contract but also says nothing about "Other Transactions" somehow renders Section 3.1(d) sufficiently definite. Both arguments expose how unconnected DCT's claim is from the plain language of the EMA.

With respect to the failure of a condition precedent, DCT first asserts that Sections 3.1(b) and 3.1(b) are "entirely independent" because they "don't even reference each other." Oppn. at 52. The plain language of the EMA belies this assertion. Section 3.1(b) explicitly requires that the Risk Management Strategy "set forth the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds specified thresholds, or the effect of which would have certain consequences under the Risk Management Strategy." ROA188. There can be no clearer connection to approval rights under Section 3.1(d): the Risk Management Strategy had to specify what approvals were necessary and needed to be obtained pursuant to Section 3.1(d). If it were otherwise, Rainbow would have no direction as to when to seek approval for Commodity Transactions or Other Transactions and DCT's approval authority could be completely arbitrary. Moreover, Section 3.1(b) specifically requires that a Risk Management Strategy set forth the

approvals necessary for Commodity Transactions and Other Transactions – the very transactions that are subject to Section 3.1(d).

DCT next argues that it had the right to approve Other Transactions "in its sole discretion." This may be so, but it does not answer the question of which Other Transactions required approvals; how those approvals were to be obtained; and whether blanket, prior approvals such as DCT's endorsement of Rainbow's balanced physical-financial trading strategy were sufficient. DCT's argument also does not answer the question of how Rainbow was to seek approvals for transactions that needed to be decided upon in fractions of a minute. Those questions were to be answered in a Risk Management Strategy. DCT's failure to establish a Risk Management Strategy identifying when and how approvals were to be obtained renders Section 3.1(d) too indefinite to support a breach of contract claim. The District Court's failure to even consider this issue, moreover, is itself a reversible error.

## III. THE DISTRICT COURT ERRED IN IGNORING THE PARTIES' COURSE OF PERFORMANCE.

It is telling that DCT does not dispute that, throughout the seven-year term of the EMA, DCT repeatedly and consistently endorsed Rainbow's combined physical-financial trading strategy and not once – until Winter Storm Uri – suggested that Rainbow needed advance approval for third-party financial trades of

less than a season in duration. These undisputed facts completely undermine the District Court's order and DCT's arguments and demonstrate why summary judgment should have been entered in favor of Rainbow.

### A. The Facts Establish that DCT Approved Rainbow's Trading.

To the extent that the EMA can be read to have required Rainbow to obtain DCT's approval for third-party trades, the facts establish that DCT *did* provide such approval on a blanket basis. DCT's executives declared themselves as "fans" of Rainbow's unified physical-financial trading strategy and made it clear that they "did not want to get in the way" of Rainbow's execution of that strategy. ROA1079 at 2-3; ROA1080 at 2; ROA1073 at 5-6; ROA1074 at 6. Particularly in the absence of a Risk Management Strategy describing a specific "approval" process, DCT's repeated endorsement of Rainbow's strategy demonstrates that DCT fully approved of the strategy – and only interpreted the EMA differently when the outsized profits and losses resulting from ERCOT forcing prices to $9000/MWh presented the opportunity for a cash grab.

The District Court wholly ignored this evidence and did not even address the argument that the contract was modified by the course of performance. DCT now tries to excuse the error by focusing only on the absence of advance approval of the *specific* transactions at issue. But nothing in Section 3.1(d) says that a blanket approval is any less effective than transaction-by-transaction approval – the latter

of which would be impractical, given the nearly instantaneous decisions that must be made trading physical and financial energy products. This was clear error. DCT indisputably *did* approve of Rainbow's physical-financial trading strategy and made clear that Rainbow had discretion to trade in accordance with that strategy. Therefore, Rainbow did not breach Section 3.1(d) in any event.

### B. The Parties' Course of Performance Modified the EMA.

As explained above, DCT approved Rainbow's trading on a blanket basis under the terms of the EMA as written. Alternatively, the parties modified the EMA to provide for such blanket approval through their course of performance.

DCT does not address at all the caselaw cited by Rainbow in its opening brief holding that, even where a contract contains a nonwaiver clause and a provision limiting modifications to those set forth in writing, New York law recognizes modification of contract terms through course of performance. *See, e.g., Aiello v. Burns Int'l Sec. Servs. Corp.*, 973 N.Y.S.2d 88, 96 (N.Y. App. – 1st Dept. 2013); *CT Chems., Inc. v. Cinmar Impex, Inc.*, 613 N.E.2d 159, 162 (N.Y. 1993). Instead, DCT seeks to bar consideration of the parties' course of performance by referencing the parol evidence rule. But the parol evidence rule is inapposite to modification through course of performance. *See, e.g., Expocorp v. Hyatt Mgmt. Corp. of N.Y.*, 520 N.Y.S.2d 579 (N.Y. App. – 2d Dept. 1987) (the parol evidence rule "does not bar the introduction of extrinsic evidence to show a subsequent

waiver or modification of a written contract.”). The inapplicability of the parol evidence rule to evidence of modification or waiver through course of performance cannot seriously be disputed; otherwise, estoppel and waiver could never be proven.

The undisputed evidence is that DCT’s seven years of affirmatively endorsing Rainbow’s combined physical-financial trading strategy, expressed desire not to “get in the way” of Rainbow’s physical and financial trading, ROA1049 at 5-6 and ROA1050 at 6, and total absence of any suggestion that individual third-party trades required DCT’s prior approval (however that would have been accomplished) either (a) demonstrates that no prior approval was required by Section 3.1(d), (b) constituted any prior approval required by Section 3.1(d), or (c) modified the EMA to give Rainbow the authority to engage in physical and financial trading on DCT’s behalf without prior authorization of individual trades unless the trades involved a season-long or longer duration. Under any alternative, DCT’s claim fails.

### C. DCT’s Actions Over Seven Years Estop It From Seeking to Disclaim the Transactions at Issue.

For seven years, DCT lauded Rainbow’s physical-financial trading strategy. Despite being fully aware of Rainbow entering into financial trades on its behalf hundreds of times, DCT never once (until Winter Storm Uri) informed Rainbow

that DCT interpreted the EMA to require Rainbow to seek prior approval of individual third-party trades and never suggested in any way that such a requirement existed. For seven years, DCT actively encouraged Rainbow to engage in financial transactions with third parties on DCT's behalf. For seven years, DCT approved of Rainbow's calculation of fees earned and payments owned based on net profits and losses from Rainbow's combined physical-financial trading strategy. DCT is therefore estopped from claiming, *post hoc*, that Rainbow's financial trades on DCT's behalf during Winter Storm Uri were somehow unauthorized and the financial losses somehow not DCT's responsibility.

DCT does not dispute that a party is estopped from enforcing rights that "would work fraud or injustice upon the person against who enforcement is sought and who, in justifiable reliance upon the opposing party's words and conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 659 (N.Y. 2006). Rather, DCT claims that there can be no estoppel because DCT did not make a "false representation." Oppn. at 58. DCT's own case authority, however, makes clear that estoppel may arise either from a false representation "or concealment of material facts." Oppn. at 57 (citing *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (N.Y. App. – 4th Dept. 1980)). If DCT truly understood that the EMA required

individual third-party trades to be approved by DCT in advance, it plainly concealed that understanding from Rainbow for seven years and its conduct misled Rainbow for seven years. DCT is estopped from enforcing an interpretation of the EMA that it had concealed for seven years.[12]

### D. DCT Waived Any Right of Prior Approval.

DCT's seven years of affirmatively endorsing Rainbow's third-party trading, both physical and financial, without any prior approval and no suggestion that prior approval was required, is a clear waiver of any alleged prior approval rights under Section 3.1(d). *See, e.g., Fundamental Portfolio Advisors*, 850 N.E.2d2d at 658 ("Contractual rights may be waived if they are knowingly, voluntarily, and intentionally abandoned."). DCT's only response is that the EMA contained a provision requiring waivers to be in writing. New York law is clear, however, that even where a contract contains a nonwaiver clause requiring any waiver to be made in writing, a waiver may nonetheless be made through the parties' course of conduct. *See Aiello*, 973 N.Y.S.2d at 96. DCT's attempt to avoid its waiver of any supposed right of prior approval fails.

---

[12] DCT erroneously asserts that the District Court "rejected Rainbow's estoppel defense." Oppn. at 58. As Rainbow explained in its opening brief, the District Court did not even address the estoppel defense. This is, in itself, reversible error.

## IV. The District Court Measured Damages Incorrectly.

DCT persists in its overly simplistic view of damages, in violation of the principle that damages should be based on "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach" rather than "what the actual economic conditions and performance were in light of hindsight." *Sharma v. Skaarup Ship Management Corp.,* 916 F.2d 820, 826 (2d Cir. 1990) (quoting *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559 (N.Y. App. 4th Dept. 1982)).[13] Despite that fact that DCT has only provided evidence of damages that are impermissibly based on hindsight, it attempts to justify this error by arguing that the singular set of transactions at issue somehow breached agreement at multiple different points in time. This attempt to avoid clear New York case law should be rejected. DCT's claim is premised on the futures trades that occurred on February 10 and 12, 2021, and thus it was required to prove damages as of that date. It is undisputed that DCT did not do so.

Moreover, despite DCT's argument to the contrary, Rainbow has not changed its position regarding the proper measure of damages. Rainbow consistently argued below that it was "entitled to summary judgment because DCT

---

[13] DCT argues in a footnote that this case is inapplicable because the agreement at issue in the present case is not a securities purchase agreement. Oppn. at 62, n.10. However, *Sharma* in no way limits its analysis to securities agreements specifically, and its holding is clearly applicable to futures trades like the ones at issue here.

cannot establish damages under the proper measure." ROA1041. It did not abandon that position. Rather, the language DCT quotes from Rainbow's prior briefing related to the question of calculating interest on the court's judgment after it had been entered, not the methodology for calculating damages in the first place. ROA960. When contesting the amount of the damages award, Rainbow argued that "if DC Transco had been entitled to payment of the $19,735,233.50," interest couldn't run until payment of that amount was due. Here, by contrast, Rainbow's argument is far more fundamental, as it argues that DCT is not entitled to $19,735,233.50 *at all* because that was not based on the correct measure of damages.

## V. The District Court Erroneously Granted DCT Summary Judgment on Rainbow's Unjust Enrichment Counterclaim.

Like the District Court, DCT misses the point of the unjust enrichment counterclaim. The physical and financial trades undertaken by Rainbow on DCT's behalf were essential components of a unitary trading strategy: the physical and financial trades protected against risk regardless of which direction prices moved. Because of the $9000/MWh price imposed by ERCOT during Winter Storm Uri, Rainbow's physical trades made enormous profits while the financial trades incurred substantial losses. Without ERCOT's intervention, it may well have been the financial trades that made money and the physical trades that incurred losses.

The trades are inseparable, yet DCT attempts to cherry pick the profitable trades and reject the unprofitable trades.

The crux of DCT's breach of contract claim is that Rainbow's trades during Winter Storm Uri were outside the EMA because they did not receive DCT's prior approval. If the trades were outside the contract, the bar on unjust enrichment actions arising from a valid and enforceable contract has no effect. *See, e.g., Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 81 (N.Y. App. – 1st Dept. 2005) (even where the parties are subject to a contract, an unjust enrichment claim may be properly stated with respect to "conduct not covered by the contract"). DCT cannot have it both ways.

DCT then tries to claim that the physical transactions were subject to the EMA by means of a delegation of authority for short-term Commodity Transactions, while the financial transactions were extracontractual. There are two problems with this argument. First, none of the physical transactions at issue was a "Commodity Transaction" because they were all transactions solely between Rainbow and third parties. The authority delegation is therefore inapplicable. Second, the physical and financial transactions were all part of a unitary trading strategy: one set of trades cannot be separated from the other, as the financial trades hedged risk from the physical transactions and the physical transactions hedged risk from the financial transactions. The result is therefore all or nothing.

Either the physical and financial trades were made for DCT's benefit, in which case DCT is entitled to the $37 million in profits but is also responsible for the $21 million in losses, or the physical and financial trades were trades on Rainbow's own account, in which case Rainbow is responsible for the $21 million in losses but is also entitled to all of the $37 million in profits.

## VI. The District Court Properly Dismissed DCT's Attorneys' Fees Claim.

DCT's assertion that it is entitled to attorneys' fees under the contract's indemnification provision should be rejected out of hand. New York follows the American Rule with regard to attorneys' fees and cost allocation. Under New York law, recovery of attorneys' fees and other litigation costs beyond those allowed by statute can occur only when an express and explicit contractual provision allows such recovery. *See, e.g., 214 Wall St. Assoc., LLC v. Medical Arts – Huntington Realty*, 953 N.Y.S.2d 124, 125 (App. Div. – 2d Dept. 2012); *A. G. Ship Maint. Corp. v. Lezak*, 503 N.E.2d 681, 683 (N.Y. 1986). New York law is clear that an indemnification provision applies only to third-party claims unless the provision makes it "unmistakably clear" that it also applies to claims between the contracting parties. *Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989).

Here, no such "unmistakably clear" statement exists. DCT's attempt to divine first-party indemnification intent in Section 4.4(b) of the EMA is unavailing. Section 4.4(b) applies only to third-party claims. The text of the contract makes this plain: Section 4.4(a) prohibits various third-party transactions, all of which could give rise to third-party claims, including the following:

- "pledg[ing] the credit of [DC Transco] in any way in respect of any agreements entered into between Energy Manager and any Third Party" (4.4(a)(i))
- "sell[ing] or otherwise transfer[ing] any assets of [DC Transco], or caus[ing] any liens or encumbrances on the Facility or any other assets of [DC Transco]" (4.4(a)(iii));
- "mak[ing] any representation or warranty to a Third Party relating to the Project" (4.4(a)(iv));
- "engag[ing] in any transaction on behalf of [DC Transco] not permitted under this Agreement." (4.4(a)(vi))

Section 4.4(b), in turn, provides that "[DC Transco] shall not have any liability with respect to any transactions executed by [Rainbow] in breach of subparagraph (a) above, and [Rainbow] shall indemnify and hold harmless Project Indemnified Parties from any Claims or Losses arising in connection with such transactions." Not only is this *not* an "unmistakably clear" first-party indemnification provision – the opposite is true. What is actually "clear" is that this provision only applies to third parties.

The case law confirms the District Court's decision. To start, this contract is nothing like the contract in *Shah v. 20 E. 64th St., LLC*, 154 N.Y.S.3d 6 (App. Div.

1st Dept. 2021), upon which DCT relies. In that case, the provision in question provided for indemnification for breaches of the indemnifying party's obligations to the indemnified party. The *Shah* court explained that the obligations ran only to the party seeking indemnification, so that a third party could not breach the obligations. *Id*. at 21. Because the indemnification provision "*exclusively* refers to intraparty claims, the parties' intent to provide intraparty indemnification" was "unmistakably clear." *Id*. (emphasis added). No such clear and express language exists here. Indeed, each of the provisions of Section 4.4(a) could give rise to third-party claims.

Here, the District Court correctly applied *Hooper*. In that case, the provision in question was broadly worded, and obligated the defendant to:

> indemnify and hold harmless [plaintiff] from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees' arising out of breach of warranty claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system, infringement of patents, copyrights or trademarks and the like.

*Hooper*, 548 N.E.2d at 905. Despite this broad language, the court still found that the clause did "not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant." The District Court below correctly found that the same is true here: there is no clear language that indicates that the contract contemplates first-party indemnification.

DCT's attempt to argue it is entitled to fees by contrasting Section 4.4(b) with Article XI is similarly unavailing. Article XI of the EMA provides for indemnification against third-party claims arising from four specific actions: (a) a breach of a representation or warranty in the EMA; (b) a failure to perform obligations under the EMA; (c) negligent or tortuous acts or omissions; or (d) fraud, willful misconduct, or breach of applicable law. EMA §§ 11.1, 11.2. Article XI, moreover, is specifically limited to indemnification of third-party actions for personal injury, death, or property damage. *Id.* By its terms, Article XI does not apply to claims involving solely economic damages. Section 4.4(b), on the other hand, provides for indemnification against third-party claims arising from certain *ultra vires* acts undertaken by Rainbow "on behalf of the Project [DC Transco]," all of which are identified in Section 4.4(a). And unlike Article XI, Section 4.4(b) also provides for indemnification against third-party claims for economic damages. In short, Article XI and Section 4.4(b) are two different indemnification provisions that apply for different claims and different types of damages – but both apply only to third-party claims.

This analysis is not changed by *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005). In that case, there were two separate indemnification provisions, each of which applied to a different party: one contained language through which the defendant was indemnified by the

plaintiff, and the other contained language through which the plaintiff was indemnified by the defendant. While the provisions generally contained similar language, one expressly applied only to third parties, while the other applied to "any actions of any kind or nature." *Id.* at 178. The court found that the *contrast* between the two (otherwise similar) provisions indicated that the second provision included a broader group of claims, and therefore held that it applied to claims for first-party indemnification. *Id.* The case at hand could not be more different. Not only has DCT failed to identify comparably broad language, it also has not identified similarly contrasting provisions. Instead, the two provisions in question apply to different types of claims and damages sought by third parties. There is no reason this Court should depart from the plain language of these two entirely compatible and consistent provisions. Ultimately, DCT's resort to comparing and contrasting other sections of the contract to arrive at its preferred reading makes plain that Section 4.4(b) is not "unmistakably clear." The District Court's order denying attorneys' fees and costs should be upheld.

## CONCLUSION

For the reasons set forth above, the Court should reverse and vacate the District Court's grant of summary judgment and entry of judgment in favor of DCT and should render judgment in favor of Rainbow. The Court should also affirm the District Court's ruling on attorneys' fees and costs.

Respectfully submitted,

Date: June 10, 2026

/s/ Creighton R. Magid
Creighton R. Magid
DORSEY & WHITNEY LLP
1401 New York Avenue, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Attorneys for Appellant Rainbow Energy Marketing Corporation*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 7,783 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 and further this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type and style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

Date: June 10, 2026

/s/ Creighton R. Magid
Creighton R. Magid

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of June, 2026, I electronically filed the foregoing with the Clerk of Court using CM/ECF System, which will send notice of such filing.

/s/ Creighton R. Magid
Creighton R. Magid